## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **BRENDON KEITH RETZ**, | Case No. **04-60302-7** |
| Debtor. | |
| | |
| **DONALD G. ABBEY**, | |
| Plaintiff. | |
| -vs- | Adv No. **05-00018** |
| **BRENDON KEITH RETZ**, | |
| Defendant. | |

## MEMORANDUM   OF   DECISION

At Butte in said District this 21st day of March, 2007.

Plaintiff, Donald G. Abbey ("Abbey"), through his attorneys, Edward A. Murphy and

Michael G. Black, both of Missoula, Montana, initiated this adversary proceeding against

Defendant Brendon Keith Retz ("Retz") on March 8, 2005.  On September 19, 2005, after several

contested motions and amended pleadings, Abbey filed an amended complaint, doc. no. 30.

Retz, through his attorney, Harold V. Dye ("Dye"), of Missoula, Montana, filed an answer, doc.

no. 31, on September 19, 2005.  The Court conducted a pretrial scheduling conference on

1

October 19, 2005, and scheduled a trial in this proceeding for June 26, 2006.  Abbey filed a

motion for leave to file a second amended complaint, doc. no. 36, on December 1, 2005, the

Court granted on December 15, 2005.  Retz filed an answer, doc. no. 38, on December 19, 2005.

Upon motion, the Court vacated the trial setting for June 26, 2006, by Order filed February 17,

2006, without date. The Court conducted an additional pretrial scheduling conference on August

30, 2006, and set this proceeding for trial on April 10, 2007.

Abbey filed a motion for partial summary judgment, doc. nos. 61, 62, 63 and 64, as to

Count Nine of the second amended complaint ("complaint"), doc. no. 36, on February 16, 2007,

on the basis of 11 U.S.C. § 727(a)(4).  The Court, by Orders, amended the pretrial scheduling

order on February 23, 2007, doc. no. 74, and on March 9, 2007, doc. no. 92.

Retz filed an Objection, doc. no. 79, which actually is entitled "Objection to Declaration

in Support of Motion for Summary Judgment and Motion to Strike.  Given the partially

incomplete docket entry, the Court was not aware of Retz's motion to strike.  Retz also filed a

response, doc. nos. 80, 81, 82 [misidentified in docket entry as a Statement of Facts, when

actually the document is entitled Statement of Genuine Issues], 86, 87 and 88, to Abbey's motion

for partial summary judgment on February 28, 2007.  Abbey on March 6, 2007, filed a reply, doc.

no. 84, to Retz's response to Abbey's motion for partial summary judgment.  On March 7, 2007,

Retz docketed an opposition brief, doc. no. 88, by using an incorrect docket text, which actually

involved an objection to new matter in reply brief; a motion to strike and motion for leave to file

affidavit, and set the matter for hearing on March 8, 2007.  Dye's docket entry for doc. no. 88,

"Opposition Brief," was completely inaccurate and misleading and in fact did not bring to the

attention of this Court the complete purpose of doc. no. 88, which was entitled "Objection to

New Matter in Reply Brief; Motion to Strike and Motion for Leave to File Affidavit."

Furthermore, as the docket entry was inaccurate and did not contain any hearing information,

such entry did not appear on any Court calendar.  Counsel has the obligation to use the proper

docket events and codes to insure that negative notice and hearing information are properly

identified on the docket entry.  As the Affidavit, doc. no. 86, and Declaration, doc. no. 87, have

been filed, the Court grants Retz leave to file the same; however, the motion to strike is denied,

as moot, given the decision contained herein.  The Court finds such inaccurate docketing by

Retz's attorney, Dye, unacceptable.  If such inaccurate docketing by Dye in this proceeding or in

any other case or proceeding continues without seeking further training from the Clerk's Office,

this Court shall consider more serious sanctions, after notice and hearing, that could include

being prohibited from using the Court's CM/ECF system [which would also prohibit filing by

mail].

The Court conducted a brief hearing on the motion for partial summary judgment on

March 8, 2007, and took the motion under advisement.  The Court has reviewed the motion and

related pleadings filed by Abbey and the response and related pleadings filed by Dye, on behalf

of Retz; this matter is ready for a decision.  This memorandum contains the Court's findings of

fact and conclusions of law.

## FACTS

Abbey filed the following statement of facts of uncontroverted facts, doc. no. 64:

1.      Brendon K. Retz ("Retz") filed a voluntary Chapter 7 petition in
the United States Bankruptcy Court for the District of Montana on February 12,
2004.  (Case No. 04-60302, Docket No. 1).

2.      At the time of the filing of his voluntary Chapter 7 petition on

3

February 12, 2004, Retz did not file his Schedules and Statement of Financial
Affairs (hereinafter "SFA") with the Court (Case No. 04-60302, Docket No. 1).

3.      Retz's Schedules and SFA were filed with the Court on March 1,
2004.  (Case No. 04-60302, Docket No. 7).

4.      Since the filing of his Schedules and SFA with the Court on March
1, 2004, Retz has failed to file with the Court any amendments to his Schedules or
SFA.

5.      At the time Retz's Schedules and SFA were filed with the Court,
they included his signed Declarations attesting under penalty of perjury that the
information contained in both his Schedules and SFA was true and correct.  A true
and correct copy of these Declarations is attached to the Declaration of Michael G.
Black ("Black Declaration") as Exhibits A and B.

6.      The initial § 341 Meeting of Creditors was held in Case No. 04-
60302 on March 19, 2004, in Kalispell, Montana (Case No. 04-60302, Docket No.
9).

7.      At the time of the § 341 Meeting of Creditors, Retz signed a
separate Declaration under penalty of perjury attesting to the fact that he had read
his petition, schedules of assets and liabilities, and SFA on file in his bankruptcy
case pending before the Court and that all of the answers and information
provided in such documents, and any attachments thereto, were true and correct to
the best of Retz's knowledge, information and belief.  A true and correct copy of
this Declaration is attached to the Black Declaration as Exhibit D.

8.      At the initial § 341 Meeting of Creditors on March 19, 2004, Retz
testified under oath that he "owned a half of a helicopter, a small used helicopter"
and further that the helicopter was titled in the name of Chance Chacon "because
he was a flight instructor and was getting the insurance for it. . ."  *See* Transcript
of  the § 341 Meeting of Creditors, at pages 84-85.  A true and correct copy of the
transcript of this § 341 Meeting of Creditors is attached to the Black Declaration
as Exhibit C.

9.      On July 8, 2004, the continued § 341 Meeting of Creditors was
held in this case.  A true and correct copy of the transcript of this continued § 341
Meeting of Creditors is attached to the Black Declaration as Exhibit E.

10.     Chance Chacon was an employee of Timberland Construction,
LLC (hereinafter "TCLLC"), and he resigned from his position by letter dated
August 13, 2003.  During February and July 2003, TCLLC paid for all of the

4

insurance for the Robinson R22 helicopter titled in the name of Chance Chacon. The two payments to AOPA Insurance Agency for this insurance amounted to $13,247.00. As the person managing day-to-day affairs of TCLLC in this timeframe, Retz was aware of these payments and these payments are clearly referenced in email produced by Retz. TCLLC obtained the insurance for the helicopter, a fact known to Retz, and his testimony at the § 341 Meeting of Creditors about Chance Chacon "getting the insurance" was a false statement under oath. *See* Black Declaration at 3-4, ¶ 10, and Exhibit H thereto.

11.     According to bank records, as of the close of business on February 12, 2004, the Brendon K. Retz and Misty R. Retz Wells Fargo Bank of Montana joint checking account (Account No. 543-7229171) ("Wells Fargo Account") had a balance of $17,372.26. *See* Black Declaration at 4, ¶ 11, and Exhibit I thereto. On Schedule B, Item 2, Retz indicates a checking account balance of $68.42, and does not identify this Wells Fargo Account.

12.     Retz was the sole shareholder of Timberland Construction, Inc. (hereinafter "TCI") as of the date he filed his petition and he controlled the company. On July 27, 2004, Retz prepared or printed out a report from TCI accounting software for Account No. 3400, which is an account that tracks owner distributions and contributions to the company. This report lists 62 transactions, and 58 of these transactions occurred within one year before Retz filed his petition. The four transactions prior to Retz's filing (Record Nos. 399, 412, 413, and 414) indicate debits totaling $151,051.70. The total on the document provides Retz received $332,633.17 in net distributions through the end of 2003, which means he received $181,581.47 in distributions from TCI during the year prior to filing his petition. *See* Black Declaration at 4, ¶ 12, and Exhibit J thereto. These distributions are not identified in response to Questions 1 or 2 in the SFA.

13.     On March 21, 2003, Retz paid his father Robert Retz $38,287.30 by check (drawn on the Wells Fargo Account). *See* Black Declaration at 4, ¶ 13, and Exhibit K thereto. This transaction is not identified in response to Questions 3, 7,or 10 in the SFA.

14.     In March 2002, Retz obtained Personal Articles insurance from State Farm Fire & Casualty Company (Policy No. 26BR43316). The policy has remained in effect from March 13, 2002 to the present. A premium was paid on this policy on March 31, 2004 (drawn on a joint account with Misty R. Retz at First Interstate Bank), shortly after the petition was filed. The next premium payment of $484.00 is due on March 13, 2007. The same ten articles have been insured since December 19, 2002, and have also been appraised. The current insured value of this personal property is $45,853.00, and only one item has an insured value below $1,000.00 (it is insured for $481.00). *See* Black Declaration

5

at 5, ¶ 14, and Exhibit L thereto.  On Schedule B, Item 7, Retz has listed $200.00 in jewelry (in Misty Retz's case, Cause No. 04-60247, Misty Retz listed $1,275.00 for jewelry).  These insured items are not listed on Schedule B.

15.     On December 23, 2003, Retz presented a payment to Glacier Bank drawn on his personal account at Glacier Bank of Whitefish (Account No. 40028999) ("Personal Glacier Bank Account") in the amount of $12,000.00.  *See* Black Declaration at 5, ¶ 15, and Exhibit M thereto.  This payment is not listed in response to Question 3 or 10 of the SFA.

16.     On May 28, 2003, Retz presented a check in the amount of $10,000.00 to the Bellagio in Las Vegas (Check No. 3001 on his Personal Glacier Bank Account).  Casino records indicated Retz lost $13,200.00 at the Bellagio during May 25, 2003 through May 28, 2003.  *See* Black Declaration at 5, ¶ 16, and Exhibit N thereto.  Neither the payment nor the gambling loss is listed in response to Questions 8 or 10 in the SFA.

17.     On June 19, 2003, Retz agreed to pay $1,000.00 per month on a Glacier Bank of Whitefish loan for Chance Chacon (Loan No. 12750803) regarding the Robinson R-22 helicopter.  During the 90 days preceding Retz filing his petition, the sum of $3,500.00 was automatically withdrawn from Retz's Personal Glacier Bank Account and paid toward this loan.  Within a year prior to Retz filing his petition, the sum of $8,000.00 was paid toward the Chance Chacon helicopter loan.  *See* Black Declaration at 5-6, ¶ 17, and Exhibit O thereto.  These transactions were not disclosed in response to Questions 3, 7, or 10 in the SFA.

18.     In the 90 days prior to Retz filing his petition, Retz paid $4,178.88 to GMAC.  *See* Black Declaration at 6, ¶ 18, and Exhibit P thereto.  These payments were not disclosed in response to Question 3 of the SFA.

19.     On October 8, 2003, Retz deposited $60,000.00 in cash into his Personal Glacier Bank Account.  On October 14, 2003, Misty Retz deposited $50,000.00 in cash into Retz's same personal account.  *See* Black Declaration at 6, ¶ 19, and Exhibit Q thereto.  The source of this $110,000.00 of cash income is not specified in response to Questions 1 or 2 of the SFA.

20.     In the 90 days preceding Retz filing his petition, Retz purchased new computer equipment, office equipment (desks, chairs, credenzas, file cabinets), and a copier.  These items were bought in the name of Brendon Retz, Timberland Construction, and/or TCI from November 24, 2003 through January 9, 2004.  On November 24, 2003, Retz purchased $7,431.00 worth of office equipment, which was charged to a Bank of America credit card listed on his Schedules.  On December 12, 2003, Retz purchased $2,002.00 more in office

equipment, which was charged to an American Express credit card listed on his Schedules.  During December 4-16, 2003, Retz purchased $15,590.63 in computer equipment and software (from vendors such as CDW Computer, ZipZoomFly.com, and Crucial Technologies), which was charged to an American Express card listed on his Schedules.  Retz has also produced an invoice for computer equipment in the amount of $34,340.00 (indicating "Paid in Full"), which is dated December 4, 2003, but the source of funds for such payment is not known.  On January 9, 2004, Retz purchased a copier for $10,860.00, which was charged to an American Express credit card listed on his Schedules.  None of this property has ever been turned over to TCI, TCLLC or "Timberland Construction."  *See* Black Declaration at 6-7, ¶ 20, and Exhibit R thereto.  Retz has also produced copies of hundreds of pages of email that predate the filing of his petition, but has listed no computer on his schedules.  The computer equipment, office equipment, and copier have not been listed in Schedule B, nor identified in response to Questions 5, 7, or 10 of the SFA.

Retz filed his statement of genuine issues of fact on February 28, 2007, doc. no. 82, in opposition to Abbey's statement of uncontroverted facts.  The statement of genuine issues of fact are follows:

1. The fact of whether Defendant "knowingly and fraudulently" made a false oath or account remains at issue. No discovery documents are submitted that establish this essential scienter requirement. Abbey, by his own admission, is relying on adverse inferences from other materials. However, this is impermissible as all reasonable inferences from the record must be drawn in favor of the party opposing. summary judgment.

2. Genuine issues of fact remain as to the matters contained in paragraphs 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20 of Abbey's "Statement of Uncontroverted Facts." The sole basis for these purported uncontroverted facts is the Declaration of Michael G. Black. Black's declaration is, however, inadmissable because it does not provide that the matters contained therein are true to his own knowledge as is required by F.R.Evid.602 and F.R.Civ.P. 59(e). Not only does the Black declaration not state that the matters contained therein are true to his personal knowledge but it is completely clear that he cannot truthfully so state since the substance of the declaration concern what purport to be the business records of Trustee Samson (¶ 6); Timberland Construction, LLC (¶P 8, 10, Wells Fargo Bank (¶ 11, 13), Timberland Construction, Inc. (TCI) (¶ 12), State Farm Fire & Casualty (¶ 14), Glacier Bank of Whitefish (¶ 15, 16, 17, 18 and 19)), the Bellagio (¶ 16). Mr. Black's testimony could not provide the foundation to have these documents admitted at trial and his declaration is not sufficient for the Court to

consider them in this motion.

3. In addition the general incompetency of the Black declaration, the matters
stated in paragraphs 6 through 20 of the declaration are further objectionable as
hearsay and lacking proper foundation to be admitted as business records. There
can be no doubt that the various records attached to the Black declaration are
hearsay since they are statements not made by the declarant offered to prove the
truth of the matter asserted. Records of regularly conducted activities are
admissible an exception to the hearsay rule under F.R.Evid. 803(6) but this
requires the foundation testimony of the custodian or a certification in
conformance with F.R.Evid. 902(11) and 902(12). None of this foundation is
supplied by the Black declaration.

## JURISDICTION

Plaintiffs allege and Defendants do not dispute that this Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 and 1334.

## APPLICABLE LAW

### I. SUMMARY JUDGMENT

Summary judgment is governed by FED. R. BANKR. P. 7056. Rule 7056, incorporating FED. R. CIV. P. 56(c), states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)). The manner in which this burden is proven depends on which party has the burden on a particular claim or defense at the time of trial.

If the *moving* party will bear the burden of persuasion at trial, that party must

support its motion with credible evidence–using any of the materials specified in
Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial.
Such an affirmative showing shifts the burden of production to the party opposing
the motion and requires that party either to produce evidentiary materials that
demonstrate the existence of a "genuine issue" for trial or to submit an affidavit
requesting additional time for discovery.  If the burden of persuasion at trial
would be on the *non-moving* party, the party moving for summary judgment may satisfy
Rule 56's burden of production in either of two ways. First, the moving party may
submit affirmative evidence that negates an essential element of the nonmoving
party's claim. Second, the moving party may demonstrate to the Court that the
nonmoving party's evidence is insufficient to establish an essential element of the
nonmoving party's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265  (1986)

(Brennan dissent) (citations omitted).  *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

*Companies, Inc.*, 210 F.3d 1099, 1102-06 (9th Cir. 2000) (discussing burdens for withstanding

summary judgment).

When seeking summary judgment, the moving party must initially identify those portions

of the record before the Court which it believes establish an absence of material fact.  *T.W. Elec.*

*Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  If the moving

party adequately carries its burden, the party opposing summary judgment must then "set forth

specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback*

*& Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED.

R. CIV. P. 56(e).  *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th

Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in

dispute").  That is, the opponent cannot assert the "mere existence of some alleged factual

dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct.

2505, 2510, 91 L.Ed.2d 202 (1986).  Moreover, "[a] party opposing summary judgment may not

simply question the credibility of the movant to foreclose summary judgment."  *Far Out Prods.,*

*Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. However, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense." *Id.*

If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986). Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

## II. OBJECTION TO DISCHARGE, 11 U.S.C. § 727(a)(4)

Section 727(a) of Title 11 provides "[t]he court shall grant the debtor a discharge, unless – (4) the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account." Under FED. R. BANKR. P. 4005, Abbey, at trial, has the burden of proving the

10

objection. As noted above in *Celotex*, 477 U.S. at 330-34, 106 S.Ct. at 2557, the moving party

having the burden of proof at trial "must support its motion with credible evidence–using any of

the materials specified in Rule 56(c) ['pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits'] –that would entitle it to a directed verdict if not

controverted at trial. Such an affirmative showing shifts the burden of production to the party

opposing the motion and requires that party either to produce evidentiary materials that

demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting

additional time for discovery."

The evidentiary standards for proving an objection to discharge have been analyzed Judge

Randolph J. Haines as follows:

> The plaintiff, of course, always has the ultimate burden of proof.
> Bankruptcy Rule 4005. But depending on the procedural context, there are at least
> three possibly applicable evidentiary standards. The lowest of them is when the
> bankruptcy court has conducted a full trial and found that the discharge should be
> denied. Because the standard of review on appeal for the factual finding of the
> requisite intent is the clearly erroneous standard, *Devers,* 759 F.2d at 753, it will
> take only a modicum of evidence of fraudulent intent to sustain the bankruptcy
> court's finding. Possibly equal to that standard, but possibly a higher standard, is
> the strength of the evidence necessary at trial to shift the burden of going forward
> from the plaintiff to the debtor, to explain the innocence of his transactions and
> intent. The Fifth Circuit described that point as when plaintiff "makes a prima
> facie case." *Reed,* 700 F.2d at 992. In this precise context, *Reed* held that it is only
> upon a showing of fraud by the creditor, that the burden shifts to the Debtor to
> explain the transaction. *Id.* Finally, the highest standard is that required of a
> plaintiff to obtain summary judgment when the debtor has denied any fraudulent
> intent, because the court must then be convinced that no fact finder could infer
> that the debtor's intent was innocent. But generally "scienter should not be
> resolved by summary judgment," *Provenz v. Miller,* 102 F.3d 1478, 1489 (9th
> Cir.1996), so "credibility issues are to be left to the trier of fact to resolve on the
> basis of oral testimony *except* in extreme cases." *In re Chavin,* 150 F.3d 726, 728
> (7th Cir.1998)(emphasis in original).

> Because this is summary judgment, plaintiff must satisfy that highest

> standard. Mere presentation of facts that could sustain a factual finding of
> fraudulent intent, or even establishment of a prima facie case, will not necessarily
> be sufficient to win summary judgment, if on such undisputed facts a fact finder
> could infer that the debtor's intent was innocent.

*Murphey v. Crater (In re Crater)*, 286 B.R. 756, 760-61 (Bankr.D.Ariz. 2002). "A claim for denial of a discharge under § 727 is construed liberally and in favor of the discharge and strictly against a person objecting to the discharge." *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).

"[P]laintiff must show that (1) the debtor knowingly and fraudulently made a false oath; and (2) the false oath related to a material fact." *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999) (citing *Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990)). "A false oath may involve a false statement or omission in the debtor's schedules." *Id*. (citing *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).

In Count Nine of Abbey's complaint, Abbey alleges in paragraphs 42 - 44 that Retz failed to adequately disclose fourteen items. Retz in his answer merely denies the allegations made in Count Nine by stating "Deny paragraphs 42 - 44. The issue becomes whether Retz acted with the requisite intent and whether the false statements and omissions were material.

### a. Knowingly and Fraudulently

As noted above Debtor must knowingly and fraudulently make a false oath. First, the Court considers the term "fraudulently." The requisite fraudulent intent "must be actual, not constructive. *Wills* 243 B.R. at 64 (citing *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d

751, 753 (9th Cir. 1985)).  Abbey may prove such intent through "circumstantial evidence or by inferences drawn from Retz's course of conduct."  *Id*. (citing *Devers*, 759 F.2d at 753-54). Surrounding circumstances and certain badges of fraud may establish the necessary intent, including

> (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the debtor was in poor financial condition at the time of the transfer; (4) that the debtor transferred all or substantially all of his property; (5) that the transfer left no assets to satisfy creditors; and (6) that the debtor received inadequate consideration. *See In re Woodfield,* 978 F.2d 516, 518-19 (9th Cir.1992).

*Wills*, 243 B.R. at 64.  Although *Woodfield* involves 11 U.S.C. § 727(a)(2), the analysis of intent applicable to such section applies also to 11 U.S.C. § 727(a)(4).  6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.).  "A court may find the requisite intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." *Wills*, 243 B.R. at 64 (citing *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564 (Bankr. S.D.Cal. 1996)).

The second term "knowingly" requires Retz to act deliberately and consciously.  *Roberts*, 331 B.R. at 883.  The following analysis from *Roberts*, is instructive:

> The bankruptcy court did not make a finding that Roberts acted deliberately and consciously in failing to make these disclosures until he amended his Statement. Instead, the court found that Roberts exhibited, "a careless and reckless approach to the important duty of disclosure in sworn bankruptcy filings." "Careless and reckless" is a lower standard than "knowing."
>
> An action is careless if it is "engaged in without reasonable care." *Id.* at 225. This is a negligence standard, not a knowing misconduct standard. A false statement resulting from ignorance or carelessness does not rise to the level of "knowing and fraudulent." *See, e.g., Mondore v. Mondore (In re Mondore),* 326 B.R. 214, 217 (Bankr.W.D.N.Y.2005) ("a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent").
>
> Similarly, recklessness does not measure up to the statutory requirement of

"knowing" misconduct. An action is reckless if it creates, "a substantial and unjustifiable risk of harm to others [through] a conscious (and sometimes deliberate) disregard for or indifference to that risk ...." BLACK'S LAW DICTIONARY at 1298. Since the bankruptcy court did not find that Roberts made his nondisclosures "knowingly" in the required sense, we cannot sustain the denial of his discharge.

*Roberts*, 331 B.R. at 884. The Court notes however that "[a] reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge." 6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.).

The elements of "knowingly" and "fraudulently" may not be conflated. They each must be proven. *See Roberts,* 331 B.R. at 885.

As noted in Retz's sworn affidavit, doc. no. 86, he states on personal knowledge:

4. As part of the preparation for filing my Petition I collected information and prepared several drafts of the Schedules and Statement of Affairs, which I provided to my bankruptcy attorney, Harold Van Dye. In addition, I visited with Mr. Dye and provided him with information regarding my business and personal affairs in order that he be fully advised regarding my pre-Petition activities.

5. In the draft versions of the Schedules and Statement of Financial Affairs I included various statements and facts regarding my activities. However, those statements and facts did not in all instances appear in the final version of the documents which were filed. I was personally present when Mr. Dye explained to the Trustee that the failure to include all information in those instances was due to the default provision of Mr. Dye's computer program and that Mr. Dye could confirm the information had been provided by me. Due to my location, on request of my counsel I signed the signature page to the Schedules and Statements without seeing the filed version, believing them to have been consistent with my draft versions.

6. At the 341 meetings I explained my inability to provide certain information. I was involved in a number of businesses, each of which involved a substantial number of transactions in complex undertakings. Preparing my schedules was made difficult by the fact that the business records for those companies were in the possession of Jim Cossitt, then later the Trustee and,

14

finally, transferred by him to Mr. Abbey. Anticipating the need for the records, prior to turning over the records to Mr. Cossitt in December 2003, I had my secretary make a duplicate copy of business records from the office. Upon Mr. Cossitt's instruction, I did not remove those copies from the office. They were turned over to the Trustee with the original records. I told the Trustee there was a duplicate set intended for my use. The Trustee informed me we would "sort that out later" and he would take possession of the records and put everything in a storage unit. He also instructed me to not present documents to him piecemeal, but to do so all at one time.

7. The Trustee indicates in his Affidavit he took possession of approximately 200 banker's boxes of records. Mr. Black in his Declaration refers to over 28,000 documents. I was not provided timely access to those records. I made Mr. Samson aware of the fact that I needed access to that information when he came into possession. I was told by Mr. Samson that I could get access when the records were moved from a storage unit in Whitefish to Missoula. However, I was not informed when they were moved to Missoula or subsequently transferred to Mr. Abbey. As a result, my ability to reconstruct information was restricted or not possible at the time. For example, even though it was known I was involved in the various Timberland businesses and received draws or compensation, I advised the Trustee I could not identify the amount of income I had earned in the preceding two years because the tax returns had not been prepared. To this date, even though the Trustee and Abbey have the records, I've not been provided with that information or advised a return has been filed.

* * *

9. The lack of an amendment to the Schedules and Statements was the result of two events. First, I was advised that the Schedules and Statements should not be amended piecemeal but only when I was in a possession to complete information. Second, even though I was attempting to provide information to the Trustee, who had my business and personal records, he had already filed [his] adversary proceeding. I was advised attempting to amend after that filing would be meaningless or perceived as a concession.

10. All of the actions I undertook in connection with the bankruptcy and the disclosure of information were discussed with and divulged to my counsel. In preparing documents and filings with the court I relied on the advice of my counsel and believed that I was acting appropriately or timely, or that for reasons based on his legal advice my actions were appropriate.

11. At the 341 meetings I discussed the claimed omissions or incomplete sections with the Trustee and my counsel. I intended to provide the requested

information. My counsel and the Trustee communicated after the meetings, often by emails, about the status of my efforts. I was often copied on the emails. As an example, although in one section of the filings I included the various businesses with which I was involved, they were not listed again in another section. That was explained and the information was provided in the filings with the court, just not in every section as it should have been. Again, there was no intent to withhold any information and the Trustee had the records which contained it.

12. The question has come up about my supposed purchase of computer and office equipment preceding the filing of my Petition. I have explained and pointed out documentation to the Trustee that the computers were not purchased by me. As a result, they were properly not included on my Schedules or Statement of Affairs. The Trustee was aware of the contention the computer equipment was not owned by me personally. I received an email from my counsel in August 2004 regarding his conversation with the Trustee about those assets.

13. I was never advised by the Trustee or my counsel that if certain information was not provided or if the Schedules and Statements were not amended the Trustee would file an action to deny me a discharge.

14. Throughout my bankruptcy I have repeatedly offered to meet with the Trustee to explain any claimed omissions or incomplete information and to address his concerns. The failure of that to occur until only recently has been the result of adversarial relationship which exists and on advice of counsel.

15. Contrary to the conclusory statement in the Michael Black Declaration, I did not personally purchase in excess of $50,000 in "hard assets" within 90 days of filing my Petition and did not fail to disclose such a "non-purchase" in my Schedules or Statements. Nor did I personally purchase furniture, office equipment or the like within the time frames or as alleged in the Black Declaration or the complaints. Any jewelry was purchased more than a year before filing and represented gifts. His Declaration is deceptive by couching the contention that either I "or TCI" made the purchases. If a business in which I was a shareholder or held an interest made any such purchases, it was my understanding no disclosure about those purchases was necessary on my personal Petition and related filings. The items were not purchased or owned by me. Further, I have disclosed the nature of those transactions to the Trustee and pointed out the documents which establish the failure to list those transactions was not improper.

16. The Black Declaration contends I failed to list a gambling loss on my filings. That is not true. Statement of Financial Affairs #8 does list the gambling loss as I recalled it to be as to amount and time. Both were substantially accurate

16

and there was no attempt to withhold that information from anyone.  Furthermore, that claimed "omission" is not the basis for either adversary complaint.

17.  The "laundry list" in the Trustee's brief of claimed omissions on my Schedules and Statement of Affairs is not in his factual statement and not in his affidavit.  Moreover, the claims are disputed.  For example, the references to computer equipment, jewelry, furniture, equipment and vehicles are inaccurate as explained in paragraph 15 above.

18.  The payment to my father, Bob Retz, within a year of my filing raised in the Black Declaration was not intentionally omitted.  Nor is it a part of either Complaint filed against me.

19.  The valuation of my shares of stock in North Forty Resort Corp.  was an approximation based on information which had been provided to me.  I provided that information to the Receiver who had been appointed prior to my bankruptcy.  The valuation did not include any discounts for minority interest status or lack of marketability.

20.  Any failure to list a specific asset or transaction in my filings was either inadvertent or the result of my lack of access to records, which were in the possession of the Receiver or others.  I believed the Trustee and others knew of the businesses in which I was involved and would have full access to my records.

Retz's attorney, Dye, provided the following statements, doc. no. 87, based on his

personal knowledge:

1. I have acted as counsel for the Brendan K. Retz in his bankruptcy case an in adversary proceedings No. 05-00018 and 05-00016.

2. Mr. Retz's financial situation was extremely complex. For a number of reasons, including the fact that many of Mr. Retz's records were in the possession of Receiver James Cossitt, Mr. Retz's Schedules and Statement of Financial Affairs were incomplete when filed.

3. At or about the time the Schedules and Statement were filed, I called Trustee Samson, advised him of that the Schedules and Statement were incomplete and told him that the information in the Schedules and Statement would be supplemented as documentation was obtained.
4. The computer program that my firm uses to prepare bankruptcy petitions, by default checks the box "None" when no information is entered. My conversation with Mr. Samson was intended to covey (sic) the fact that the indication of "None" were not correct.

17

5. In addition, Mr. Retz returned a draft of the Schedules and Statement on which he had made a number of corrections and additions. I specifically recall that the transfer of 650 Woodside to Ryan Retz was on this draft. I recall that there were other corrections and additions but do not recall what they were at this time.

6. Through error on the part of my office, the corrections and additions on the draft did not get made on the document filed with the Court.

7. I have diligently searched my office and files and cannot find the draft mentioned above although I know that it existed.

8. At all times Brendan Retz fully disclosed to me the events, facts and circumstances of the various transactions which form the basis of the adversarial complaints. Any failure to address the contentions of the Trustee was the result of legal advice on my part or a good faith belief Brendan and I were attempting to provide requested information.

9. As a result of the information Mr. Abbey was providing to the Trustee, even though the Trustee was in possession of the business and personal records of Mr. Retz, the Trustee assumed an adversarial and suspicious role against the Debtor, including the filing of the adversary proceeding to deny him a discharge, which affected the ability and manner in which information was provided.

10. The Schedules and Statement of Affairs were not amended, despite the intention to do so, as a result of the filing of the adversary Complaints. It was my advice and decision to not file the amendment.

* * *

12. Despite the adversarial nature of the proceedings and the effect it had on certain strategic decisions, I regularly communicated with the Trustee regarding efforts to obtain requested information and with regard to his concerns relative to the disclosure of assets on the part of Brendan Retz. Included in those communications was a discussion in or around August 2004 in which I advised the Trustee that due to the receivership of Timberland Construction, LLC (TC,LLC), Brendan Retz had purchased computer and office equipment for Timberland Construction, Inc. (TCI) and financed the same with Wells Fargo [Mr. Retz did not want to continue to make the payments on the Wells Fargo loan without Mr. Samson's permission as he held the TCI stock]. . . .

Retz's sworn statement and Dye's unsworn statement under penalty of perjury establish

factual statements beyond self-serving statement, which create a genuine issue of material fact as

18

to whether Retz acted with the requisite intent under § 727(a)(4). As an example, in *Wills*, evidence existed that debtors "transferred assets on the advice of their accountant for tax considerations." *Wills* 243 B.R. at 65. In the case *sub judice*, Retz states, as confirmed by Dye's statement that disclosures and amendments were not made as a result of Dye's legal advice. Whether that evidence holds up at the time of trial involves questions of fact. "A common instance of 'false oath' is when a debtor declares that the schedule of property is true and correct and it appears that the debtor has knowingly and fraudulently omitted assets from it. But if items were omitted by mistake or upon honest advice of counsel, to whom the debtor had disclosed all the relevant facts, the declaration will not be deemed willfully false, and the discharge should not be denied because of it." 6 COLLIER ON BANKRUPTCY, ¶ 727.04[2] (15th ed. rev.) (citing *In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974) ("explanation by a bankrupt that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud"). Given the statements of Dye, material factual issues exist as to Retz's knowingly and fraudulently making a false oath with the requisite intent.

### b. Materiality

The second factor involves whether the false oath related to a material fact. This broadly defined term, materiality, is established if the false statement "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Wills*, 243 B.R. at 62 (citing *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)). The 9th Circuit Court has, in a bankruptcy crimes case under 18 U.S.C. § 152, determined that materiality includes "(1) matters relating to the extent and nature of the debtor's assets; (2) inquiries relating to the debtor's

19

business transactions or estate; (3) matters relating to the discovery of assets; (4) the history of

the debtor's financial transactions; and (5) statements designed to secure adjudication by a

particular bankruptcy court." *Wills*, 243 B.R. at 62, n. 3 (citing *United States v. Lindholm*, 24

F.3d 1078, 1083 (9th Cir. 1994).

The Bankruptcy Appellate Panel in *Wills* provides the following instructive analysis to

consider in determining materiality:

> The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and
> creditors have accurate information without having to conduct costly
> investigations. *Aubrey,* 111 B.R. at 274.  "[T]he opportunity to obtain a fresh start
> is ... conditioned upon truthful disclosure." *Id.*  "The entire thrust of an objection
> to discharge because of a false oath or account is to prevent knowing fraud or
> perjury in the bankruptcy case. As a result, the objection should not apply to
> minor errors or deviations in testimony under oath."  William L. Norton, Jr.,
> NORTON BANKRUPTCY LAW AND PRACTICE 2d § 74.11 (1997). A false statement
> or omission that has no impact on a bankruptcy case is not grounds for denial of a
> discharge under § 727(a)(4)(A). 6 Lawrence P. King et al., COLLIER ON
> BANKRUPTCY ¶ 727.04[1][b] (15th ed. Rev.1998)(citing *In re Fischer,* 4 B.R. 517
> (Bankr.S.D.Fla.1980)). As a result, omissions or misstatements relating to assets
> having little or no value may be considered immaterial. *See, e.g., In re Waddle,* 29
> B.R. 100 (Bankr.W.D.Ky.1983). Likewise, omissions or misstatements
> concerning property that would not be property of the estate may not meet the
> materiality requirement of § 727(a)(4)(A).  *See, e.g., In re Swanson,* 36 B.R. 99
> (9th Cir. BAP 1984). However, an omission or misstatement relating to an asset
> that is of little value or that would not be property of the estate is material if the
> omission or misstatement detrimentally affects administration of the estate.

*Wills*, 243 B.R. at 63.  Additionally,

> In determining whether or not an omission is material, the issue is not merely the
> value of the omitted assets or whether the omission was detrimental to creditors.
> Even if the debtor can show that the assets were of little value or that a full and
> truthful answer would not have directly increased the estate assets, a discharge
> may be denied if the omission adversely affects the trustee's or creditors' ability to
> discover other assets or to fully investigate the debtor's pre-bankruptcy dealing
> and financial condition. Similarly, if the omission interferes with the possibility of
> a preference or fraudulent conveyance action the omission may be considered
> material.  6 King, COLLIER ON BANKRUPTCY ¶ 727.04[1][b].

*Wills*, 243 B.R. at 63.

As the Court above has concluded, material issues of fact exist.  No further discussion of the conjunctive elements to determine whether Retz has made a false oath is necessary.  For cause the Court will issue a separate Order as follows:

IT IS ORDERED that Plaintiff's motion for partial summary judgment as to Count Nine of  Plaintiff's complaint is denied; that Defendant's "Opposition Brief," doc. no. 88 [actually entitled "Objection to New Matter in Reply Brief; Motion to Strike and Motion for Leave to File Affidavit], is granted in part and denied in part; that the motion for leave to file affidavit is granted as Retz's affidavit and Dye's declaration have been filed; that the motion to strike buried in doc. no. 88 is denied as moot, given this Order; that Retz's objection to new matter in reply brief is overruled; that another motion to strike buried in Retz's objection, doc. no. 79, is denied as moot; that Retz's objection, doc. no. 79, to Abbey's declaration filed by Attorney Michael G. Black is overruled; that attorney Harold V. Dye shall contact Chief Deputy Clerk Lynn Myers, at 406.497.1252, for purposes of undertaking a refresher course in how to file pleadings and documents in the Court's CM/ECF system and to become familiar with the procedure for filing a pleading multiple times in the docket when alternative relief is requested in one pleading before he misfiles some pleading or document that may be prejudicial to his client; and that the parties shall be prepared to proceed to trial on April 10, 2007, at 9:00 a.m., or as soon thereafter as counsel can be heard, in the BANKRUPTCY COURTROOM, RUSSELL SMITH COURTHOUSE, 201 EAST BROADWAY, MISSOULA, MONTANA.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana