## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **BRENDON KEITH RETZ**, | Case No. **04-60302-7** |
| Debtor. | |
| | |
| **DONALD G. ABBEY**, | |
| Plaintiff. | |
| -vs- | Adv No. **05-00018** |
| **BRENDON KEITH RETZ**, | |
| Defendant. | |

## MEMORANDUM  OF  DECISION

At Butte in said District this 6th day of September, 2007.

In this adversary proceeding Plaintiff Donald G. Abbey ("Abbey") seeks denial of Defendant/Debtor Brendon Keith Retz's ("Brendon") discharge under 11 U.S.C. §§ 727(a)(2)(A) and (B), 727(a)(4)(A) and 727(a)(5).  Brendon opposes Abbey's allegations and seeks discharge of his debts, contending that he lacked fraudulent intent and corrected his Schedules and Statements informally at the 11 U.S.C. § 341(a) creditors' meeting.  After trial of this cause and review of the parties' briefs and applicable law, this matter is ready for decision.  For the reasons set forth below, a separate judgment shall be entered for the Plaintiff and against the Defendant denying Brendon's discharge under §§ 727(a)(2)(A) and (B), 727(a)(4)(A) and 727(a)(5).

1

The agreed Pretrial Order submitted by the parties on November 20, 2006, was approved by the Court. It provides that this Court has jurisdiction of this cause under 28 U.S.C. § 1334, and that this is a core proceeding under 28 U.S.C. § 157(b)(2)(J). This Memorandum of Decision includes the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052.

Trial of this adversary proceeding was held at Missoula on April 10 and 11, 2007, and on June 1, 4 and 5, 2007. Abbey appeared and testified, represented by attorneys Edward A. Murphy ("Murphy") of Missoula, Montana, and Michael G. Black ("Black") of Missoula. Brendon appeared and testified, represented by attorneys Ward E. Taleff ("Taleff") of Great Falls, Montana, and Harold V. Dye ("Dye") of Missoula who also testified. Other witnesses testifying included: Trustee Richard J. Samson ("Samson"), appraiser Martha Noel ("Noel"), Rodney D. Stell ("Stell"), Brendon's spouse Misty Retz ("Misty"), Brendon's brothers Eric Retz ("Eric") and Ryan Retz ("Ryan"), Ryan's spouse Angela Rae Retz ("Angie"), Joe Bilau ("Bilau"), Riley McGiboney ("Riley"), accountant David J. Schultz ("Schultz"), William Matteson ("Matteson"), and Brendon's attorney Bruce Measure ("Measure"). Several exhibits ("Ex.") of both parties were admitted into evidence[1]. At the conclusion of the parties' cases-in-chief the Court granted the parties time to file briefs, which have been filed and reviewed by the Court together with the record and applicable law. This matter is ready for decision.

---

[1]The following exhibits were admitted: Plaintiff's Ex. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 41A, 42, 43, 44, 45, 50, 51, 52, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 72, 73, 74, 75, 76, 77, 78, 78, 80, 81, 83, 86, 87, 91, 93, 95, 96, 101, 102, 103, 104, 105, 106, 107, 111, 112, 113, 114, 116, 117, 118, 119, and 120; and Defendant's Ex. A, B, E, I, J, K, L, M, P, Q, S, T, V, W, X, Y, Z, AA, BB, CC, FF, II, MM, NN, OO, PP, QQ, WW, YY, ZZ, CCC, FFF, JJJ, MMM, OOO, PPP, QQQ, and RRR.

**AGREED FACTS**

The approved Pretrial Order sets forth the following agreed facts:

1. Brendon K. Retz ("Retz") filed a voluntary Chapter 7 petition in the United States Bankruptcy Court for the District of Montana on February 12, 2004. (Case No. 04-60302, Docket No. 1).

2. At the time of the filing of his voluntary Chapter 7 petition on February 12, 2004, Retz did not contemporaneously file his Schedules and Statement of Financial Affairs (hereinafter "SFA") with the Court (Case No. 04-60302, Docket No. 1).

3. Retz's Schedules and SFA were filed with the Court on March 1, 2004. (Case No. 04-60302, Docket No. 7). Retz and his counsel advised the Trustee at his initial Section 341 meeting his Schedules and SFA would require amendment.

4. Since the filing of his initial Schedules and SFA with the Court on March 1, 2004, Retz has not filed with the Court any amendments to his Schedules or SFA[2]. Since the filing of his initial Schedules and SFA Retz has submitted additional financial information to the Trustee and appeared for two meetings of creditors.

5. The initial § 341 Meeting of Creditors was held in Case No. 04-60302 on March 19, 2004, in Kalispell, Montana (Case No. 04-60302, Docket No. 9).

6. On July 8, 2004, the continued § 341 Meeting of Creditors was held in this case.

**ADDITIONAL FACTS**

Additional facts are taken from the testimony and exhibits admitted at trial, or the case

dockets. Trustee Samson testified that this case was one of the most voluminous cases he has

ever had as trustee, with thousands of transactions, and that "suspicion, distrust . . . [and]

acrimony" permeated this case. Transcript ("Tr."), pp. 96, 129. Dye testified that this case was

---

[2]Brendon filed amended Schedules and SFA on August 7, 2007, after the trial of this adversary proceeding concluded and the record was closed. The Court does not deem it necessary or appropriate to reopen the record to consider the amendments.

one of the two most complicated individual bankruptcies he has ever been involved with.  Tr., p.
1112.  Various aspects of this complex case will be addressed separately where possible, and
together where necessary.

Brendon is a graduate of the University of Montana with a degree in business
management, and currently is enrolled in the MBA program.  He has taken accounting classes,
and performed the accounting for his own businesses.  Tr., p. 462.  After Brendon graduated
from college he developed and implemented a business plan involving his parents and family
members, a bed and breakfast resort known as the "North Forty Resort," for which he performed
the bookkeeping, maintained the ledger, wrote checks and paid bills, compiled financial
statements and balance sheets.  Tr., pp. 461-63.

Eric is Brendon's and Ryan's brother, and was employed by and involved with building
North Forty Resort Corp. before leaving for other employment.  Tr., p. 211.  Eric testified that he
has been an officer or director, and a minority shareholder of North Forty Resort Corp.  Tr., pp.
212, 225-26.  Eric does not know whether he currently is secretary or an officer of North Forty
Resort Corp., and was not sure that they ever had annual meetings.  Tr., pp. 213, 214.  Eric
testified that his parents Robert and JoEllen own 82 percent (82%) of North Forty Resort Corp.,
and the three brothers each owned 6%.  Tr., p. 226, 409[3].

Brendon testified that he was a director of North Forty Resort Corp. from its beginning.
Ex. 22; Tr., pp. 718-19.  He testified that he has never received a dividend in the history of North
Forty Resort Corp., never sold or received an offer to sell any of his 6% of shares.  Tr., pp. 925-
26.  Ex. 22 is the minutes of the first meeting of the North Forty Resort Corp. board of directors,

---

[3]Ryan thought he owned 3%, but was not sure.

dated February 12, 1993, and states that Brendon was a director and appointed vice president. Tr., p. 718.

Brendon started a construction company, Timberland Construction, Inc. ("TCI"), in 1994. Tr., p. 463. Brendon was sole shareholder of TCI prior to 2001, and remained sole shareholder to the date of the filing of his bankruptcy petition. Tr., pp. 51, 713; Ex. 2, pp. 6-7, 19. Brendon performed all the accounting for TCI for the first few years until he hired a bookkeeper. Tr., p. 464. Brendon purchased a computer accounting program, "Master Builder", to aid him in his record keeping at TCI. Tr., pp. 468-69. Brendon testified that he considers himself proficient at using Master Builder, particularly with respect to the billing, and job costing/financial reporting components. Tr., p. 470. He described Master Builder as not as interactive as other accounting programs, but that the more familiar one is with the program the easier it is to find information. Tr., p. 475.

Brendon and Misty were married in 2001, but were in the process of dissolution of their marriage at the time of trial. Tr., p. 815. They had a newborn baby shortly before Brendon's bankruptcy. Tr., p. 817.

Brendon testified that TCI grew from less than $500,000 in annual revenue in 1994 to between $4 million and $5 million in 2001. He could not remember what his salary was at TCI. Tr., p. 739. Brendon owned a 6% individual interest in his family's North Forty Resort Corp. Ex. 2, pp. 6-7, 19. Brendon owned 50% of Timberland Properties, LLC ("Timberland Properties"), with Abbey owning the other 50%, and Timberland Properties owned 100% of Creekside Lots, LLC, Copperwood Development, LLC, and other subsidiaries. Ex. 2, pp. 65-66.

Donald Abbey testified he has been a real estate investor since 1975, and a commercial

5

real estate broker.  He estimated he has done close to 10,000 real estate transactions and has

interests in more than 60 companies.  Tr., pp. 324, 340, 370.  In 2000, Abbey testified that a

majority investor attempted a hostile takeover attempt of one of Abbey's companies to liquidate

its interest.  Tr., p. 370.

     Brendon and Abbey entered into a business arrangement in 2001 or 2002 whereby TCI

and Brendon became members of Timberland Construction, LLC ("TCLLC"), Tr., p. 51.

Brendon testified that his attorney Tornow created the TCLLC entity.  Tr., p. 472. Abbey testified

that he formed a new company with Brendon, TCLLC, of which Abbey owned 50%, in March

2002, to build Abbey a single-family residence on Shelter Island, and do normal subdivision and

construction work in northwest Montana.  Tr., pp. 325, 326.

     Brendon testified that once TCI became a member of TCLLC, TCI no longer had

significant assets which required a lot of tax accounting, and was "basically mostly just a pass-

through entity."  Tr., pp. 465-66.  After June of 2001 TCI did not continue to operate as a

construction company.  Tr., p. 471.

     Brendon testified that he maintained overall authority for maintaining the books of

TCLLC, to the point where they went to the accountant, Dave Schultz of the firm of Jordahl &

Sliter, who prepared TCLLC's tax returns for 2001 and 2002[4].  Tr., p. 466.  Brendon

characterized his knowledge of generally accepted accounting principles as above bookkeeper

level but below accountant lever.  Tr., p. 468.

---

[4]Schultz testified that Matteson contacted him in late 2005 requesting assistance on
preparing TCLLC tax returns, but Schultz declined because of a conflict of interest.  Tr., pp. 282-
83.  Brendon testified that Schultz contacted him about the request, but Brendon did not think he
was in a position to authorize Schultz, but does not think he objected because he wanted the form
K-1s from TCLLC completed so he could finish his own taxes.  Tr., pp. 467-68.

Abbey wanted to have some control and be able to look inside the books of the contractor with which he was building his large single-family home on Shelter Island. Tr., p. 325. Abbey testified that he began planning his Shelter Island house and negotiating with Brendon about entering into a partnership in 2000, and they first reached a verbal agreement for TCI to construct Abbey's Shelter Island project, then reached an agreement whereby Brendon would put in all his assets – worth about $300,000, and Abbey would match it with $300,000 in cash. Tr., pp. 327, 366. Before they put their agreement in writing, Abbey signed documents Brendon requested him to sign. Tr., p. 367.

Abbey testified that the real estate to be contributed to TCLLC by Brendon or TCI consisted of the lots and buildings on Woodside Lane in Whitefish, Montana (including a house at 650 Woodside), an office building, bank accounts, a Keogh account and equipment. Tr., p. 342. Brendon testified that the gist of the agreement was that he was going to contribute all of TCI's assets and liabilities to TCLLC. Tr., p. 959. Brendon testified that he never owned the 650 Woodside lot personally before the transfer, and that it always was a TCI asset. Tr., p. 959. Abbey testified that the operating agreement required Brendon to convey 650 Woodside to TCLLC, but that he does not know whether Brendon ever conveyed it. Tr., pp. 342-33. Brendon testified that the operating agreement required 650 Woodside to be contributed to TCLLC by TCI, and he believes that the operating agreement effectuated that transfer and it was put on TCLLC's books on or about July 1, 2001. Tr., pp. 478, 485, 504, 959. Abbey testified that he thought 650 Woodside was worth about $180,000 after the time he signed the operating agreement. Tr., p. 346.

At the time 650 Woodside was contributed to TCLLC, Brendon testified, he did not

7

believe the home on it was completed and it had a construction loan against it in TCI's name at Whitefish Credit Union, and so TCLLC paid whatever it took to complete construction of the project over and above the construction loan.  Tr., pp. 484-85; 959, 964.  He testified that capitalized cost of 650 Woodside was $136,000, and the construction loan balance in July 2001 was $99,000.  Tr., pp. 485, 964.

Brendon testified that he moved into 650 Woodside after it was finished in the Fall of 2001.  Tr., p. 959.  He testified that he spoke with Abbey about his moving into 650 Woodside, because he had sold his old house to Chance Chacon[5] and needed a place to stay with Misty while his new house was being built at 665 Woodside[6] which he and Misty owned personally. Tr., pp. 659-61.

Abbey testified that he visited 650 Woodside with Brendon, who told Abbey that he was living there and it was not for sale.  Tr., p. 343.  Abbey testified that he told Brendon that was contrary to their operating agreement, and that Brendon replied that he was paying rent, but Abbey testified that he later learned that Brendon was not paying rent.  Tr., p. 343.  Brendon remembered the conversation differently, but admitted that he never paid rent for 650 Woodside. Tr., p. 960.  Brendon testified that he was willing to pay rent at 650 Woodside and offered to pay rent but that Abbey responded:  "Don't be ridiculous.  Just put a cup at the back door and stick a quarter in it for your uncle Don now and then."  Tr., p. 960.

Brendon testified that TCLLC owned 650 Woodside in May of 2002.  Tr., p. 504.

_____

[5]Chance Chacon was the project foreman for the Shelter Island project.  Tr., p. 176.

[6]Construction at 665 Woodside was delayed when Brendon and Misty contemplated building on a different lot at "Iron Horse", but that lot was assigned by them to TCLLC and sold to a client.  Tr., pp. 961-63.

8

Brendon testified that under the terms of the operating agreement, Ex. 12, that 650 Woodside was contributed to TCLLC by TCI. Tr., p. 478. Brendon testified that he was aware of only accounting entries and loan documents, from his and Misty's refinancing of 650 Woodside which paid off the construction loan against it, which indicated a transfer of 650 Woodside out of TCLLC. Tr., p. 478-79.

Abbey testified that 650 Woodside is or should be owned by TCLLC. Tr., pp. 358-59. Abbey testified that Brendon never requested that Abbey allow the transfer of 650 Woodside to Brendon, and Abbey never consented to such a transfer of 650 Woodside in writing, but that it was transferred to Brendon without Abbey's approval. Tr., pp. 343-44, 345-47. Abbey testified further that the operating agreement did not permit Brendon to transfer excess equity in a property to himself from TCLLC without Abbey's written approval. Tr., p. 346. Brendon agreed that he did not request Abbey's written consent to transfer 650 Woodside to himself, but he testified that "[i]t wasn't the way we did things", and that he and Abbey had established a pattern starting when TCLLC was formed that "[w]e did most everything verbally". Tr., p. 487.

Brendon testified that he signed loan documents the last week of June 2002 for a loan in the amount of $121,000 to pay off the construction loan, and TCI deeded 650 Woodside to Brendon and Misty at the beginning of July 2002, which was recorded on July 5, 2002. Tr., pp. 479-80; Ex. 13. Brendon testified that $121,000 from his loan went to pay off TCLLC's construction loan secured by 650 Woodside. Tr., p. 483.

Brendon was not sure that he had signed Ex. 13 on July 3, 2002, as the deed states, because that date does not match the date he signed the loan documents. Tr., pp. 481-82. Brendon identified Ex. 15 as a line of credit that he and Misty took out , secured by 650

9

Woodside, and dated September 6, 2002.  Tr., p. 499.  Ex. 16 is the deed of trust to Wells Fargo

securing the LOC. Brendon testified that he paid down the first mortgage of Whitefish Credit

Union about $20,000 in order to obtain the $50,000 LOC from Wells Fargo, and that he used that

LOC all the time for himself and to loan TCLLC money.  Tr., pp. 500-01.

In addition to the construction loan, 650 Woodside was on a lot that was subject to a trust

indenture, Ex. WW, which Brendon testified was coming due at the end of June 2002 with an

outstanding balance of $22,000.  Tr., pp. 963-64.  Abbey acknowledged that he was aware that a

construction loan and land loan existed on 650 Woodside owed by TCLLC.  Tr., p. 376; Ex. 12,

Schedule 12.4, Bates, #12099.

Brendon testified that an appraisal had valued 650 Woodside at $170,000.  Tr., p. 479;

Ex. 14.  Brendon did not agree that he immediately realized $49,000 in equity by purchasing 650

Woodside because, he testified, he exchanged another piece of property that had equity in it.  Tr.,

p. 483.  Brendon testified that he discussed 650 Woodside with Abbey and its indebtedness, and

that he offered to exchange his and Misty's interest in 665 Woodside for TCLLC's interest in 650

Woodside and refinance the construction loan and trust indenture debt against 650 Woodside.

Tr., p. 965.  Brendon testified that Abbey agreed, and so Brendon got a new loan from Whitefish

Credit Union in late June or early July of 2002 in the amount of $121,000 and paid off the

construction loan and trust indenture.  Tr., p. 965.  Abbey was asked on cross examination by

Dye whether it is possible that he forgot that Brendon asked him to exchange 650 Woodside for

665 Woodside and Abbey answered:  "Absolutely not."  Tr., p. 371.  Brendon testified that he

does not remember whether 665 Woodside ever was deeded into TCLLC, and later testified that

"I don't think I deeded it TCLLC", so he doubted that a deed to 665 Woodside placed the

10

property back in his name.  Tr., pp. 1003-1004, 1009-1010.  Brendon testified: "I was sloppy

with deeds.  That's the bottom line."  Tr., p. 1010.

Taleff asked Brendon what price he used in exchanging 650 Woodside[7] in and out of

TCLLC, and Brendon responded $41,181 on both sides of the transaction.  Tr., pp. 966-67.  Ex.

YY is a TCLLC Job Cost Journal generated by TCLLC's accounting system "Master Builder[8]",

which Brendon testified at the middle of the first page reflects a land exchange "665/650

Exchange" as a job cost dated 6/30/2002, in the amount of $41,181.00, which he probably

entered into Master Builder, and which he and Misty paid.   Tr., pp. 972-76.

Ex. ZZ is a printout from TCLLC's Master Builder program of a journal transaction

record which Brendon testified he entered for the 665/650 exchange, with the date of exchange

listed as 6/30/2002 and date of entry 7/23/2002, with no subsequent alterations.  Tr., pp. 998-99.

Brendon explained that Ex. ZZ is the exchange entry adjusting all of TCLLC's Master Builder

accounts to remove 650 Woodside from TCLLC's books and add 665 Woodside and its

associated debt.  Tr., p. 1000-1001.  On cross examination Brendon testified that Ex. ZZ shows

that he obtained both 650 Woodside and later 665 Woodside from TCLLC at cost.  Tr., p. 1012.

Brendon testified that Ex. ZZ shows that he put into TCLLC a lot for $41,181 that had loans

---

[7]This reference to 650 Woodside appears to interpose for 665 Woodside, which is the
subject property described in Ex. 111.

[8]Brendon was not certain that he retained a full and complete set of TCLLC's "Master
Builder" computer files after a state court receiver was appointed and took over TCLLC's
bookkeeping.  Tr., pp. 976-79.  Brendon retrieved some Master Builder files from Glacier Bank.
Tr., pp. 977, 978.

against it[9], and took out the work in process account balances for 650 Woodside out of TCLLC, making an equity for equity exchange between 650 and 665 Woodside. Tr., pp. 1002-1003. Ex. ZZ reflects that TCLLC assumed a $26,000 obligation on 665 Woodside[10]. Tr., p. 1003. Brendon admitted that Abbey did not approve that $26,000 borrowing in writing, did not authorize the transfer of 650 Woodside to Brendon in writing, did not authorize the transfer of 665 Woodside back to Brendon in writing. Tr., pp. 1003, 1010-11, 1012. Brendon admitted that no money changed hands in the equity for equity exchange, although the originating loans were paid off. Tr., pp. 1006, 1009.

A few months after that exchange, Brendon testified, he and Misty decided to build their home on 665 Woodside. Tr., p. 1006. On November 12, 2002, Brendon and Misty signed a deed of trust to Whitefish Credit Union reflecting a note amount of $232,000, which could not exceed $256,000. Ex. 111; Tr., p. 1004. Brendon testified that Ex. 111 was for a construction loan on 665 Woodside when he and Misty resumed their plans to build their home there. Tr., pp. 966, 1004. Brendon testified that he used the loan proceeds from Ex. 111 together with his and Misty's cash and paid TCLLC for 665 Woodside at the same price he had exchanged it into TCLLC a few months before. Tr., p. 966[11].

---

[9]Brendon testified that the originating loans for the lots which made up 665 Woodside were in his name, and either a Peter Tracy loan or a credit union loan. Tr., pp. 1008-09.

[10]Brendon testified that 665 Woodside was three lots combined into two, and the credit union wanted one of the lots paid off to allow Brendon to make that consolidation, thereby creating roughly $15,000 in equity. Tr., p. 1005.

[11]Brendon's response was to Taleff's question whether proceeds from the loan secured by Ex. 111 were used in relation to 650 Woodside. Tr., p. 968:8-11. It is unclear whether Taleff was confusing 650 Woodside and 665 Woodside in his question, or meant to say 650 Woodside. If the latter then Brendon's answer was unresponsive, but Taleff did not follow up.

### The TCLLC "Operating Agreement".

Abbey testified that Brendon called him almost a year before the agreement was signed with a cash flow problem and could not make payroll, and offered to treat Abbey as a partner from January 2001 if Abbey gave him $100,000 to solve the cash flow issue.  Tr., pp. 327, 397[12]. Ex. 12 is the operating agreement for TCLLC, dated retroactive to July 1, 2001, and signed by Brendon as TCI's president and by Abbey as governing members in March 2002, before the 665/650 Woodside exchange, dated June 30, 2002, shown by Ex. ZZ.  Tr., pp. 329-30, 334, 366, 472, 477-78.

Brendon testified that during the negotiation of the operating agreement he had concerns and tried to address them, that a lot of the operating agreement did not seem to fit together, that it began as something more typical of what Abbey did, and that many changes were made during negotiations over several months.  Tr., pp. 474-75.  Brendon testified that his primary focus was the tax components of the operating agreement because of the risk of a significant taxable event for him if not done correctly, and that Abbey was concerned with his depreciation allowance. Tr., pp. 496-98.  Brendon testified that they probably went through more than three drafts before agreeing on the final version, and that he had a full opportunity and assistance from his tax attorney and accountant in reviewing Ex. 12.  Tr., pp. 473, 474.  Brendon testified that he is sure he paid his attorneys and accountant to review Ex. 12 before it was signed.  Tr., p. 496.

Abbey testified that after Ex. 12 was signed he contributed the additional $200,000 by wire transfer, and that without a written operating agreement he would not have contributed the

---

[12]Abbey testified that Brendon told him he could not meet payroll because he could not get a last draw from a woman named Valentino.  Tr., p. 397.

13

$200,000, the Shelter Island project would have stopped and Abbey would have asked for his $100,000 initial contribution back. Tr., pp. 330, 341, 394. Brendon agreed that Abbey did not contribute the additional $200,000 until the operating agreement was signed. Tr., p. 489. Brendon testified that he needed the $200,000 for short term funding, and that he used it, without Abbey's written consent, to pay credit lines that he had let the company use. Tr., p. 489. Abbey testified that after he wired the $200,000 to TCLLC, he did not authorize in writing any transfer of TCLLC's property to Brendon. Tr., p. 342.

Paragraph 5.4.1 of the operating agreement, Ex. 12, at pages 16-18, states that the day-to-day operations shall be managed by Brendon, but at page 17 defines "Major Decisions" that fall outside the scope of TCLLC's day-to-day operations and require Abbey's written consent, including but not limited to: (b) distributions (c) incurring or guaranteeing indebtedness, (f) determination of officers of the company or any of its operating LLC's, (g) determination of compensation of "Significant Employees", (h) approval of any transaction not identified in the applicable budgets, (k) disposal, sale, exchange or liquidation of assets of the company or its operating LLC's, (t) any transaction between TCLLC or an operating LLC and any governing member, representative or affiliate of a governing member. Tr., pp. 335-37.

Abbey testified that Brendon was not authorized under the operating agreement to sell or convey property on behalf of TCLLC, enter into transactions with the company or write checks greater than $5,000 without Abbey's written approval. Tr., pp. 338, 340; Ex. 12, p. 22, paragraph 5.11.4. Under cross examination, Abbey clarified that checks specific to a particular

construction project that were greater than $5,000 did not require his signature[13].  Tr., p. 365.

Abbey described the "major decisions provisions" in Ex. 12, which he relies on as his checks and

balances as to what happens in his companies, as consistent with his business practices in his

other business ventures, Tr., pp. 340-41, 345, 394.

Loans are governed by paragraph 4.3 on page 13 of Ex. 12, and require full disclosure and

prior approval of the governing members.  Tr., p. 338-39.  Paragraph 9.5 on page 36 of Ex. 12

requires separate bank accounts in the name of TCLLC, and prohibits commingling of company

funds with funds of any other person.  Tr., p. 340.  Abbey testified that the operating agreement

provided for annual compensation to Brendon in the amount of $40,000, and that amount is

specified at Ex. 12, p. 20, paragraph 5.8.  Tr., p. 338, 339.  Brendon testified that he and Abbey

initially agreed that Brendon would make $80,000, but that Abbey then said he preferred

Brendon not take as much salary and should make his money off the profitability of the company,

so they dropped his annual salary down to $40,000 in the operating agreement, and it never

increased.  Tr., pp. 739-40.

Page 45 of Ex. 12 includes paragraph 14.2, which provides that it and other concurrent

written agreements are the complete and exclusive statement of agreement "and replace and

supersede all prior written and oral agreements" by and between the members.  Tr., p. 333.

Paragraph 14.14 on page 47 of Ex. 12 requires that any amendments to the operating agreement

must be in writing and signed by all members.  Tr., p. 334.  Abbey testified that no written

---

[13]Paragraph 5.11.4 on page 22 of Ex. 12 provides in pertinent part: "Unless provided for in the Annual Operating Budget or the Annual Capital Budget, all checks and drafts (excluding those that are a direct expense of an ongoing construction project) obligating the Company to pay money in an amount of less than $5,000 may be signed by Retz, acting alone."

amendments exist to the operating agreement, Ex. 12, and that he never gave up any of his rights

under Ex. 12.  Tr., pp. 334, 342.

Brendon disagreed.  When asked whether the way he was supposed to operate changed

when Ex. 12 was signed, Brendon testified:

> Legally, maybe.  I mean I discussed – as we were getting close to nearing
> the end of completing the operating agreement, Don and I were both getting
> frustrated because it wasn't getting done.

> And he finally just said, "Don't worry about it Brendon.  Just finish it up.
> It's only for the file anyway".

> And we never even talked about it again.  And I never even heard anything
> about the operating agreement until things blew up that – in the summer of '03.

Tr., p. 488, 489, 496.

Later, Brendon admitted that with respect to the tax consequences of the transaction he

certainly intended for the operating agreement to be enforceable.  Tr., p. 498.  Abbey testified

that he did not ever tell Brendon that the operating agreement was only for the file and that

Brendon did not have to abide by it.  Tr., p. 334:19-23.  Brendon gave the operating agreement to

TCLLC's banks for their loan files.  Tr., p. 488.

**TCLLC's Banking.**

Brendon testified that he used or controlled 25 or 30 credit cards prior to filing for

bankruptcy, including those used by his employees.  Tr., p. 749.  He testified that he preferred to

use the American Express business credit card to earn Skymiles, until he charged to the

authorized credit limit, then he would use a second card which did not have a limit.  Tr., pp. 749-

50.

TCLLC had a checking account in TCLLC/Brendon's names at Glacier Bank of

16

Whitefish, account no. 129612934.  Ex. 54 is a bank statement dated 4/30/02 showing a wire transfer credit in the amount of $200,000, dated 4/4/02, which Brendon testified was Abbey's contribution.  Tr., p. 492.  Page 2 of Ex. 54 shows a $60,000 check, which cleared the account the same date the $200,000 wire transfer from Abbey arrived.  Tr., p. 493.  Ex. 55 is the $60,000 check on the Glacier Bank account shown by Ex. 54, and Brendon testified that it was a "short term loan payback to me".  Tr., pp. 493-94, 496.  Brendon explained that he loaned TCLLC money every month, and could think of no other reason for writing a check to himself for that large of an amount.  Tr., p. 494.  The date on Ex. 55 is 3/31/01, more than a year before Ex. 54 and 55 show that the $60,000 check cleared on 4/2/02.  Brendon testified that Ex. 55 is misdated, but admitted that he had to have been the person who dated it.  Tr., p. 495.  Brendon admitted that he did "not specifically" ask Abbey for his approval to draw the $60,000 from his $200,000 capital contribution, and did not get his written consent.  Tr., pp. 495-96.

Rodney Stell is the northern region president for American Bank of Montana in charge of its Whitefish branch, and is in charge of all loans.  Tr., p. 174.  Stell testified that Brendon brought Abbey in to apply for a construction loan for Abbey's Shelter Island project.  Tr., p. 174.  Abbey testified that he met with Stell on multiple occasions, and told him the purpose of the loan was to facilitate the timely payment of contractors so they would not walk off the job and leave the project unfinished.  Tr., p. 393-94.  Abbey testified that, as a result of his audit of TCLLC and Brendon's request for a cash flow facility, a $500,000 line of credit ("LOC") at American Bank of Montana for TCLLC was set up to pay only the Shelter Island monthly payables, to be paid from the construction loan.  Tr., pp. 357, 360.

Brendon signed and submitted Ex. 30, a personal financial statement for Brendon and

17

Misty, dated 1/31/03, which was part of a loan application submitted to American Bank of Montana by Brendon and Abbey for the 1-year $500,000 LOC for receivables financing. Tr., pp. 176, 177-178, 179, 739. Brendon testified that in addition to financial statements he provided copies of prior tax returns to banks. Tr., p. 922. Ex. 30 shows total assets for Brendon and Misty in the amount of $1,278,500, a net worth of $859,500, and shows Brendon's salary as $40,000 and their total income as $190,000. Tr., p. 739. Brendon testified that he based his $190,000 total income from an estimate of his distributions from TCLLC plus his salary. Tr., p. 740. Page 2 of Ex. 30 lists assets including 100% of TCI, 6% of North Forty Resort, 665 Woodside Lane "under const.", and a Glacier Air hangar encumbered by a mortgage held by Glacier Bank.

Brendon testified that he thinks the American Bank loan was approved in the very first part of February 2003. Tr., p. 995. Stell sent Brendon Ex. RRR, a letter dated February 3, 2003, offering terms for the $500,000 LOC. Tr., p. 997. Ex. 101 is the cashflow loan agreement with American Bank dated March 1, 2003, signed by Brendon and Abbey individually and as managers of TCLLC. Tr., p. 362. Abbey testified that Ex. 101 satisfied the requirement for his written consent under the operating agreement, Ex. 12. Tr., p. 364.

Ex. 101 identifies American Bank as lender and TCLLC, Brendon and Abbey as borrowers, dated 3/1/2003, for a term of 1 year. Tr., pp. 186-87. Ex. 102 is the promissory note dated 3/1/2003 for the $500,000 LOC with American Bank, Brendon, TCLLC and Abbey. Tr., p. 190; Ex. 2, pp. 42-43, 48. . Stell testified that Brendon, Abbey and TCI all were makers on the promissory note to American Bank, and that the collateral was the company's accounts receivables, except that accounts receivables from employees of Timberland Construction were not eligible. Tr., pp. 178, 183, 184-85. Ex. 103 is the commercial security agreement for the

18

loan on Ex. 101, also dated 3/1/2003, and signed by Brendon for himself and TCLLC, and

Abbey.  Tr., pp. 188-89.  Stell testified that Brendon had the opportunity to review Ex. 101 and

that he signed it.  Tr., p. 189.

Stell testified that American Bank funded the $500,000 LOC in March 2003, but that the

LOC was not ever paid down because TCLLC consistently reported adequate receivables on its

collateral schedules.  Tr., pp. 190-91.  Stell explained that TCLLC listed receivables from their

books and records, anything over 45 days was ineligible, and the net listed receivables exceeded

$500,000 from March through September 2003, so no principal payment was required.  Tr., p.

192.

Ex. 104 is the collateral schedule provided to TCLLC by American Bank to fill out, dated

8/15/03, and the aging schedule for accounts receivable for the same period.  Stell testified that

American Bank asked Brendon if his receivables schedules were correct and he said "yes".  Tr.,

p. 192.  The loan value of accounts listed on Ex. 104 is $770,746.49 versus the $500,000 LOC

amount, and Stell testified that the loan was adequately collateralized at the time of and based on

Ex. 104.  Tr., pp. 194-95.  Ex. 105 is a similar collateral schedule, dated 7/16/03, showing

$625,477.38 loan value, which Stell testified adequately collateralized the loan.  Tr., p. 195.

Ryan testified that he prepared Ex. 104 and 105 after Brendon showed him how.  Tr., pp. 447-48.

Ryan testified that Brendon signed Ex. 104 and Ryan signed Ex. 105.  Tr., p. 449.  Ryan testified

that the data on Ex. 105 came from TCLLC's Master Builder program.  Tr. 449.  Stell testified

that TCLLC submitted Ex. 104 and 105 to American Bank, and that American Bank relied on

them to determine whether or not to demand principal repayment.  Tr., pp. 194, 195, 205.

Ex. 105's aging schedule includes an entry on page 3[14] for 665 Woodside Lane in the amount of $54,848.42 due 7/16/2003, which is the same property listed on Brendon's financial statement as his residence on Ex. 30. Tr., p. 198. Stell testified that 665 Woodside would not be an eligible account receivable if it was Brendon's residence. Tr., pp. 198-99. Another ineligible account receivable Stell noted was on Bates page 785 of Ex. 105, No. 2016 in the amount of $2,007.16 for Copperwood Court Subdivision. Tr., p. 199. Stell testified that if TCLLC guaranteed the financing for that project with another lending entity then it was an ineligible account for American Bank's collateral schedule. Tr., p. 199.

Stell testified that monthly interest payments were made, but no principal reduction payments were made on the American Bank loan until it matured. Tr., p. 193. He testified that Brendon never made payments on the LOC to American Bank, and that an entity owned by Abbey, LDP Holdings, LLC, paid it off. Tr., pp. 203, 206-07.

Abbey also had a construction mortgage with American Bank for the Shelter Island property. Tr., pp. 362-63.

**TCLLC Operations.**

Brendon testified that TCLLC's operations continued along the same growth trajectory as TCI with increasing revenues, more projects and more employees. Tr., p. 475. Abbey testified that he received a compilation of statements from Schultz's firm that Brendon's company was cash-flowing hundreds of thousands of dollars per year. Tr., pp. 321, 395-96. Brendon admitted that Shelter Island was a source of about fifty percent (50%) of TCLLC's revenue in 2003. Tr., pp. 508-09. The Shelter Island project was TCLLC's largest project and was Abbey's greatest

---

[14]Bates no. 00784, Ex. 105.

personal concern.  Tr., pp. 370, 408.  Brendon testified that TCLLC did not have a written

agreement with Abbey for the construction of Abbey's Shelter Island project, but that it was to be

built at cost of materials and contractors, and customary rates for labor and equipment.  Tr., pp.

1042-43.  On cross examination Abbey admitted that one of the reasons he got involved with

TCLLC was so that his Shelter Island property would be built at cost.  Tr., p. 369.  Brendon

testified that TCLLC performed from $300,000 to $600,000 per month in work done on the

Abbey project.  Ex. 2, pp. 64, 65.

Abbey testified that he communicated with Brendon in person during tours of TCLLC

projects, by phone and email, and he would have dinner often with Brendon and his wife, but that

after March 2002, Abbey testified that he spoke a lot less with Brendon, and their social contact

ceased.  Tr., pp. 368-69.  Brendon testified that he sent financial reports to Abbey in California.

Tr., p. 476.  Abbey testified that he started an audit of TCLLC in November 2002 by Deloitte &

Touche, and started receiving audit results in January 2003.  Tr., pp. 355, 392.

Brendon hired his brother Ryan, who was living in Boise, Idaho, to come to work for

TCLLC in May 2002, where he worked until the end of September 2003 as TCLLC's financial

controller.  Tr., pp. 399-400, 421-22, 458.  Ryan did not work for TCI while he worked for

TCLLC.  Tr., p. 435.

Ryan's wife Angie testified that Brendon called them in Boise wanting Ryan to come up

and help out with the books and accounting, and offered them a "good deal" on 650 Woodside,

where Brendon and Misty were residing, or a similar house which might be built.  Tr., p. 457.

Ryan testified that part of Brendon's offer of employment was the chance to buy 650 Woodside

or another house that TCLLC was building in the same development[15], or he would not have
accepted the offer.  Tr., p. 400, 402, 403.  Misty testified that the decision to sell 650 Woodside
to Ryan and Angie was made before they moved to Whitefish, and prior to the dispute between
Brendon and Abbey, and the offer persuaded Ryan and Angie to move to Whitefish because
although the pay Brendon offered Ryan was about the same as Ryan earned in Boise, they had
not been able to buy a house.  Tr., pp. 825-26, 827.  Brendon admitted that he offered Ryan a
good deal on a house because "I really needed him"[16].  Tr., pp. 502-03.

Ryan had been making a base salary plus commission in Boise and was seeking other
employment.   Brendon offered him $28,000 per year when he started with TCLLC, which was
about the same to a little more than Ryan had been earning.  Tr., pp. 412, 413.  Ryan started
working for TCLLC in May 2002, and received one raise to $30,000 before he stopped working
for TCLLC.  Tr., pp. 420-21, 502.  Brendon testified that he believed his offer to Ryan of a good
deal on a house was an obligation of TCLLC.  Tr., p. 504.  He testified that he first committed to
sell 650 Woodside to Ryan and Angie late in 2002.  Tr., p. 967.

Ryan's duties at TCLLC included entering short term loans and other data into TCLLC's
accounting system, a program called "Master Builder".  Tr., pp. 422, 428.  Ryan testified he was
involved also in processing accounts payable for TCLLC.  Tr., p. 439.  Ryan testified that if
Brendon and Abbey made a distribution and instructed Ryan to print a check he would, including
checks for payments on construction loans, but that Ryan did not monitor the loans or checks.

_____

[15]Ryan testified that he and his wife were anxious to move out of a small house they were
living in next to the North Forty Resort.  Tr., pp. 402-03

[16]Brendon admitted that he did not advertise locally for the controller position before
asking Ryan to move to Whitefish.  Tr., p. 502.

Tr., pp. 423, 425, 426-27, 439-40.  Ryan testified that Brendon had the same access to the Master

Builder program as Ryan.  Tr., p. 425, 428.  Ryan testified that Brendon is the person who would

have classified an entry on Master builder as a distribution.  Tr., p. 427.

Brendon testified that, while Ryan was keeping the books for TCLLC, Brendon did not

have personal books and did not keep personal files of Brendon's bank statements at TCLLC's

office.  Tr., pp. 602-03.  However, Brendon testified that he has the same Master Builder data

now that he possessed in February and March of 2004.  Tr., p. 674.

Schultz is a certified public accountant ("CPA") in Montana with 20 years experience and

an emphasis on tax.  He testified that he compiled unaudited[17] financial statements for TCLLC

until 2002, with information probably provided by Ryan.  Tr., pp. 279-80.  Ryan testified that he

was aware of Abbey's concerns when the Deloitte and Touche auditors came up to look at the

Shelter Island accounting records.  Tr., p. 408.  Deloitte and Touche sent Abbey an email

message regarding the audit, originating March 28, 2003.  Ex. OOO.  On March 28, 2003,

Deloitte & Touche provided its audit report, Ex. PPP.  Abbey testified that he became aware of

guarantees of debt by TCLLC entered into in 2003 that he did not sign.  Tr., p. 357.

**Brendon's Bank Accounts.**

Ex. 33 is a bank statement for Brendon's checking account no. 40028999 dated 2/19/03.

Brendon produced it, but was not sure if he had it in his possession before filing or preparing his

Schedules.  Tr., p. 604.  Brendon could not remember trying to look for all his original bank

statements when preparing his Schedules.  Tr., pp. 604-05.  The first time he recalled looking for

---

[17]The difference between audited and compiled financial statements, Schultz explained, is
in a compiled financial statement the CPA takes the client's information and no assurances are
given by the CPA.  Tr., p. 280.

them was after his first creditor meeting, and he found Ex. 33 in Ryan's office at the North Forty

Resort, to which he always had access.  Tr., p. 605, 606.  Among the transactions shown on Ex.

33 are an online payment to a Bank of America card in the amount of $35,422.94, dated 1/22/03;

a $35,000 withdrawal, dated 1/30/03, described as "Transfer to DDA" and deposit, dated 1/31/03

in the same $35,000 amount described as "Transfer from DDA"; and another "Transfer from

DDA" in the amount of $50,000, dated 2/18/03 (page 4).

**The "Falling Out".**

In February 2003 Brendon went to Las Vegas where he lost $12,500 on February 3,

2003[18].  Ex. 1, SFA Question 8.  Abbey testified that in May 2003 he ran into Brendon on the

comp casino floor of the Bellagio resort in Las Vegas, right across from Abbey's suite, and that

Abbey was aghast that someone who made $40,000 a year according to their operating agreement

was on the Bellagio's comp casino floor.  Tr., p. 348.  Abbey testified that was the reason he

returned to Whitefish in July 2003.  Tr., pp. 348-49.  Abbey testified that he discovered Ryan was

living in 650 Woodside when he came to Whitefish in June or July 2003.  Tr., p. 390.  Brendon

testified that he discussed Ryan's purchase of 650 Woodside with Abbey while Brendon was

moving or getting ready into his new house at 665 Woodside.  Tr., pp. 981-82.  Brendon testified

that Abbey asked whether they could sell the little yellow house, and Brendon told Abbey that he

had bought or exchanged 650 Woodside a year ago and was selling it to Ryan as an inducement

for him to move to Whitefish.  Tr., p. 982.  He testified that Abbey said that he didn't remember

that and said that in the future they should start keeping a log of things like that, to remind Abbey

what they agreed to and Brendon said he would gladly do that, and that was the end of it.  Tr., p.

---

[18]Brendon testified at his § 341(a) meeting:  "It was a bad trip."  Ex. 2, p. 35:15.

24

983.  Abbey testified that he did not learn of Ryan's employment until after Abbey came to Whitefish in the Spring of 2003, and testified that he never agreed to a compensation package for Ryan or a "good deal" on a house if he came to work for TCLLC.  Tr., pp. 347-48.

Brendon was injured in July 2003 in a motorcycle accident.  Tr., pp. 352.  Abbey testified that he first learned of unauthorized transactions between TCLLC and Brendon in July 2003 when he returned to Whitefish.  Tr., p. 331.  Abbey went to the banks and asked to see accounts and outstanding loans, and he discovered loans and partnerships that he did not know existed.  Tr., p. 350.  Abbey testified that he learned that Tornow had been made TCLLC's authorized agent in Montana by Brendon without Abbey's permission.  Tr., p. 353-54.  Abbey testified that Tornow brought Abbey a bunch of partnerships involving TCLLC that Tornow put together without Abbey's signature, and that Brendon deeded a piece of property that was included in the TCLLC operating agreement to Tornow.  Tr., p. 354.

Abbey testified that he went to Ryan and asked about the loans and partnerships, and Ryan showed him an account with $50,000 going back and forth from Brendon to TCLLC, which Ryan told him was Brendon trying to shore up a financial statement for application for a bond.  Tr., pp. 349-50.  Abbey testified that Ryan refused to answer his questions as TCLLC's managing member.  Tr., p. 350.  Ryan testified that Abbey came to see him in his office about 2 or 3 weeks after Ryan moved into 650 Woodside, in late July or early August of 2003, while Brendon was in the hospital from the motorcycle accident, and before Matteson arrived, and accused Brendon of stealing money.  Tr., pp. 406-07.

Matteson is a CPA and first worked with Abbey in April of 2003 in California.  Tr., p. 793.  Abbey testified that he hired Matteson and sent him to Whitefish after August 2003 to act

25

as Abbey's agent in uncovering unauthorized loans and partnerships, first as a consultant and later as a vice president for The Abbey Company. Tr., pp. 351, 391. Matteson testified that he was sent to Montana to assess the financial condition of TCLLC and its operations, review compliance with the operating agreement, validate that all the contributions which were supposed to have been made were made, and follow up on Deloitte & Touche's draft audit report that brought to Abbey's attention some overcharges on a construction project. Tr., pp. 793, 794. Matteson arrived at TCLLC's office on a Monday in the first week of August. Tr., p. 794. Ryan testified that Matteson showed up a day or two after Abbey screamed at him in his office, at the beginning of August 2003. Tr., pp. 440-41.

Brendon was not in the office, and Matteson learned he was hospitalized. Tr., pp. 794, 795. Brendon did not meet Matteson until he got out of the hospital, but learned about him from Ryan as the person to whom to send all TCLLC financial statements, but Brendon did not believe Matteson was there for a formal audit. Tr., pp. 507-08. Matteson first met Brendon the second week in August.

Matteson testified that he asked Ryan about supporting documents for all of the assets that were to have been contributed to TCLLC, but Matteson had difficulty getting access to the books and records of TCLLC to find out what had been contributed. Tr., pp. 795, 797. He testified that two properties were listed as TCI's contribution under the operating agreement, i.e., Lot 6 of Woodside known as 650 Woodside, and Lot 7 of Woodside known as 660 Woodside, and in addition an office building in Brendon's name was also to be contributed to TCLLC. Tr., p. 797. Matteson testified that he believed at the time of his visit in August 2003 that 650 Woodside was still an asset of TCLLC, and Ryan did not tell him otherwise. Tr., p. 798.

26

On cross examination Dye elicited Matteson's testimony from a deposition in an adversary proceeding against Ryan Retz, that Ryan told Matteson in early 2003 that Ryan was living at 650 Woodside.  Tr., pp. 805, 806.  On redirect examination Matteson was asked whether Ryan told him in August 2003 that Ryan was purchasing 650 Woodside from Brendon, and Matteson's response was "No".  Tr., p. 807.

Abbey testified that he learned that 650 Woodside had been transferred to Ryan in July 2003, but that he was focusing on withdrawing financial support from TCLLC and shutting down the Shelter Island project to protect his $10 million investment.  Tr., pp. 346-47.  By that time, Abbey testified, he was in "combative conflict"[19] with Brendon and did not give any further written consent.  Tr., p. 347.  However, on cross examination Abbey testified that Brendon continued to bring him various projects in 2003, and Abbey met with the president of Glacier Bank in late July or August 2003 regarding one such project where he stated he had a lot of confidence in Brendon, though he retracted that statement to Glacier Bank shortly thereafter, and various lawsuits ensued.  Tr., p. 378-80, 382.  Abbey testified that he did not have any further interaction with Brendon until a receivership meeting, at which he said Brendon asked him if things could go back to "normal", and Abbey replied that it was way beyond that point.  Tr., p. 352.

Abbey testified that TCLLC ceased working on the Shelter Island project in August of 2003.  Tr., p. 326.  Brendon believed that TCLLC ceased work on Shelter Island in the middle of September 2003.  Tr., p. 509.  Abbey testified that at the time TCLLC ceased working on the

---

[19]Abbey testified that Misty called him shortly before he came to Whitefish in August 2003, and left a message on his answering machine that she would burn her house down before she gave it to him.  Tr., p. 383.

Shelter Island project he had invested $10 million in the project, and only 2 unfinished boat houses and a hole in the ground, which was the basement of his home, existed.  Tr., pp. 326-27.

**State Court Litigation.**

Litigation between Abbey and Retz commenced in the Montana Eleventh Judicial District Court, Flathead County, Cause No. DV-03-440(B), shortly after TCLLC ceased work on the Shelter Island project in August of 2003 when Brendon and TCI sued Abbey, and Abbey countersued and added Ryan to the lawsuit.  Tr., pp. 415, 509.  Brendon testified that he did not provide any notice to Abbey that TCLLC was going to cease working on the Shelter Island project because Brendon thought he was racing Abbey to the courthouse and had seen a draft of a lawsuit against him.  Tr., pp. 509, 510.  Brendon directed people to remove TCLLC equipment and business records from the Shelter Island project site, a few days before he filed suit.  Tr., pp. 510, 511.  Brendon testified that Abbey was telling TCLLC's lenders that Brendon had been stealing from him and doing things without authorization, and Abbey had shut down TCLLC's construction funding leaving unpaid subcontractor bills, which Brendon could no longer pay as he had previously paid with loan advances, and Brendon filed suit to stop Abbey from doing that. Tr., p. 854.

Abbey testified that James H. Cossitt was appointed by the state court as receiver for TCLLC after Brendon sued him. Tr., p. 353.  An initial hearing to appoint the receiver was held on September 3, 2003, and Brendon recalled discussing his intent to sell 650 Woodside at that hearing.  Tr., p. 520, 799.  Brendon testified that the September 3, 2003, hearing was the first time he learned about Abbey's allegations that Brendon had failed to contribute assets he was obligated to contribute to TCLLC in July 2001.  Tr., pp. 983, 1036-37.

Brendon's state court attorney Measure testified that Brendon came into his office the day before the September 3, 2003, hearing and asked him to represent Brendon, and Measure agreed to represent him and they discussed the sale of 650 Woodside.  Tr., pp. 837-38.  Measure testified that he represented Brendon, Misty, Ryan and TCI in Cause No. DV-03-440(b).  Tr., p. 843.  After the show cause hearing on September 3, 2003, the court entered an Order dated September 17, 2003, Ex. QQ, appointing attorney James H. Cossitt ("Cossitt") as "Custodian of the companies" with state law receiver powers.

Matteson testified that Brendon's attorney, Dan Wilson, indicated at the state court hearing that a sale of 650 Woodside was pending, but no other terms or information on the transaction were provided until two or three weeks before the property was sold.  Tr., p. 799.  Brendon admitted he never saw any written permission from Cossitt, or the state court, authorizing the transfer of 650 Woodside.  Tr., pp. 523, 526.  But Brendon testified that  his attorney Measure approached Cossitt and requested his approval for the sale, and Cossitt responded that the judge already ordered it transferred in the first hearing, and so Cossitt did not need to approve it.  Tr., pp. 525, 529, 984.  At that meeting, Brendon testified, he first became aware of Abbey's concern about the sale of 650 Woodside to Ryan, although later he testified that he might not have fully realized that the question of Ryan buying 650 Woodside became an issue until after the adversary proceedings were filed in the bankruptcy case.  Tr., . 984, 985-86.

Brendon testified that the state court at the September 2003 hearing ordered him to transfer the property and deposit the proceeds with Cossitt for later determination.  Tr., pp. 526-27, 852.  Ex. FFF is the transcript of the September 3, 2003, state court hearing.  Brendon did not disclose Ryan Retz's name as the purchaser of 650 Woodside, the purchase price or whether the

29

property was appraised.  Tr., pp. 531-33[20].  Brendon testified that it did not matter that an

appraisal had been done or what it was because Ryan and he had made the deal and only needed

the appraisal so that Ryan could obtain financing.  Tr., p. 534.  The following testimony by

Brendon was elicited by examination under oath conducted by the state court:

> Question    So if I order you to transfer all that you now have the ability to transfer that was supposed to have been transferred under the Operating Agreement, you don't have a problem with that?
>
> Answer [Brendon]   I've entered into a buy-sell on 650 Woodside, so I would have – I would have a problem with transferring any property on Woodside because it was agreed to with Don and I about how it was gonna be disposed of. If there's anything else out there, I would have no problem transferring it.
>
> Q What do you mean?  You have a buy-sell on 650 Woodside, but you'd have a problem with transferring any property in Woodside?  Why is that?
>
> A No, I wouldn't have a problem – okay.  I wouldn't have a problem transferring anything except my house or 650 Woodside because I have a buy-sell entered into on 650 Woodside.
>
> Q   And your house was a property that was to be transferred into the LLC under the Operating Agreement?
>
> A  No.  My house – that land was not purchased yet.

Ex. FFF, pp. 104-05, 1037-37.

The order, Ex. QQ dated September 17, 2003, is silent about the court's reasoning

regarding 650 Woodside's treatment, except the following language:

> IT IS HEREBY ORDERED that Plaintiff Retz transfer or cause the immediate transfer of title of any real property which he was obligated to transfer to

_____

[20]Brendon's testimony at the September 3, 2003, hearing at Ex. FFF, pp. 98, 104-08, includes his assertions about how he purchased 650 Woodside from TCLLC, based solely on what Brendon described is a "verbal conversation" between himself and Abbey, after Abbey allegedly agreed to let Brendon live in it without paying any rent and to purchase it at less than appraisal.

> [TCLLC], pursuant to the operating agreement of [TCLLC], and for which he has
> the present ability and present obligation to transfer.  This order does not pertain
> to the property at 650 Woodside.  The proceeds from any sale of the property of
> 650 Woodside shall be applied to first satisfy any underlying debt and costs of
> sale and the balance of any proceeds shall be deposited with the Custodian, Mr.
> Cossitt, for his determination as to the appropriate disposition of any such balance
> of proceeds.

Ex. QQ, p. 5; Tr., pp. 848-49.

Measure testified that he could not say whether the identity of the buyer of 650 Woodside, his

client Ryan, was disclosed prior to the entry of Ex. QQ.  Tr., p. 849.

Brendon testified that Cossitt suspended TCLLC's normal business operations about the

third week of September 2003.  Tr., p. 513.  Brendon recalled that Cossitt was upset at Brendon's

decision regarding how to fund TCLLC payroll from a TCI stock account without Cossitt's

approval.  Tr., pp. 513-14.  Ryan kept working for TCLLC under Cossitt's supervision until

September 23, 2003, when Cossitt "terminated everyone."  Tr., pp. 425-26, 435.  Ryan testified

that when he left TCLLC the Master Builder data was under Cossitt's control and the server

ended up with Whitefish Credit Union, but Ryan belived that the TCLLC Master Builder records

were complete and accurate when Cossitt fired him.  Tr., pp. 425-26, 435.  Ryan went to work

for TCI, but ceased being an employee of TCI around Thanksgiving of 2003.  Tr., p. 436.

Cossitt filed a joinder in a motion for contempt, which Abbey filed against Brendon, Ex.

113, on October 14, 2003, in the state court regarding Brendon's stock transactions.  Tr., pp. 514-

15.  Ex. 112[21] is Cossitt's joinder in Abbey's motion for prejudgment attachment against

Brendon.  Brendon admitted attending a hearing on the motion for contempt held on October 16,

--------

[21]Ex. 112 and 113 are certified copies of those documents from the clerk of court for the
Montana Eleventh District Court, Flathead County.  They were admitted over objections of
Retz's counsel.

2003, but testified that he could not remember any reference to 650 Woodside at that hearing.

Tr., pp. 517-18.  Ex. 93 is the transcript of the October 16, 2003, contempt hearing.  The state

court found Brendon in contempt for liquidation of the stock account.  Ex. 93, pp. 4-5.  The court

fined Brendon $500 and imposed a jail term of five days, but suspended execution of those

sanctions,

> on the condition that Mr. Retz – that he take no further action with regard to any
> assets, liabilities, contracts – expand that, Mr. Best, with whatever terms you can
> think of – that relate in any way to the LLCs – I guess that's it – all of the LLC's
> that are Third-Party Plaintiffs in this case.  Okay?
>
> And on the condition that – that Mr. Retz, for a period of 90 days, not
> transfer any real or personal property, excluding cash and current earnings,
> exceeding $5,000 in value without the written consent of either the receiver or the
> court.

Ex. 93, p. 5:9-22.

Measure drafted Ex. Z, a letter to Cossitt dated November 5, 2003, advising of the buy-

sell between Brendon and Ryan for 650 Woodside.  Measure testified that the transaction had

received approval to go forward.  Tr., p. 840.  Ex. Z asks Cossitt to formally approve the sale so

that TCLLC's "equitable interest in the real estate owned by Brendon and Misty may be

conveyed pursuant" to the state court's September order directly to the receivership.  Brendon

testified that he knew the excess proceeds were disputed.  Tr., p. 785.  Measure testified that

TCLLC's equitable interest would retain any proceeds above the mortgages.  Tr., p. 841.

Brendon testified that he attended a receiver meeting presided over by Cossitt, at which Measure

asked Cossitt to formally approve the sale of 650 Woodside because it was getting close to

closing.

The state court entered its order on application for contempt on November 20, 2003,

including the above restrictions.  Ex. 18, p. 2.  Brendon recalled that the restrictions expired

sometime in January 2004.  Tr., p. 520.  On November 21, 2003, during the 90 day period

ordered by the state court in Ex. 18, Brendon and Misty signed the warranty deed conveying 650

Woodside, or Lot 6 of Woodside subdivision, to Ryan.  Ex. 19.  Tr., pp. 523, 527.

Brendon's counsel moved to withdraw as his attorneys because he could not pay them.

Tr., pp. 525, 537.  Measure agreed that he withdrew because Brendon could not afford to pay his

fees, plus there was a nonwaivable conflict with other clients of Measure's firm.  Tr., p. 840.

Brendon picked up his entire file from Measure's office, and  tried to find other counsel but did

not have the resources to hire anyone.  Tr., pp. 540, 842.

Ex. 32 is a financial statement Brendon signed and gave to Cossitt, dated 12/12/2003.

Tr., p. 743.  A helicopter in which Brendon owned an interest is not listed on Ex. 32, and

Brendon testified that it was unintentionally left off because he didn't think about it or thought it

was in Chance Chacon's name, or included in the vehicles[22].  Tr., pp. 744-45.  A special master

was appointed in the state court litigation to hear pending matters and help Cossitt make

decisions.  Tr., pp. 538-39.

**TCI Transactions/Accounts.**

 TCI had a share account at Whitefish Credit Union, and Ex. 51 is a printout of that

account from June 2003 to June 2004.  Tr., pp. 762-63.  Ryan testified that construction loans for

Copperwood Properties, LLC, and Creekwood Lots, LLC, were paid through share accounts at

the credit union.  Tr., p. 440.

---

[22]Ex. 32 lists vehicles with a total value of $135,000.  While the helicopter is not listed,
the Glacier Air Hangar Unit B is listed with a market value of $55,000.

33

Ex. 76 is a check from TCI's Wells Fargo account to Brendon in the amount of $60,000.00, dated 8/30/03, numbered 1007, with a memo "Distribution". Tr., p. 666. The TCI ledger, Ex. 66, shows on page 1 the $60,000 distribution.

Ex. 74 is a check from TCI's Wells Fargo account to Brendon in the amount of $8,000.00, dated 9/3/03, and numbered 1012. Tr., p. 662. Brendon testified that he could not remember what Ex. 74 was for, but if it was on the ledger Ryan was working on it would be a distribution or transfer between Brendon and TCI. Tr., p. 663. The ledger, Ex. 66, shows on page 2 a transfer dated 9/3/2003 for $8,000.00 and transfer number 1012 described simply as "own."

Ex. 75 is a check from TCI's Wells Fargo account to Brendon in the amount of $8,000.00, dated 9/6/03, and numbered 1013. Tr., p. 664. Brendon testified that he could not remember what the payment on Ex. 75 was for. Tr., p. 664. The ledger, Ex. 66, shows on page 2 a transfer, dated 9/6/2003, for $8,000.00 and transfer number 1013 described simply as "dist".

Ex. 77 is a check from Timberland's Glacier Bank account, dated 9/30/03, signed by Brendon for "Cash" in the amount of $48,000. Tr., p. 668. Brendon testified that he held onto that $48,000 and used it to pay an American Express account, but he did not know if he was classifying anything at that point, "I was just trying to survive". Tr., pp. 668-69.

On November 26, 2003, Brendon made numerous purchases of office equipment and a copier on behalf of TCI at Office City in Missoula. Ex. 83; Tr., pp. 750, 751. The first page of Ex. 83 shows purchases totaling $7,431.00 at Office City on 11/26/03, which Brendon paid for by credit card on his Bank of America Alaska Airlines Visa business card, account no. 4003 9010 0039 6166. Ex. 114; Tr., pp. 751-52. The third and fourth pages of Ex. 83 are Ricoh

34

Corporation ("Ricoh") invoices for purchases on December 12 and 13, 2003, with notations "Pd In Full A/E Approval #174235. Brendon testified that he did not know what A/E Approval means, and did not know whether those purchases were charged on an American Express Card. Tr., p. 754. The last page of Ex. 83, a Ricoh invoice for a purchase by TCI in the amount of $10,860.00, has a handwritten notation, "Invoice paid by c/c on 1-9-04". Ex. P, a series of American Express business platinum card statements in the name of Brendon and "Timberland Const", account number 3783-477207-63001, includes at Bates # 00900 a charge for Ricoh Corporation dated 1/12/04 in the amount of $10,860. Tr., pp. 754-55.

Brendon identified Ex. 86, an account statement for Wells Fargo Bank Business Direct Division in TCI's name, customer number 89-8037201-7, as an invoice for a loan payment for May-June 2004. Tr., p. 756. Ex. 86 lists total outstanding principal in the sum of $40,164.70, and lists loans for office furniture and new servers and computers dated 11/26/03 and 12/4/03. Tr., p. 756. Brendon testified that he purchased the Office City furniture with credit cards, and when asked what he did with the money that he borrowed from Wells Fargo Bank above and beyond the credit card charges, Brendon answered that it went into an operating account of TCI, where he would have used it to try to stay current on his credit cards. Tr., p. 757. TCI had operating accounts at Wells Fargo and at Glacier Bank of Whitefish. Tr., p. 761.

Ex. 86 lists a loan for the purchase of new servers and computers in the amount of $19,375.00, dated 12/4/03. Brendon testified those were purchased in parts and pieces, and were listed on Ex. P as credit card purchases on the TCI American Express card. Tr., pp. 758, 936; Ex. P, Bates # 00893. The third page of Ex P shows a payment made on the computers on 9/24/03 in the amount of $1,056.70. Tr., p. 939. Brendon testified that he used the Wells Fargo

35

loans[23] for servers and computers to keep the American Express cards current, if possible, or in the TCI operating account where it "probably went 16 different directions".  Tr., p. 759:10-11[24]. Ex. V and W are letters from Wells Fargo to TCI regarding the computers and office furniture loans.  Tr., pp. 938.

Ex. 50 is a statement of TCI's Glacier Bank checking account for the period ending 12/31/03.  It includes an electronic payment to American Express on the day after Brendon took out the loan on servers and computers, 12/5/03, in the amount of $10,102.59, after a deposit in the amount of $12,500.00 was made the same day.  Brendon testified that TCI purchased the computers, that he did not ever personally own or pay for them, that he disclosed the ownership of computers to Dye and discussed whether TCI's assets had to be listed on his personal bankruptcy Schedules.  Tr., p. 935.  Dye confirmed that he discussed Brendon's purchase of computers and office equipment for TCI, and that it was proper to disclose only the equity interest in TCI shares in his Schedules and SFA.  Tr., p. 1060.

The second page of Ex. 86 lists the Ricoh copier and laptop, a loan amount of $15,475.00, the date the loan was established as 1/12/04 – six days after Brendon purchased the copier on Ex. 83.  Brendon testified that the Wells Fargo Business Direct Division loan on Ex. 86 was "not directly" used to purchase the Ricoh copier, which was purchased on TCI's American Express account (Ex. P, Bates # 00900) but instead went into a TCI operating account, but he did not know which one. Tr., pp. 760, 761.

---

[23]Ex. Q is a loan statement for those computers on a TCI account for March-April 2006. Tr., p. 936.

[24]Later, "20-100 different directions".  Tr., p. 759:13.

Ex. 52 is an account statement for TCI account number 861-9819934 at Wells Fargo Bank, N.A., dated February 12, 2004, showing an ending balance of $1,520.49.  Tr., p. 762

TCI and Brendon had a Visa credit card at First Bankcard, account no. 4418 2292 3322 8017, and Ex. 87 is the statement for that account dated March 9, 2004, showing a balance owing of $1,941.07.

After Cossitt terminated TCLLC's employees, Ryan became an employee of TCI.  Tr., pp. 435, 465.  Ryan testified that he produced a spreadsheet showing Brendon's money in and money out, from TCI records.  Tr., pp. 430, 435.  Ryan entered the data into the spreadsheet, Ex. 66.  Tr., pp. 432-433, 436, 666.  Brendon testified that the TCI books never were completed sufficiently for generation of a reliable balance sheet as of December 31, 2003, and after his father Robert Retz ("Robert") died, Brendon gave up and surrendered the books and records.  Tr., pp. 712, 713.

Cossitt sent Brendon W-2 forms for the tax year 2003 for TCI and TCLLC.  Ex. 56, 57; Tr., p. 745-46.  Ex. 58 consists of payroll stubs for Brendon from TCI, and one TCLLC, for periods from 1/6/2003 through December 2003.  Tr., p. 746.  Ex. 59 is a payroll stub to Brendon from TCI[25] dated 3/1/2004, showing year to date wages of $22,000.  Tr., pp. 747-48.  The books and records of TCLLC were moved into storage and then to another office, and Brendon testified that he did not know who was keeping track of the company documents.  Tr., p. 603.

**TCI Assets.**

Brendon testified that the office furniture, computer equipment and Ricoh copier which

---

[25]Although the name of the Timberland entity on Ex. 59 is cut off, Brendon is designated as employee 20 on Ex. 59.  On Ex. 58 (TCI pay stubs), Brendon is employee 20, while on the only  TCLLC pay stub on Ex. 58, he is employee no. 1.

he purchased in late 2003 and early 2004 for TCI is in storage at the North Forty Resort.  Tr., pp.

765, 766.  He testified the screen for the laptop he purchased for TCI went out and the repair

shop told him it was not worth fixing.  Tr., p. 766.  The North Forty Resort purchased some of

TCLLC's office equipment from the credit union.  Tr., p. 766.

   **Brendon's Assets**[26].

   **1.  Country Club Membership.**  In 2003 Brendon purchased a lot at the Iron Horse Golf

Club.  Tr., p. 955.  He testified that he paid approximately $205,000 for the Iron Horse lot and

paid more for a country club membership linked to the lot worth between $50,000 to $75,000,

which could not be sold independent of the lot, so he listed the value of the membership together

with the value of the lot.  Tr., pp. 738, 955.  He testified that he told Dye about the value and

ownership interest before he filed his Chapter 7 petition, and discussed it with Samson at the §

341 meeting along with the fact that the membership was not severable.  Tr., pp. 954-55.

   **2.  Jewelry.**  Riley McGiboney is an insurance agent with State Farm Insurance.  Riley

testified that he has known Brendon for over 30 years and provided insurance for Brendon's

home, vehicles, personal articles and a personal liability umbrella policy.  Tr., p. 238.

Riley testified that he provided insurance for Brendon's and Misty's items of jewelry first on

3/13/2002, and that the jewelry remains insured.  Tr., pp. 239, 240.

   Additional items were added to the policy on 5/23/02.  Tr., p. 240.  Ex. 80 is the State

Farm personal articles insurance policy.  Tr., p. 241.  The third and fourth pages of Ex. 80, Bates

# 00119-120, are the personal insurance application for Brendon and Misty, with a liability limit

of $28,100.  Tr., p. 246.  The second page of Ex. 80, 00118, shows coverage amounts of the

---

   [26]Discussed in greater detail below.

insurance for each article of jewelry, which Riley testified are from an appraisal of the items Riley obtained from the client.  Tr., pp. 243-44, 258.  The amount of coverage on Ex. 80, Bates # 00118, dated January 24, 2007, given for a Tag Heuer men's watch is $1,027, and the amount for a man's Omega watch is $2,026.  Tr., pp. 244-45.  Brendon testified that he lost the Tag Heuer watch in the Fall of 2002, and doubts he even looked at the insurance invoice.  Tr., pp. 781, 783

Riley testified about insurance claims made on Brendon's items of jewelry covered by State Farm.  Tr., pp. 246-47.  Brendon admitted submitting a claim to fix the Omega watch.  Tr., p. 782.  Ex. 81 is a printout of an underwriting review from Riley's computer.  Tr., pp. 247-48. Ex. 81 shows occurrences of damage to one of Brendon's watches on 12/15/03 when he hit it on a doorknob and broke a crystal and bezel.  A claim was made and $233 paid according to Ex. 81. Riley testified the watch was repaired and is still listed on the personal items covered under the policy.  Tr., pp. 248, 259.  On cross examination Riley could not say when the crystal and bezel were repaired, and did not know which of Brendon's watches was broken and repaired.  Tr., p. 259-61.  A second claim from Ex. 81 dated 2/15/05, was paid in the amount of $615, when the insured went into the ocean and water got in the watch and ruined it.  Riley testified that he believed that watch was repaired, and that is still insured.  Tr., pp. 248-49.  Riley testified that claims made for damage to jewelry are based on a submitted receipt.  Tr., p. 264.

**3. Vehicles**.  Riley testified that Brendon completed car loan applications for State Farm Bank reflected in Ex. 78 for a 2002 Audi and a Harley Davidson.  Tr., pp. 250-51, 256.  The application for the 2002 Audi was dated 2/21/03 and for the Harley Davidson the date was

September 12, 2003[27].  Tr., pp. 253, 264-66.  Riley testified that Brendon gave him the

information to fill out the applications on Ex. 78 over the phone, and Brendon told him that his

monthly gross income at Timberland Construction was $20,833.  Tr., p. 252, 253, 669.  Brendon

testified that he probably got the $20,833 income figure from his 2002 tax returns, which he

increased because he expected to make more in 2003 because he knew TCLLC's profitability

was up.  Tr., pp. 670-72.  The loan amount requested for the 2002 Audi was $81,000 on Ex. 78.

Tr., p. 261.  Riley testified that Brendon borrowed funds against the Harley Davidson.  Tr., p.

262.

### 4.  Helicopter.

On January 28, 2004, Brendon signed Ex. 116, stating that he had bought Chance

Chacon's interest in the helicopter, and owned 100 percent of the helicopter in May of 2003.  Tr.,

pp. 620, 624.  He gave Ex. 116 to Randy Cogdill, his Glacier Bank loan officer, to show Brendon

authorized Chacon to transfer the helicopter.  Tr., p. 623.  Cogdill put together Ex. 65, an

accounting of loan no. 12750803, which Brendon accepted.  Tr., p. 678, 679.

### Transfer of 650 Woodside to Ryan Retz.

The house at 650 Woodside is a 3 bedroom 1,400 square foot house in Whitefish.  Tr., p.

401.  Matteson testified that after Brendon filed the lawsuit against Abbey Matteson performed a

search at the county recorder's office to see the chain of title on property, and he discovered that

650 Woodside had been deeded or transferred out of TCI directly to Brendon and Misty.  Tr., p.

798.  Abbey testified that Ryan and Brendon never informed him that Brendon intended to sell

---

[27]Ex. 78 does not provide the dates, but Riley testified that he obtained the dates of the loans from State Farm Bank after State Farm's attorney Brad Luck asked Riley to obtain additional information of the dates, from a request from Abbey's counsel Black.  Tr., p. 267.

650 Woodside to Ryan. Tr., p. 351.  Abbey testified that he learned that 650 Woodside had been transferred to Brendon in July 2003, but that he was focusing on withdrawing financial support and shutting down the Shelter Island project to protect his $10 million investment.  Tr., p. 347.

Ryan testified that he believed Brendon owned 650 Woodside when Ryan started with TCLLC in May 2002, and that Brendon and Misty were living in it.  Tr., pp. 413, 458.  Ryan could not recall any specific document authorizing the transfer of 650 Woodside from TCLLC to Brendon.  Tr., p. 450.

An appraisal of 650 Woodside dated 7/8/2002, Ex. 14, was ordered by a credit union and performed by Rick Caerbert, and fixed the market value of 650 Woodside at $170,000.  Tr., p. 987.  Brendon testified that he saw Ex. 14 after his loan was negotiated and signed.  Tr., p. 987.

Bilau was Ryan and Angie's neighbor on Woodside Lane, and Angie's co-worker.  Tr., pp. 230-31.  Bilau testified that Angie told him, around October 2002, that she and Ryan were going to purchase 650 Woodside Lane for around $160,000[28].  Tr., pp. 232-33.  Angie admitted telling friends and coworkers that they were going to acquire 650 Woodside.  Tr., p. 458.  Ryan testified that he purchased 650 Woodside, where Brendon was living at the time, for $160,000 under a written buy-sell agreement.  Tr., pp. 401-02, 403-04.

Ryan testified that there has been substantial appreciation in real estate values in Whitefish since 2000.  Tr., p. 453.  He testified that they arrived at the $160,000 price based on an unsolicited offer of $180,000 for 650 Woodside which Brendon had received but had not accepted.  Tr., pp. 453, 505.  Misty testified that a couple named Pannell had offered them

---

[28]Bilau's testimony regarding the purchase price was offered only for the fact that Angie stated it, not for the truth of the matter.  Tr., p. 233.

$175,000 to $180,000[29] in late 2002 to purchase 650 Woodside, but she and Brendon had just moved in and did not want to move again, so that sale did not go through. Tr., p. 827, 967-69. Brendon testified that he determined the $160,000 selling from the Pannell offer, less a commission that would not need to be paid and a little more. Tr., p. 970.

Noel is a certified residential appraiser who testified she was hired by Whitefish Credit Union to complete an appraisal for 650 Woodside, which she did in July 2003. Tr., pp. 161-62. Ryan and Brendon both testified that Brendon contacted Noel and ordered her appraisal. Tr., pp. 418, 507, 987. The owner of the property was identified to Noel as "Timberland Construction". Tr., p. 162. Noel testified that Misty gave her the earlier appraisal, Ex. 14, when she visited 650 Woodside, but that Noel did not rely on Ex. 14 and completed her own appraisal on July 25, 2003, Ex. 17, valuing 650 Woodside at $220,000, or $60,000 more than Ryan's purchase price. Tr., pp. 165, 421. Noel was paid for her appraisal by Ryan and Angie Retz. Tr., pp. 166-67, 419.

Brendon testified that he and Ryan did not enter into a written purchase and sale agreement for the sale of 650 Woodside until they needed one for the title company, which they then backdated. Tr., pp. 505-06. Ryan believed that Brendon and Misty were the owners, and they are listed as the sellers on the purchase contract, Ex. AA, dated July 20, 2003. Tr., p. 415. Ryan is the buyer named on Ex. AA, and he and Angie moved into 650 Woodside on July 20, 2003, after Brendon and Misty's other house was finished enough for them to move in and vacate 650 Woodside. Tr., pp. 404, 458. Misty testified that the sale of 650 Woodside would have happened much earlier if their new home had been completed, but the new home was behind schedule and that was the primary reason the closing of the sale to Ryan was delayed. Tr., p.

---

[29]Ex CCC is Pannell's offer for $179,000. Tr., pp. 967-68.

828.

Although Ex. AA is dated July 20, 2003, Ryan testified that it was backdated to the date he moved in, and that he signed Ex. AA after Brendon got out of the hospital, probably the first or second week of August 2003 and after Matteson arrived. Tr., pp. 415-16, 417-18. Ryan's purchase of 650 Woodside closed on November 24, 2003. Tr., pp. 404-05, 505.

Brendon testified that his agreement with Ryan and Angie to give them a good deal on 650 Woodside preceded his dispute with Abbey by substantial time period. Abbey testified that he learned that 650 Woodside had been transferred to Ryan in July 2003, but that he was focusing on withdrawing financial support and shutting down the Shelter Island project to protect his $10 million investment. Tr., pp. 346-47. Ryan testified that he told Abbey he was going to buy 650 Woodside, but does not remember when, and that one of Abbey's associates, Mr. Peterson, asked Ryan when he had bought 650 Woodside. Tr., pp. 441-42.

When the lawsuit between Abbey and Brendon ensued, Ryan learned that Abbey asserted that TCLLC should own 650 Woodside, but Ryan testified that Brendon had paid off the Whitefish Credit Union loan on that house and gotten his own loan. Tr., pp. 442-43. Ryan testified that he sought advice of counsel after the litigation began, and was told by his attorneys there was no problem going through with the purchase despite Abbey's claim that TCLLC owned 650 Woodside, and that Cossitt had approved of the sale. Tr., pp. 406, 444-45. Ryan's attorneys then moved to withdraw as his counsel in the middle of November 2003, before he closed on the purchase of 650 Woodside. Tr., p. 445, 447; Ex. 117[30].

-------

[30]Ryan testified that he was not served with the motion to withdraw, Ex. 117, but he remembers the conversation with his attorney. Tr., p. 450.

Brendon testified on direct examination that he discussed the sale of 650 Woodside with his attorneys Dye, Measure and Wilson, before the sale took place in the fall of 2003, that he disclosed the price and that Ryan was the purchaser and that it was going to be sold at below market and a good deal for Ryan, and they discussed the implications if Brendon filed for bankruptcy relief. Tr., pp. 898-900. Dye recalled discussing the sale of 650 Woodside at his first meeting with Brendon, Robert and Ryan on October 7, 2003, and recalled them telling him that it was a verbal handshake deal to sell the house to Ryan at below fair market value. Tr., pp. 1056-57. Brendon testified that Dye told him that if he had to file bankruptcy the transaction would be scrutinized and the sale price may be in question because he gave Ryan a good deal on it, but that Brendon wanted to follow through on his agreement with Ryan and it got all his attorneys' blessings. Tr., p. 901. Dye testified that he discussed issues of fraudulent transfer, constructive fraudulent transfer and Brendon's purported lack of insolvency because of his substantial assets. Tr., pp. 1058-59. Dye testified that he did not advise them not to proceed with the sale to Ryan, because the agreement to sell 650 Woodside to Ryan was more than a year old, Brendon had consulted with his state court attorneys and the state court judge had said to go ahead with the sale. Tr., p. 1059. Dye testified that he had no information about appraisals at the time, but it would not have made a difference to him. Tr., pp. 1059-60.

Matteson testified that he learned that Ryan was the proposed purchaser of 650 Woodside two or three weeks before the sale, in October or early November of 2003. Tr., pp. 799, 800. Matteson did not get to see the buy/sell agreement before the sale closed, and did not learn the terms or that an appraisal had been performed on 650 Woodside until after the sale. Tr., pp. 800, 801. Matteson testified that he wrote Cossitt a letter objecting to the sale, and attended a receiver

meeting and discussed with Cossitt, in Brendon's presence, Abbey's objection to the sale of 650

Woodside to Ryan.  Tr., pp. 802-03.  Brendon admitted seeing an email, but testified that he just

learned of Matteson's objection the week of trial.  Tr., p. 902.  Ex. 19, the deed from Brendon

and Misty of 650 Woodside to Ryan[31], was dated November 21, 2003, within the 90 day period

during which the state court prohibited Brendon from taking any action with regard to TCLLC's

assets, or transfer any real property in Ex. 18, p. 2.

**Brendon's Personal Bank Accounts**.

Brendon and Misty signed an EquityLine Account Agreement, Ex. 15, with Wells Fargo

Bank, dated 9/6/02, establishing a credit limit of $50,000 and listing their address as 650

Woodside.  Ex. 68 is a Wells Fargo account statement for Brendon and Misty, listing deposits of

$50,000 on 4/14/03 and $35,000 on 5/1/03, and checks in the amounts of $50,000 on 4/15/03 and

$85,052.73, all of which Brendon could not identify.  Tr., p. 650-52.

Brendon testified that on a month-by-month basis he would typically loan TCLLC from

$50,000 to $100,000 short term, and pay himself back from collected TCLLC receivables.  Tr., p.

652.  Later, Brendon testified that there would not be distributions between himself and TCLLC,

"personally because I wasn't the member."  Tr., p. 674.  Ex. 72 lists advances taken and

payments made on the Wells Fargo EquityLine Account, by Brendon and Misty.  Ex. 73, p. 2, is

an actual bank statement from Wells Fargo showing an online deposit in the amount of $50,000

dated 2/21/03.  Brendon testified that $50,000 came off of the Wells Fargo LOC he and Misty

had.  Tr., p. 649.

_____

[31]Samson testified he intervened in proceedings to set aside the transfer of 650 Woodside
to Ryan.  Tr., p. 97.

Brendon also had personal bank accounts at Glacier Bank.  Ex. 34 is a Glacier Bank statement for Brendon's personal account, no. 40028999, dated 3/19/03.  Brendon did not know where the deposits in Ex. 34 came from, but testified that based on his normal business practices the $50,000 deposit on Ex. 34, dated 2/20/03 was "possibly a short-term loan back and forth, or something."  Tr., p. 676.

Ex. 20 is Brendon's and Misty's personal account statement from Wells Fargo, account no. 543-7229171, for the period March 7 through April 4, 2003.  Brendon testified that a check dated 3/21/03, no. 1049 in the amount of $38,287.30, was from Brendon to his father in repayment of a convoluted refinancing involving loans between Brendon, his father and his brother Eric.  Tr., pp. 715-16.

Ex. 35 is Brendon's Glacier Bank statement for no. 40028999 for the following month dated 4/18/03.  Tr., p. 677.  Ex. 35 reflects on the third page (page 2) a $500 transfer to loan account number 12750803.  When asked whether that was a payment for the helicopter Brendon testified that it might be but he could not recall.  Tr., p. 675.  Brendon could not identify the sources of the deposits on Ex. 35.  Tr., p. 677.

Ex. 36 is Brendon's Glacier Bank statement dated 5/19/03 for account no. 40028999, reflecting deposits described as "DDA Regular Deposit" in the amounts of $50,000.00 and $20,000, of which Brendon could not identify the source.  Tr., p. 682.  Ex. 31 is a personal financial statement which Brendon signed, dated 5/20/2003, which he testified was provided to Glacier Bank of Whitefish and states his income as $315,000, comprised of $40,000 salary and $275,000 in "Past 12 Months Distributions", which Brendon testified he must have verified from TCLLC's income statements for the first few months of 2003 from the Master Builder program.

Tr., p. 741-42.  Ex. 31 lists Brendon's 6% interest in the North Forty Resort Corp. at an estimated

market value of $100,000, which he testified he calculated from the initial capitalization of $1

million and an assumed increase in value.  Tr., p. 742.  Brendon did not list his interest in a

helicopter on Ex. 31, and testified that he "probably just didn't think about it."  Tr., p. 742.

Ex. 38 is a statement of Brendon's personal Glacier Bank account with the account

number x'd out, dated 7/18/03 for the period from 6/20/03 through 7/20/03.  Tr., p. 72.

Ex. 64 is an authorization signed by Brendon, dated June 19, 2003, to automatically take out

payments from his Glacier Bank checking account for a loan # 12750803 for Chance Chacon.

Tr., pp. 622-23.  Ex. 37 is Brendon's Glacier Bank statement, dated 6/19/03 for account no.

40028999, reflecting two deposits in the amount of $15,000.00 each, and another in the amount

of $28,000.00.  Brendon could not identify the source of those deposits, but testified that he is

working with records provided by Samson to identify the source.  Tr., p. 680.  Ex. 39 is

Brendon's Glacier Bank statement, dated 8/19/03, for account no. 40028999, reflecting a "DDA

Regular Deposit" in the amount of $10,000.00 on 7/22, the source of which Brendon could not

identify, and a $50,000.00 transfer to DDA, which Brendon testified looks like it was being

transferred into the TCLLC account, but he was not sure.  Tr., p. 684.

Ex. 40 is the Glacier Bank statement for account no. 40028999, dated 9/19/03.  Brendon

testified that a $6,000 deposit, dated 8/25 came from an automatic monthly transfer from a share

account at Whitefish Credit Union, but he could not recall whether it was a personal account or

TCI account.  Tr., p. 685.  The $38,700 deposit on page 2 of Ex. 40, dated 9/15/03, was related to

the American Express North Forty transactions.  Tr., p. 686.  Brendon testified that the $38,700

transfer was not income, but was from advances on his personal American Express account at the

North Forty resort which Brendon put together in the hopes of reaching a settlement with Abbey. Tr., p. 687.  Ex. 40 also includes two transfers to loan no. 12750803 on 9/15/03 in the amounts of $1,000.00 and $1,005.91.  Brendon testified that he did not know what those payments were for, and that maybe they were for his overdraft loan, but he admitted that the loan number for those two transfers is the same loan number for the helicopter loan for which he arranged monthly withdrawals from his Glacier Bank account in Ex. 64.  Tr., p. 692.

Ex. 96 is Brendon's American Express statement for the period ending 10/11/03, and shows at page 3 four (4) charges for North Forth Resort of $40,000 each, the first, dated 9/13/03, which Brendon testified included the $38,700 deposit, dated 9/15/03 on Ex. 40.  Tr., p. 688.  Ex. 106 is Brendon's personal Bank of America credit card statement, dated 11/13/03, showing a $37,000 charge to North Forty Resort. Corp., dated September 25, 2003.  Tr., pp. 73, 690. Brendon testified that he charged the $37,000 credit shown on Ex. 106 to the North Forty Resort account and took the money out of North Forty Resort, without other family members knowing. Tr., pp. 690, 992.

Ex. 69 is Brendon and Misty's Wells Fargo account statement for the period from September 6 through October 6, 2003.  Tr., pp. 657-58.  Ex. 69 reflects ATM deposits on 9/24/03 in the amount of $25,000 and on 9/29/03 in the amount of $10,000, both of which Brendon testified he was pretty sure were made by check.  A check dated 9/29/03 in the amount of $12,181.00 is reflected on Ex. 69, page 2, which Brendon explained is his check to his father, Robert, on Ex. 70, no. 1072.  Tr., pp. 659-660.  Brendon testified that Robert stepped in to pay for a piece of land Brendon had under contract when Brendon's financing fell through because of his litigation, so he gave Robert the money for the down payment on the land to close in Robert's

48

name[32].  Tr., pp. 660–61, 956, 957.  Brendon testified that Robert repaid the down payment,

reflected on Ex. 41 in the amount of $12,181 on 10/10/03, and kept the lot.  Tr., pp. 701-02, 957.

Ex. 41 and 41A comprise Brendon's Glacier Bank statement for account no. 40028999,

dated 10/17/03.  Page 1 of Ex. 41 includes a $37,500.00 withdrawal, dated 9/23/03, described as

an online payment of a Bank of America credit, and a deposit, dated 9/25/03, described as a

transfer from checking in the amount of $38,700, which Brendon testified was an American

Express charge transfer back to him.  Tr., p. 696.  A transfer in the amount of $8,700, dated 10/3

on page 2 of Ex. 41 was also part of Brendon's returns of charged amounts on his North Forty

Resort credit cards.  Tr., p. 697.  Brendon testified that he may have written a $30,000 check for

the difference to himself "and I might have cashed it, or something."  Tr., p. 697.  Later Brendon

testified that some of the American Express advances went into TCI for payroll and business

expenses, and he is sure that he spent some of the advances on his and Misty's monthly expenses

which were heavy.  Tr., p. 700.  Brendon described the $130,000 deposit on 10/14/03 on Ex. 41

as a combination of his and his father's money to pay off American Express, and $60,370.25 paid

10/9/03 to American Express.  Tr., p. 701.

Ex. 41 includes a $15,000 withdrawal, dated 10/7/03, transferred to account no.

49901824, which Brendon testified he thought was his repayment to TCI for a countercheck that

he assumed was written to him.  Tr., p. 703.  He testified that he was reviewing that transaction

to update his response to Question 3 of the SFA for Samson.  Tr., p. 703.  At the bottom of page

2 of Ex. 41A for the same Glacier Bank statement are two withdrawals, dated 10/14/03, and

---

[32]Brendon testified that his father never transferred the lot to him, and instead sold it
before he died.  Tr., p. 661.

10/16/03, in the amounts of $5,000.00 and $4,000, transferred to account no. 129631785, which

Brendon did not recognize.  Tr., p. 703.

Ex. 42, Brendon's Glacier Bank statement for account no. 40028999, dated 11/19/03,

shows two transfers to loan # 12750803 for the helicopter on 11/17/03 totaling $1,500.  Tr., 626.

Brendon testified that he discussed selling the helicopter with Dye before the sale, and that Dye

thought that it would make things simpler because it was in Chacon's name, and Cogdill at

Glacier Bank was urging him to clear up the loans against the helicopter and the hangar.  Tr., pp.

947, 952.  Brendon sold the helicopter prior to filing bankruptcy, but he could not remember how

much he sold it for, and learned from Glacier Bank documents that he received about $8,000 in

equity from the sale.  Tr., p. 946.  Ex. QQQ is a cashier's check made out to Brendon by Plexis

for the helicopter sale, and a loan debit, dated 2-12-2004, showing $8,009.29 in proceeds

Brendon received and used to pay Dye's fees and his Whitefish Credit Union home mortgage.

Tr., pp. 947, 950.  Brendon later testified that both the helicopter and hangar were sold to Plexis,

and he is not sure which page of Ex. QQQ applies to which.  Tr., p. 1029.  Brendon testified he

sold the hangar for $55,000 and it had about $8,000 in equity, which he used to pay Dye and

Whitefish Credit Union.  Tr., p. 953.

Ex. 91 is a copy of four checks Brendon wrote on his Glacier Bank account in the latter

part of December, 2003, including a check to Glacier Bank on 12/23/03 in the amount of

$12,000.  Brendon testified that the $12,000 was probably deposited into the TCI business

account, but was not sure.  Tr., p. 768.

Ex. 45 is Brendon's personal share account at Whitefish Credit Union for the period from

July through December of 2003.  Tr., p. 710. Brendon testified that a $4,000 auto transfer on Ex.

45, dated July 21, 2003, might be from TCI, and a loan distribution of $24,962.94, dated October 3, 2003, was probably the last advance from the construction loan on his house, but he testified that none of the deposits on Ex. 45 are income.  Tr., p. 710.

Brendon testified that he could not recall so many transactions because during the last year or so he was in business he was responsible for from one to two thousand transactions per month, and a million dollars worth of construction work per month, and he could not put his finger on all those transactions, but since recovering his materials he is providing additional information to the Trustee.  Tr., pp. 861-62

**Brendon's Chapter 7 Bankruptcy.**

**1.  Pre-bankruptcy.**

Brendon testified that he retained Dye as his counsel in October 2003.  Tr., pp. 521-22, 540, 855.  Dye is board certified as a consumer bankruptcy practitioner by the American Board of Certification and a member of the Bankruptcy Section of the State Bar of Montana, and he testified he first began representing Brendon on October 7, 2003.  Tr., p. 1044.  The first time they met, Brendon testified, he had been sent by Measure to talk to Dye about bankruptcy as a possibility to extricate himself from the lawsuit and the most likely way for his creditors to get paid by a trustee who would be able to get access to Brendon's net worth.  Tr., pp. 855-56, 867, 1044.  Dye's billing records, Ex. 6, Bates #00001, shows 2.5 hours of conferences with Brendon on October 7, 2003.

Dye testified that he was told at his first meeting with Brendon that the buy/sell agreement with Ryan for 650 Woodside was backdated to comply with the bank's financing requirements, and he also discussed with Brendon the proposed sale of the helicopter and hangar,

51

which Dye told Brendon was permissible but needed to be disclosed on the SFA.  Tr., p. 1076.

Brendon's father Robert was present at the first meeting with Dye and asked about the American Express advances from the North Forty account, and on Dye's advice Brendon gathered up cash and borrowed $80,000 from his father and paid American Express back.  Tr., pp. 689, 1077-78.  Brendon later testified that on Dye's advice his father loaned the $80,000 to Misty, who gave it to Brendon, and after the fact it could be secured by a mortgage on Misty's property.  Tr., pp. 698-99.  Brendon had tried to accumulate his net worth to either settle with Abbey or go forward with the lawsuit, but by December 2003 he and his attorney Measure realized it was going to get worse.  Tr., p. 854.  Dye agreed to represent Brendon at their first meeting, but did not agree to represent Ryan until later in 2004.  Tr., p. 1045.  Dye testified that he never represented Robert Retz, North Forty Resort Corp., TCI or TCLLC.  Tr., p. 1045.

Dye sent Brendon a client information worksheet on October 23, 2003.  Tr., pp. 541, 574-75, 819, 1090-91.  Ex. 8 is Dye's transmittal memo referencing the worksheet.  Tr., pp. 574, 576, 1090.  Ex. Y, minus Misty's handwritten entries, came from a bankruptcy software program Dye used at the time, and is the standard worksheet form he used in every case.  Tr., pp. 1048, 1090, 1116.  Dye testified that he would have sent his worksheet to Brendon and a separate worksheet to Misty because they contemplated filing separate bankruptcy petitions.  Tr., p. 1047.

Dye had a 2.4 hour conference with Brendon and Misty on October 28, 2003, "regarding filing information and questions."  Ex. 6, Bates # 00001; Tr., p. 1115.  Dye testified that the conference was more of a general discussion because Brendon was "extremely reluctant to file bankruptcy."  Tr., p. 1116.

Dye traveled to Kalispell with Brendon for a conference with Brendon on January 8,

2004, and to attend a receiver meeting. Ex. 6, Bates # 7. Dye testified that they discussed the possibility of his filing bankruptcy during that trip. Tr., p. 1104. In a phone call with Brendon occurring on 1/13/2004, Dye discussed schedule preparation. Ex. 6, Bates # 7; Tr., p. 1105. Dye testified that that phone call was about the time it became clear that Brendon would have to file bankruptcy because of the withdrawal of his state court attorneys. Tr., p. 1117.

Brendon testified that he did not want to file bankruptcy and did not do anything with Dye's worksheet when he first received it because "It made my stomach turn". Tr., p. 856. Dye agreed Brendon had strong reservations and viewed bankruptcy as a last resort. Tr., p. 1048.

Brendon testified that he began gathering materials to work on his schedules during the third week of January 2004. Tr., pp. 575, 665, 774, 829-30. Brendon testified that he did not work on Dye's worksheet until the end of January, when a special master hearing in state court was scheduled for which he had no representation. Tr., p. 778. Brendon testified that he requested another worksheet from Dye, who sent him one like Ex. Y (before Misty filled out Ex. Y), and he transcribed the worksheet word-for-word it into his Excel computer[33] file to start working on his schedules, and worked on the worksheet on his computer. Tr., pp. 541, 542, 575, 830, 858.

Brendon began compiling names and addresses of his creditors, and lists of loans and loan numbers, but TCLLC's records and most of TCI's records were controlled by Cossitt. Tr., pp. 859-60. Misty and Brendon testified that most of their personal financial documentation was

_____

[33]Brendon testified that he did not know whether he transcribed the worksheet into a business computer or his personal computer. Tr., p. 542. He testified that he emailed the Excel file to himself and worked on it at his house, where a hard drive failed but he recovered it and the email is still on his laptop. Tr., pp. 543-44. Brendon started looking for the worksheet, after it went missing, early in 2007. Tr., pp. 545-46.

usually kept at the office, where Brendon paid their bills, and when they left the office their paperwork was placed in boxes and very disorganized.  Tr., pp. 817, 818, 861.

On January 27, 2004, Brendon called Dye, and Dye recalled that they discussed whether it would be proper for Brendon to make advance monthly mortgage payments from the proceeds of liquidation of assets, which Dye supposed were from the helicopter and hangar, because Brendon contemplated that he would not be able to work given the time required for the bankruptcy process.  Tr., p. 1105; Ex. 6, Bates #7.

Ex. J is an earlier worksheet that Brendon started working on in mid-January 2004, which he thinks he gave to Dye in preparation for a meeting.  Tr., pp. 862-63, 1096.  Dye concluded that he received Ex. J from Brendon in person on February 3, 2004, on which Ex. 6 shows they had a conference, including Misty, for 1.5 hours.  Tr., pp. 1049-50, 1096, 1097, 1098.  Dye testified that the information on Ex. J was inadequate to complete Brendon's Schedules and SFA, and they talked about the additional things needed "in general terms", after which Dye gave Ex. J to his paralegal to enter date into the bankruptcy program.  Tr., p. 1096, 1097, 1098, 1118.

Brendon testified that he spent "almost every waking hour" between February 12, 2004, and March 1, 2004, trying to compile information on his worksheet.  Tr., p. 861.  Brendon testified that he did not withhold any information from Dye.  Tr., p. 904.  Dye testified that he discussed with Brendon his difficulties in gathering information requested in the worksheet, and Dye explained to Brendon that he would have to disclose payments, transfers and transactions with insiders going back a year.  Tr., p. 1054.  Dye testified that Brendon informed him that Brendon had been acting as a funding source, with hundreds or thousands of entries, personal borrowings on credit cards contributed to TCLLC and withdrawals from TCLLC, the records of

54

which were in the possession of the receiver who was not allowing Brendon access to those records. Tr., pp. 1054-55.

Brendon testified that he did not give Dye his original bank statements, such as his Glacier Bank statement, Ex. 33, and could not recall whether he gave Dye copies of his original bank statements. Tr., pp. 596-97. Brendon then corrected himself and testified that he gave Dye some bank statements, such as Ex. 38 being a copy of his Glacier Bank checking account. Brendon testified that he did not have his own bank statements or credit card records, or those of TCLLC, to complete the questions, and he told Dye and Dye replied that they could not wait to file and would tell Samson that they would make their best effort, answer his questions, keep working and eventually amend to include everything required. Tr., pp. 865-66, 867. Brendon testified that he tried to get access to documents controlled by the receiver Cossitt, but Cossitt told him he would have to pay Cossitt $200 to sit and watch Brendon go through the records, and would not allow Brendon to take anything from Cossitt's office, and Brendon could not afford to pay him. Tr., pp. 866-67.

Brendon testified that he did not work on a hard copy of the worksheet. Tr., p. 858-59. The worksheet on Brendon's computer was never lost, but Brendon testified that he did not remember it or its location. Tr., p. 544. Brendon testified that he and Dye thought Dye had Brendon's worksheet but could not find it in his file, and then Brendon started to search for it. Tr., pp. 546, 770, 771. Brendon testified that one of the hard copies of his draft worksheets with handwritten notations was lost by either himself or Misty, although the electronic copy remained on his Excel program[34]. Tr., p. 769.

_____

[34]The lost worksheet is discussed in detail below.

Brendon testified that he did not decide to file his petition until the last minute, when he had no choice because he was no longer represented by counsel in state court. Tr., pp. 537, 775. Misty testified that Brendon was "fighting tooth and nail" and did not want to file, but their attorneys and Brendon's family tried to convince him that it was the only solution to his litigation with Abbey, and that they would go bankrupt anyway[35]. Tr., pp. 815, 816, 829. Misty recalled that a hearing date was approaching in the state court litigation for which Brendon was not to able to respond because he had no representation since he could not pay his attorneys. Tr., p. 817. Brendon testified that his counsel had withdrawn in December 2003, and he could not engage other counsel, a special master had been appointed in January and set a hearing on a range of issues on February 13, 2004, the day after Brendon eventually filed his petition. Tr., pp. 857, 1042, 1050.

On February 11, 2004, Brendon wrote a check to Whitefish Credit Union in the sum of $9,665.88, #1144 for 6 payments on his mortgage, and wrote a check to Dye & Moe in the amount of $7,367.80. Ex. X. He testified that he either delivered the mortgage check to the credit union himself, or gave Misty the check and had her go into the credit union and pay it in person on February 11 or 12[36], 2004, and he gave Dye his check in person on February 11, 2004. Tr., pp. 1027, 1028, 1106. Brendon testified that the payments on his mortgage were six payments in advance. Tr., p. 1030. Dye testified that he discussed making advance mortgage payments and paying Dye a retainer with Brendon, and that he told Brendon such payments were

---

[35]Misty filed her own Chapter 7 petition, and has received a discharge. Tr., p. 815.

[36]Brendon was not sure, but he testified that he knew that the checks had to be received by February 12, 2004. Tr., p. 1028.

permissible.  Tr., p. 1077.  On cross examination Dye admitted that his billing records do not

include any such discussions on or about February 11 or February 12, 2004, like he had on

January 27, 2004.  Tr., p. 1106; Bates # 7, 10.  Dye's billing records show a 2 hour conference

with Brendon on February 11, 2004, "regarding additional information for schedules" which Dye

testified he felt he needed[37].  Tr., p. 1119.

Brendon testified that the cashier's check from Plexis on Ex. QQQ for the helicopter

and/or hangar sale was written on February 12, 2004.  Tr., p. 1029.  The back side of the cashier's

check for $58,009.28 shows it cleared Glacier Bank on February 12, 2004.  Ex. X also shows a

check to Misty on February 12, 2004, in the amount of $450.00.  Misty testified that she did not

hear Brendon ever suggest that his transactions or his bankruptcy filing was intended to defraud

creditors, interfere with creditor's rights or conceal assets.  Tr., p. 829.  They looked at

bankruptcy as their saving grace and wanted a clean start to get away from the legal nightmare

and put Abbey behind them.  Tr., pp. 828-29.

### 2. Brendon's Bankruptcy.

Brendon filed his voluntary Chapter 7 petition at 2:45 p.m. on February 12, 2004, without

his Schedules and SFA.  Tr., p. 1090.  The receivership was still in place, and the special master

had scheduled a hearing for February 13, 2004, which Brendon believed would result in Abbey

taking control of everything and Brendon losing the ability to pay people he owed.  Tr., pp. 277,

857.  Brendon had paid Dye's bill in full to the date of the filing of his Chapter 7 petition.  Tr., p.

580.

---

[37]Dye testified that he was charging Brendon for time spent on Misty's and his brother's
bankruptcies, at Brendon's direction because he felt responsible for their being involved.  Tr., p.
1119.

Dye testified that he suggested that Brendon and Misty have their personal property appraised by Garner's Auction Service. Tr., p. 1061. An appraisal of Brendon's and Misty's personal property, dated February 20, 2004, prepared by Todd Gardner and Tracy Gardner, was admitted as Ex. L.

Brendon testified he worked as hard and fast as he could on his Schedules for weeks before they were filed. Misty testified that Brendon would take the baby early in the morning and work on his Schedules on the computer trying to extract information "from this mess that we had of company information as well as personal financial documents." Tr., pp. 818-19.

Dye's billing records reflects several phone calls with Brendon on 2/20/2004, 2/26/2004 and 2/27/2004 regarding his Schedules and revisions, 3.1 hours. Ex 6, Bates # 00010, 00011; Tr., pp. 581, 1108-09, 1119. On February 20, 2004, Dye had a phone call to Brendon "regarding info for schedules". Ex. 6, Bates # 00010; Tr., p. 1118.

Ex. K is a later worksheet Brendon gave to Dye, and the highlights and notations on Ex. K are Brendon's. Tr., p. 864. Dye believed that Brendon delivered Ex. K personally, for a meeting on February 25, 2004, which did not make it into Dye's time records. Tr., pp. 1099, 1119-20, 1126. Ex. K does not include the helicopter and hangar transactions, or transfers out of the Wells Fargo account. Tr., p. 1100. Dye testified that he was revising the Schedules based on communications with Brendon, or instructing his paralegal to revise Schedules at Dye's direction. Tr., p. 1109.

On February 27, 2007, Dye prepared a motion for extension of time to file the Schedules and SFA. Ex. 6, Bates #00011. Dye testified that he has never known the Court to deny a motion for extension, which can be for up to 15 days. Tr., pp. 1109-10. Under examination by

the Court Dye testified that he requested only a one-day extension, not the normal 15 days,

because the § 341 meeting was imminent.  Tr., p. 1120.

Ex. 7 includes draft schedules purportedly sent by Dye to Brendon by facsimile on

February 27, 2004, but Brendon testified that he does not believe that he received Ex. 7,

> Because when we went to sign the, went to sign the signature pages that needed to
> go with the filing, we didn't have – Harold had to – or Harold's assistant had to e-
> mail me the signature pages to fill out and fax back.  So I'm – I don't know that I
> would have had these or I would have just used them to sign and fax in.

Tr., pp. 579, 871.  Brendon did not remember reviewing or ever having in his possession draft

Schedules and SFA.  Tr., pp. 578.  Later Brendon testified that it was very likely that Ex. 7 was

faxed to his residence, but he could not recall receiving or seeing the draft schedules, or

discussing them with Dye.  Tr., pp. 583-84, 871, 1124.   Dye testified that Ex. 7 was faxed to

Brendon at 9:40 a.m. on February 27, 2004, and that if Brendon had told him he did not receive

Ex. 7 Dye would have faxed another draft.  Tr., p. 1111.  Dye testified that he may have given

Brendon draft schedules at their in-person meetings, but does not have any documentation of it.

Tr., p. 1119.

Brendon testified that he was working off of his own worksheets while conferring with

Dye about his Schedules.  Tr., pp. 582, 1124.  Ryan helped Brendon work on his Schedules and

SFA, and helped Brendon go through Brendon's bank statements until their father died in late

September 2004 when they had a falling-out[38].  Tr., pp. 427-28; 600-01.  Misty also testified that

she helped Brendon with information or bank statements she had.  Tr., p. 834.  Misty testified

---

[38]Ryan moved back to Boise about a year ago.  Tr., pp. 605-06.  Brendon testified that his
estrangement from his brothers and separation from Misty was largely caused by his abuse of
sleeping medications, and he was admitted to the hospital for depression in December 2004.  Tr.,
pp. 913-14.

that she also worked on a worksheet for her own bankruptcy, and did not recall seeing Ex. 7. Tr., p. 820. Ex. Y is her worksheet which she received from Dye. Tr., p. 820. She testified that besides Ex. Y she talked with Dye about many issues over the phone because they knew that Abbey would scrutinize everything as he did in state court. Tr., pp. 823-24.

Brendon signed a signature page for his Schedules on March 1, 2004, beneath a declaration which states: "I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 29 sheets plus the summary page, and that they are true and correct to the best of my knowledge, information, and belief." Ex. A; Ex. 1. Brendon's declaration that he read his Schedules was false, as admitted by Brendon at trial:

> Question: Okay. And were the foregoing summary and schedules true and correct to the best of your knowledge and belief as of the time you signed these documents?
>
> Brendon: I didn't, I didn't review them.
>
> Q: Why didn't your review them?
>
> Brendon: Because I didn't have the final, the final – I don't know what you call it – the final schedules that Harold [Dye] was going to submit.

Tr., pp. 577-78.

Brendon testified that he did not see the Schedules and SFA, or drafts, before they were filed. Tr., pp. 872, 874, 1126, 1127. Brendon and Dye testified that Dye's paralegal sent Brendon signature pages for the Schedules and SFA as a .pdf attachment to an email, without schedules. Tr., pp. 872, 1051. Dye testified that he does not remember hearing Brendon or Misty telling him that they needed the schedules. Tr., p. 1051. Dye testified: "I didn't think about – I know we faxed documents to them." Tr., p. 1051.

Misty testified that she was present when Brendon signed the signature pages for his

60

Schedules and SFA. Tr., p, 821. She testified that Brendon called her and she had to rush home to sign a signature page because Van needed to file them that day. Tr., p. 822. Misty testified that she was concerned that they had not seen their Schedules, but Brendon reassured her that it was just the information they had given Van and it needed to be signed that day, so they both signed their signature pages. Tr., pp. 822-23, 872.

Brendon also signed his a signature page for SFA and Statement of Intention on March 1, 2004. Tr., pp. 576, 873; Ex. 1[39]; Ex. B. Above Brendon's signature on the SFA signature page, Ex. B, is the declaration: "I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs, and any attachments thereto and that they are true and correct". Ex. B; Ex. 1; Tr., pp. 576-77. Even though he signed his Schedules and SFA under penalty of perjury, Brendon admitted at trial that "what ended up getting filed was not complete and accurate". Tr., pp. 585, 586, 867, 893. He testified that at the time he signed the signature pages he understood that Dye was not finished and was still working on the Schedules. Tr., p. 890.

Dye's billing records for March 1, 2004, show that he spent 1.5 hours in correspondence and a phone call with Brendon, and revised the Schedules twice. Ex. 6, Bates # 00013. Dye testified that he had a lot of questions because Brendon was giving him appraisals, source documentation such as tax returns, and information regarding creditors. Tr., p. 1120. Brendon testified that he knew on the date he filed the Schedules and SFA that there was information that Dye had that was not put together, but would be provided to the Trustee. Tr., pp. 585, 586. He testified that he discussed with Dye the fact they signed documents attached to pages they had not

_____

[39]Black confused Ex. 1 with Ex. 8. Tr., pp. 576.

seen, and Dye told him "we absolutely had to get it done that day". Tr., p. 874.

Dye testified that he "had to have seen" Brendon's worksheet, Ex. K, prior to completing his Schedules and SFA, but he did not remember seeing it or talking to Brendon about it. Tr., pp. 1052, 1056. Dye testified that he "absolutely" anticipated at the time Brendon's Schedules and SFA were filed that they would have to be amended. Tr., p. 1052. Dye testified that Brendon knew that the Schedules had to be completed fully and accurately. Tr., p. 1096. After the Schedules and SFA were filed Dye sent Brendon copies of the Schedules and SFA within a week. Tr., pp. 875, 1100-01. Brendon testified that he first looked at his Schedules by the second § 341 meeting. Tr., p. 1125.

Samson was appointed Trustee in Brendon's Chapter 7 case No. 04-60302-7. Samson testified that he reviewed the Schedules and SFA and was primarily concerned with responses to the SFA. Tr., p. 12:12-15. Dye testified that he spoke with Samson on more than one occasion, and with Brendon both before and after the filing, about the need to amend the Schedules and SFA. Tr., pp. 1052. 1084. Samson obtained documents from the receiver Cossitt, but he testified that Cossitt was reluctant to spend a lot of time because it was questionable whether he would be compensated for his time spent as receiver. Tr., pp. 102-03.

### 3. Brendon's Schedules & SFA.

Schedule A lists Brendon's home at "665 Wodside" [sic], and an undivided half interest in Iron Horse Lot 186 and membership valued at $152,000. Brendon testified that the value of the lot and membership had increased since he purchased it to about $300,000. Tr., p. 955.

Schedule B lists Brendon's personal property. Brendon testified that he has not reviewed Schedule B, and could not say whether it was true and accurate at trial. Tr., p. 618. At Item 2 of

Schedule B Brendon listed a single bank account with a balance of $68.42.  Ex. 1.  Samson

testified that it turned out that Brendon had more than 1 bank account, and that bank account had

more than $68.42 in it.  Tr., p. 18.  Brendon testified that he had more than $68.42 in bank

accounts, and that he had another $60 in a Whitefish Credit Union account which he forgot to

list. Tr., p. 616.  Brendon testified that he thought the Wells Fargo account was overdrawn

because of checks he had written which exceeded the balance before he wrote the checks.  Tr.,

pp. 616-17, 895.  Brendon testified that he discussed with Dye whether it was appropriate to

deduct from an account balance checks which had been written but not yet cleared, and his

counsel advised him that checks he had written but had not cleared the account prior to his filing

his bankruptcy petition should be deducted from his accounts.  Tr., pp. 617-18, 895.

The values for personal property on Schedule B, except for jewelry, came from an

independent appraisal and inventory Brendon had done and given to Dye.  Tr., p. 895, 896.

Schedule B, Item 7, lists jewelry at a market value of $200.00.  Ex. 1.  Brendon testified

that on the petition date he did not own jewelry worth more than $200, and only listed his Omega

watch and wedding ring.  Tr., pp. 781, 897-98.  Asked about the $900 value placed on the Tag

Heuer watch on Ex. 80, Bates # 126, as of March of 2002, Brendon testified that he lost that

watch in early Fall of 2002 before he bought his current one in December of 2002 along with a

pair of earrings for Misty[40].  Tr., pp. 781-82.  Brendon testified that he owned the Omega watch

insured on Ex. 80, Bates # 118 for $2,026, but that it was broken when he filed his bankruptcy

petition, and broken again, and when he took it to get a price on it he was told they would not

---

[40]He testified he paid $10,000 or $11,000 for the earrings, which are insured for $15,193
on Ex. 80, Bates #118.  Tr., p. 782.

give him anything for it.  Tr., p. 782.

Dye suggested that Brendon take his jewelry to a pawnshop for appraisal.  Tr., p. 1061.
Dye testified that a pawnshop is a market you have to go to where no other market exists to
determine liquidation value.  Tr., p. 1062.  Brendon testified that the pawnshop told him that they
would not give him anything for his Omega watch because it was broken.  Tr., p. 896.  Dye
described Brendon as "quite shocked" and offended at how low the value was.  Tr., p. 1061.
Samson testified that Brendon did not provide him with any information regarding his jewelry
before Samson filed an objection to Brendon's discharge.  Tr., p. 32.  But Samson later testified
that he had no evidence that Brendon failed to disclose jewelry.  Tr., p. 131.

Item 2 of Schedule B lists a 6% interest in North Forty Resort, Corp., of unknown value.
Ex. 1; Tr., p. 55.  Item 12 of Schedule B lists Brendon's 100% ownership of TCI, 50% ownership
of Timberland Properties, LLC and 6% of North Forth Resort, Corp.  Brendon claimed that he
did not separately include the corporate computers and equipment[41] of TCI, or TCI's debts unless
he personally guaranteed them, on his Schedules based on advice of counsel.  Tr., pp. 88, 90,
935.

Item 23 of Schedule B calls for disclosure of automobiles and other vehicles and trailers.
Tr., p. 32.  Brendon disclosed interests in two (2) Harley Davidson motorcycles, a 2003 Corvette,
a 2004 Chevrolet truck, and an undivided half interest in a 1988 BMW.  Ex. 1.  Samson checked
the Montana Department of Motor Vehicle records and learned that Brendon had a 1984 Cadillac
titled in his name which was not listed on Schedule B.  Tr., p. 33.  Brendon told Samson at the

---

[41]Those TCI computers appear to be located at the "Parkhill property".  Tr., p. 89.
Brendon testified that the TCI computers and equipment are stored at the North Forty Resort.
Tr., p. 941.

first § 341 meeting that the Cadillac was stored in an airplane hangar.  Ex. 2, p. 83.

Item 25 of Schedule B requires disclosure of interest in aircraft, and Brendon marked "None".  Ex. 1; Tr., p. 37.  Samson testified that he would look for a sale of aircraft to be disclosed at Question 10 of the SFA.  Tr., pp. 38-39.  Brendon testified that he owned 100% of the helicopter in the year prior to filing his bankruptcy petition, but that it was not titled in his name.  Tr., p. 629.  Brendon testified that he did not list the helicopter at Question 10 of the SFA because the question 10 of Dye's worksheet, Ex. K, did not ask a question that would have elicited that answer.  Tr., p. 945.  The helicopter is a Robinson R22, which Brendon described as a very small helicopter with only about 300 hours left on the engine before a mandatory rebuild, which he bought 50:50 with Chance Chacon for $44,000 so they could earn their helicopter licenses.  Tr., pp. 945-46.

Schedule F lists unsecured nonpriority claims.  When asked about Schedule F, Brendon testified that he does not know whether Schedule F is true and accurate.  Tr., p. 611.  Schedule F lists three Wells Fargo accounts, including the Wells Fargo Equipment Business Direct Division installment account in the amount of $44,401.53.  Ex. 1.  Brendon testified that the Wells Fargo accounts look like business obligations he "guaranteed or something", but they are not marked in the applicable "Codebtor" box, and are not listed on Schedule H "Codebtors".  Ex. 1; Tr., pp. 611-12, 755.  Schedule F lists three Bank of America credit card accounts, including account no. 4003 9010 0039 6166 for $10,183.57, with the Codebtor box checked.  Tr., p. 752.  First Bankcard Center is listed on Schedule F with the "Codebtor" box checked, and Schedule H identifies the codebtor as TCI, but Brendon could not remember that account.  Ex. 1; Tr., p. 613.  Schedule F lists seven American Express accounts, two of which have the Codebtor box

checked, including account number 3783-477207-63001 in the amount of $37,396.53. TCI and TCLLC are listed as Codebtors for American Express on Schedule H. Abbey is listed as a credit with tort claim[42] in the amount of $3,500,000.00, marked as contingent, unliquidated and disputed. Ex. 1

Brendon testified that he does not know whether the list of codebtors, Schedule H, is full and complete. Tr., p. 615.

Schedule I requires debtors to state their current income, and Brendon's Schedule I states his monthly income as $8,500, and Schedule J states his monthly expenses as $10,750. Tr., p. 45; Ex. 1.

Question 1 of the SFA asks for gross income from the beginning of the calendar year to the date the case was commenced, and the two years preceding the calendar year. Ex. 1. Brendon's SFA response to Question 1 disclosed income for the years 2001 and 2002, but not for 2003 and 2004 to the date the case commenced as required. Tr., pp. 46-47; Ex. 1. Samson testified that he has never received complete information about Brendon's income for 2003 and 2004. Tr., p. 47. Similarly, Brendon's response to Question 2 of the SFA provided nothing on 2003 or 2004 as required. Tr., pp. 48-49; Ex. 1. Brendon testified that he could not remember if he was receiving payroll through TCI in 2004, and could not remember if he received a W-2 for 2003, but he was sure he received distributions from TCI in 2003. Tr., pp. 645, 646. Brendon testified that he did not list his 2003 distributions from TCI because they were distribution of

---

[42]Abbey filed Proofs of Claim Nos. 30, 31, 32, and 33 in Brendon's Chapter 7 case No. 04-60302-7 on June 22, 2004. (Proof of Claim No. 35 is docketed as a proof of claim by Abbey but an unrelated .pdf document was submitted). No objections have been filed to any of Abbey's Proofs of Claim.

capital. Tr., p. 648. Brendon testified that he did not include distributions in his income on his SFA as he did for financial statements submitted to lending institutions because they were not income and his distributions as of the date of his bankruptcy will probably be losses. Tr., p. 921. He testified he was "a little bit more nervous" about listing something under penalty of perjury than he would be estimating income for borrowing purposes. Tr., p. 921.

As discussed more fully below, Brendon testified that the worksheet he used from Dye asked different questions versus Question 1 of the SFA, and Brendon did not understand that he needed to provide income for the current year. Tr., p. 919. In addition Brendon testified that he had not received K-1's from the companies in receivership, and that he still does not have K-1's or tax returns for 2003 and 2004. Tr., p. 919.

Samson testified that he was concerned about the completeness of the response to Question 3 of the SFA calling for disclosure of all payments to creditors within 90 days preceding the case. Tr., p. 17. Brendon's response to Question 3a lists payments to Bank of America, Discover Card and Providian Financial during 2003, with a notation reading "Debtor will amend to add other payments". Ex. 1; Tr., p. 637. Brendon testified, "this is one section that was, that was definitely not complete." Tr., p. 707. Brendon testified that his response to Question 3a does not include any payments to creditors from his Glacier Bank account such as the two transfers to loan # 12750803 on 11/17/03 totaling $1,500 for the helicopter, or the $1,740 online payment to MBNA American on 11/18/03, which are shown on Ex. 42. Tr., pp. 626, 627, 706, 707-08. He testified that his response to Question 3a did not include the payment to GMAC ($1,392.96), dated 12/1/03, shown on Ex. 43. Tr., p. 708. The last page of Ex. 43 shows payments Brendon made to his overdraft protection loan at Glacier Bank, account no.

67

128028999, with several payments to Glacier Bank within 90 days of the date Brendon filed his bankruptcy petition in November and December 2003, which Brendon testified were not listed on his response to Question 3a.  Tr., p. 709.

Brendon testified that he did not review his Glacier Bank statements, or his Wells Fargo statements, very intently, and turned to other sources such as credit card statements, to look for payments to creditors within ninety days before the petition date in preparing his response to Question 3a of the SFA.  Tr., pp. 706, 716.  Brendon admitted that his response to Question 3a did not include his payment to Whitefish Credit Union for his mortgage and Dye's attorney fee from proceeds of his sale of the helicopter and hangar.  Tr., p. 637.  No payments are listed for Question 3a after 2003.  Tr., p. 21.  Samson testified that his position is that any payment made before the petition date in 2004 should have been disclosed at Question 3a, including any payment to a secured debt and credit card debt, but that Brendon did not provide information about transfers from the Wells Fargo account in February 2004.  Tr., pp. 21, 23, 42-43.

Question 3b of the SFA calls for payments within one year to insiders, and Brendon's response marked the box under "None".  Tr., p. 22.  Dye testified that his bankruptcy software program marks "None" unless information is entered in response to SFA questions.  Tr., pp. 1050.  Samson testified that he found out about 4 payments in the form of credit card transfers were made to the North Forty Resort, totaling $160,000 in September 2003.  Tr., p. 41.  Brendon testified that he overlooked adding the $38,287.30 payment to his father, dated 3/13/03, Ex. 21, to his Schedules[43] because the date of the original North Forty refinance was more than a year

---

[43]Brendon testified "schedules", but disclosure of the transfer to his father at Ex. 21belonged on the SFA.  Tr., p. 716:8.

before the petition date, and he forgot the payment.  Tr., p. 716.

Brendon's response to Question 7 of the SFA, "Gifts", lists a single gift to the University of MT in the amount of $500.00.  Ex. 1.  Brendon's response to Question 9 of the SFA lists payments to Dye related to bankruptcy, including $7,367.80 paid in February 2004.

Question 10 of the SFA, "Other Transfers" requires debtors to list all other property transferred within one year preceding the commencement of the case.  Brendon did not list any transfers below Question 10, but instead states:  "See attached addendum".  The attached addendum is on the last page of Ex. 1 and does not list any specific transfers, but states:

> During the year prior to the petition date debtor made numerous contributions to and received distributions from Timberland Construction, Inc. in the ordinary course of business.  Debtor is compiling these records and will make them available to the trustee on request.

Tr., pp. 13-14; 627-28.  Brendon testified that the addendum says he would provide information at a later date regarding payments from his Glacier Bank checking account for the helicopter, but he also testified that the helicopter payments were personal and not in the ordinary course of his business.  Tr., pp. 627, 628.  Brendon testified that he did not list the transfer of the helicopter at Question 10 of the SFA because the worksheet he was working on, which Dye had sent him and he loaded onto his Excel computer program, had a question that was "different" than Question 10 of the SFA, and he answered the question he thought he was supposed to answer instead of Question 10.  Tr., pp. 630, 634, 945.  Dye was not sure why the sale of the helicopter and hangar were not listed on the SFA, but testified it should have been and the transaction took place right on the filing deadline.  Tr., p. 1077.

Brendon testified that he did not list any of the repayments he made to himself for short term loans to TCLLC from its collected receivables on his SFA, but that was what his addendum

69

was trying to say.  Tr., pp. 652-53.  He testified that the short term loans still need to be reflected in the SFA.  Tr., pp. 674-75.  Brendon did not list the $12,181.00 check to his father reflected on Ex. 69 and Ex. 70 at Question 10 of his SFA because, he testified, he interpreted Question 10 to be transfers of property, not cash or money.  Tr., p. 958.

Ex. 66 is a ledger from an accounting program in Master Builder which Ryan worked on, dated 7/27/04, to track transfers between Brendon and TCI to complete Question 10 of the SFA.  Tr., pp. 654-55.  After their father's death Brendon did not get together with Ryan as planned to determine whether Ex. 66 was complete because Brendon was working on providing Samson with other documentation he was asking for, but Brendon testified that he is working on completing the analysis of distributions "right now".  Tr., p. 656.

Samson testified that he was not satisfied with Brendon's response to Question 10 of the SFA, and voiced his dissatisfaction on several occasions.  Tr., pp. 15-16.  Brendon testified that he had not finished his addendum to Question 10, but was in the process of finishing it in response to Samson's adversary proceeding.  Tr., pp. 628-29.

Brendon's response to Question 14 of the SFA, "Property held for another person", is marked "None".  Ex. 1.  Samson testified that he learned that Brendon held or controlled personal property owned by TCI in the form of computers, office equipment and furnishings.  Tr., pp. 50-51.  Samson testified that he did not believe that he has recovered any computer equipment belonging to TCI.  Tr., pp. 53-54.  He testified that TCI furniture, office equipment, furnishings and some computers are still in Brendon's possession.  Tr., p. 54.  Brendon testified that he believes that "person" does not include a corporation, and his counsel told him so and that is why he did not list TCI's property at Question 14.  Tr., pp. 640, 641.

Brendon testified that TCI purchased most of the computers, office equipment and furnishings within 90 days of the filing of his bankruptcy petition, using credit cards.  Tr., p. 641. Brendon borrowed funds from Wells Fargo and used the TCI equipment to secure those loans, placed the money in TCI's account and could not remember what he did with those funds other than payroll and bills.  Tr., p. 643.  Brendon did not give an accounting for those funds to the Trustee.  Tr., p. 644.

Schedule B lists Brendon's interests in TCI, TCLLC, Riverside Properties LLC,  and North Forty Resort Corp., but those interests are not listed at Question 18 of the SFA.  Dye testified that he intended to include them.  Tr., p. 1063.

Question 19 of the SFA calls for a list of books, records and financial statements of the debtor and the names of entities who may have them or prepared them.  Brendon marked "None" at all subparts of Question 19.  Ex. 1.  Brendon testified that his secretarial staff generally filed his bank statements such as Ex. 33, and he only rarely looked at them.  Tr., p. 609.  He admitted it was his responsibility to find his own financial records and review them to prepare the Schedules and SFA.  Tr., p. 610-11.

**4.  § 341(a) Meetings of Creditors.**

The § 341(a) meetings of creditors for Brendon and Misty were held in conjunction.  Tr., p. 824.  Brendon's second § 341 meeting was held on July 8, 2004.  Ex. 3.  At the conclusion of the second § 341 meeting Samson indicated that he was not concluding it, but he has not held a third § 341 meeting.  Tr., pp. 106-07.

The transcript of Misty's first § 341 meeting held on March 19, 2004, was admitted as Ex. I.  Samson testified that he asked Misty at her § 341 meeting to affirm that the Schedules and

71

Statements were accurate, and Misty responded that they were as supplemented by what they said at the § 341 meetings.  Tr., pp. 109,110, 1085; Ex. I, pp. 5-6, 53.

The transcript of Brendon's first § 341 meeting held right after Misty's on March 19, 2004, was admitted as Ex. 2.   Samson asked Brendon if he signed his Schedules and SFA at the § 341 meeting and he did not deny signing them.  Tr., p. 46.  Brendon testified that he was confused at the first creditor meeting, but did not follow up because he heard Samson say to Misty at her § 341 meeting that "anything that we had discussed in the creditor meeting was, in effect, putting him on notice in amending my schedules."  Tr., p. 868.  Brendon discussed the effect of providing information in § 341 meetings with Dye, and was told to cooperate with the Trustee and put him on notice of everything that had been left out, "[a]nd if I did that, I was safe."  Tr., p. 906.  Dye explained that the focus after the Brendon's § 341 meeting was on getting Samson the source documentation, with a formal amendment at the end.  Tr., pp. 1085-86.

At the first § 341 meeting Samson advised Brendon and Dye that he wanted bank records from Brendon's individual accounts, joint accounts, TCI accounts, tax returns for 2001 and 2002. Ex. 2, pp. 88-92.  Brendon provided the Trustee with bank statements related to a Wells Fargo Bank checking account that Samson testified showed a balance in the range of $17,000 as of the petition date, with considerable activity reflected during that period, including checks which had been written for his mortgage at Whitefish Credit Union and Dye's fees which had not cleared as of February 12, 2004.  Tr., pp. 19-20, 635-36, 877, 1026.

Ex. MMM is an account statement for a Wells Fargo Bank, N.A., Kalispell account with account number ending "9171" for the period of February 6 through March 4, 2004.  It shows

deposits during the period of $70,691.19 and withdrawals of $71,386.96 for the reporting period,

including a $50,000 online transfer and "Withdrawal made in a Branch/Store" dated February 13,

2004, the day after the petition date.  Ex. MMM; Tr., p. 1020.  The balance on the petition date is

$17,372.26, and the following daily balance is $7,226.39, which declined to $497.02 on February

17, 2004.  Ex. MMM, p. 3; Tr., pp. 25-26, 635.  Brendon testified that Ex. MMM shows two

deposits on page 2 in the amounts of $8,869.31, dated 2/10/04, and $8,009.28, dated 2/12/04,

which were proceeds from the hangar and helicopter he sold to Paul Lindquist.   Tr., p. 634.  A

transfer of $50,000 on page 2 of Ex. MMM was off a line of credit Brendon testified he and

Misty had on 650 Woodside, but after he had sold it to Ryan.  Tr., pp. 633-34.  Samson testified

that Brendon failed to disclose this account information in his Schedules.  Tr., p. 27.

Dye testified that he discussed the § 341 meeting with Brendon prior to the meeting, and

while what he tells clients varies from case to case, he tells clients that their schedules are part of

what they would be questioned about by the trustee.  Tr., pp. 1101-02.  Dye testified that

Brendon did not tell him, before the § 341 meeting, that he had not had a chance to review his

Schedules as filed.  Tr., pp. 1102-03.  He also testified that neither Brendon nor Misty

complained to him before March 19, 2004, that their Schedules were not accurate.  Tr., pp. 1104-

05.

At his first § 341 meeting of creditors Brendon testified that he acquired the real property

at 665 Woodside Lane in late 2002 from TCLLC, for which he paid $40,000 or $50,000.  Ex. 2,

pp. 7-8.  Brendon testified at the § 341 meeting that he owned half of a helicopter with Chance

Chacon, which was sold and after paying the loan off the $8,000 in proceeds went to pay

Brendon's mortgage and Dye.  Tr., p. 631; Ex. 2, pp. 83-85, 945, 950.  Brendon admitted that the

50% ownership was not accurate, and that he knew as of January 28, 2004, that he owned 100%

of the helicopter.  Tr., p. 631; Ex. 116.  On direct examination by his counsel, Brendon testified

that he did not intend to mislead the Trustee at the § 341 meeting about the helicopter, but he was

consumed by the volume of details when he told Samson he owned 50% of the helicopter and did

not remember the specifics of the document he signed so that Cogdill could sell it.  Tr., pp. 950-

51.  Brendon testified that he was not asked to provide any additional information to Samson

about the helicopter or hangar after the § 341 meeting.  Tr., p. 954.

      TCI was continuing in operation, but only to a limited degree while winding up until a

receiver was appointed, to finish up an office building for Tom Tornow, who had paid TCI about

90-95% of the contract price by the petition date.  Ex. 2, pp. 17-18, 32-33, 73, 75.  Samson

testified that he told Brendon at the first § 341 meeting to contact him if Brendon was going to

make any major decisions regarding TCI projects.  Tr., p. 52.  Brendon testified that he discussed

with Samson, who had assumed ownership of TCI, about whether to continue to make payments

on the TCI account used to purchase the computer equipment, and Samson told him that the only

business he wanted Brendon to continue was finishing up Tornow's office building and continue

to make payroll, and not to make payments on any operating lines.  Tr., pp. 644, 940.

      At the § 341 meeting Brendon disclosed his vehicles, including a 2003Harley Davidson

motorcycle valued at $11,145, a 1988 BMW vehicle, a 2003 Corvette, and a 2004 Chevrolet

truck.  Ex. 2, pp. 21-23.  The monthly payment on the Corvette was $1,300 and Brendon had the

payments automatically debited from the Glacier Bank account.  Ex. 2, pp. 22-23.  Brendon and

his brother jointly owned a Malibu Skier boat, and he testified that a 1984 Cadillac worth $1,200,

which should have been listed, was not due to oversight.  Ex. 2, p. 24; Tr., p. 95.  The 2002 Audi

is in TCI's name, is worth $50,000 and secures a $70,000 loan.  Ex. 2, pp. 25-27, 39.  Brendon

testified that he acquired an airplane hangar at Glacier International Airport in his name

personally, and owned it for about a year before he transferred it to Paul Bloomquist.  Ex. 2, pp.

79-81.  Brendon transferred the airport hangar to Bloomquist just days before he filed his

bankruptcy petition, and the transfer was not listed on the Statement of Financial Affairs.  Ex. 2,

pp. 80, 82.  The Trustee testified that such a sale of the hangar before the filing of a bankruptcy

was for $55,000 and that it "Absolutely" should have been be disclosed in the Schedules and/or

SFA, and that he would look for such a transaction in response to Question 10 of the SFA as well

as what Brendon did with the $55,000.  Tr., pp. 35-36.  Samson admitted that Brendon

volunteered the information about the hangar and helicopter and their sale at the first § 341

meeting.  Tr., p. 98[44].

Brendon testified at the first § 341 meeting that he did not know why the transfer of the

hangar was not disclosed.  Ex. 2, p. 80.  At trial Brendon testified that the worksheet question

would not have elicited that answer.  Tr., p. 952.  He testified that he netted about $8,000 from

the transfer of the hangar, and that the boat and trailer, motorcycle, Corvette and Cadillac were

all located in the hangar.  Ex. 2, p. 83.  Samson testified that $47,000 or $48,000 of the proceeds

went to pay off a lien against the hangar held by Glacier Bank, and the remainder went to Retz.

Tr., pp. 36-37. Brendon paid the $8,000 net he received from the sale of the hangar on his

mortgage, and for Dye's fees.  Ex. 2, pp. 83, 85.

After disclosing the hangar sale, Brendon testified at the first §341 meeting that he also

---

[44]Samson testified that he filed a complaint against Bloomquist to set aside the sale as a
fraudulent conveyance, but that he reached a settlement in that case for $2,500.  Tr., pp. 99-100

acquired a used helicopter within a year prior to filing his petition, which he owned 50/50 with Chance Chacon which he sold in February of 2004.  Ex. 2, pp. 83-84; Tr., pp. 100-101.

Dye advised Brendon that he was going to have to amend his Schedules.  Tr., p. 76; Ex. 2, pp. 12-13.  Samson testified that based on Brendon's § 341(a) testimony the Schedules needed to be amended.  Tr., pp. 39, 68-69.  Brendon testified that he surmised at the first meeting that the Schedules were incomplete because of the questions Samson asked.  Tr., p. 775.  But no amendments to Brendon's Schedules or Statements were filed before the trial of this adversary proceeding or given to Samson, even though Dye periodically told Samson they were gathering information and intended to amend the Schedules.  Tr., pp. 63, 69, 76, 86.  Brendon testified that Samson did not ask him to amend but rather asked only for information on specific questions, and copies of bank statements and other documents which he set out doing, although he intends to amend his Schedules and SFA if advised by counsel, or if Samson wants him to.  Tr., pp. 664, 665, 776.  Brendon testified that he "made kind of a distinction between formally amending and informally amending.  And I knew that he wanted us to definitely informally amend; and at the end of the day, I thought our understanding was that we would do one final formal amendment." Tr., pp. 905, 907-08.

Samson testified that if a trustee does not get complete information it interferes with his ability to administer a case.  Tr., pp. 30:22-24; 63-65.  He admitted that Brendon provided him with certain information, but Samson testified that he still does not know that he has all the information he needs to make determinations, or whether the disclosure he received regarding payments to creditors and insiders is accurate.  Tr., p. 67.  Brendon testified that he had between 28,000 and 30,000 pages of documents, which he did not provide to Samson, or to Dye.  Tr., pp.

76

595-96, 1094[45].  Dye testified that Brendon had some of the 28,000 pages of documents, some were on computers and he had to obtain some from banks and other sources.  Tr., p. 1113.  Under recross examination Dye admitted that F.R.B.P. Rule 2004 is an available process to obtain information or records in a bankruptcy case from a bank.  Tr., pp. 1114-15.

Brendon testified at his § 341 meeting that his individual 2003 taxes were being worked on by Dave Schultz.  Ex. 2, p. 29.  Samson testified that Brendon told him that his 2003 taxes were "a mess" and he was not in a position to know what income he had received from the Timberland entities.  Tr., pp. 77, 83-84.  Samson testified that he did not believe the tax returns for TCI have not yet been filed.  Brendon testified that he has not completed his tax returns for 2003 because he has not received a K-1 from TCLLC.  Tr., p. 647.  Samson testified that the 2003 taxes for TCLLC still were not completed or filed by Abbey. Tr., pp. 79-80.  Brendon testified that he understood after the § 341 meeting that he had to give Samson his tax returns when they were done.  Tr., p. 920.  Dye testified that he spoke with Brendon prior to the petition, and spoke with Samson, about Brendon's difficulty in obtaining tax returns information from TCI and TCLLC, in order to prepare Brendon's tax returns, and Dye anticipated that they would get the information for tax returns sometime in 2004.  Tr., pp. 1079, 1080.

Samson asked Dye for the records of contributions received and distributed to Timberland Construction, and Dye stated that he had every intention of getting the records to him.  Ex. 2, p. 36.  Near the end of the § 341 meeting Samson asked Brendon:  "What else is out there that you haven't disclosed?".  Ex. 2, p. 88.  Brendon responded that he needed to run an

---

[45]Dye testified that 28,000 pages of documents were delivered to Abbey's counsel under subpoena in the Ryan Retz bankruptcy case.  Tr., pp. 1094-95.  Those documents were delivered to Black over a period of 6 months after Abbey filed his adversary proceeding.  Tr., p. 1114.

accounts payable list off of TCLLC, which he later explained would be run off of Master Builder, to make sure it would cover any other personal guarantees he had on vendor accounts. Ex. 2, pp. 87-88; Tr., p. 1031.

Samson advised Brendon at the conclusion of the first § 341 meeting "You've got some work to do on Question No. 10[46]. Believe me." Ex. 2, p. 88; Tr., p. 1014, 1031. Dye admitted that after that meeting his discussions with Brendon concerned the Schedules and Question 10 of the SFA, and not the worksheets which were by then irrelevant. Tr., p. 1123. Brendon admitted that as of the conclusion of the first § 341 meeting on March 19, 2004, that he knew his Schedules and responses to SFA were not complete and accurate. Tr., pp. 1012, 1032. Dye remembered specifically telling Samson that the focus of the amendments would be the numerous transactions Brendon had with TCI and TCLLC. Tr., p. 1084.

Brendon testified that when he found out that his Schedules and SFA were not complete and accurate, it became his goal to complete them. Tr., p. 588. Brendon testified that they did not want to file amended Schedules that would require further amendment, but wanted to make sure everything was as close to perfect as they could get. Tr., pp. 777, 907-08. He testified that Dye told him that when they finally finished giving the Trustee everything he wanted they would, at the end of the day, file a complete and accurate set of Schedules and SFA, but that Samson did not want piecemeal amendments. Tr., pp. 588, 1013, 1014. Dye testified that Samson said that he did not want piecemeal amendment, but rather "wanted the documentation and the amendment basically at one time." Tr., p. 1085. Samson testified that he does not recall making the statement that he would prefer not to get documents and records piecemeal, but he did not

---

[46]Question 10 of the SFA.

78

deny making the statement and admitted that it sounds like something he might say. Tr., p. 124.

Brendon formed a new entity, Stumptown Development, and wanted to purchase the TCI computers and assume that debt from the estate. Tr., p. 941. He testified that he had explained to Samson at the § 341 meeting that he did not own the TCI computers personally. Tr., p. 944. Ex. 6 shows Dye's billing records on May 13, 2004, Bates #00019, where Brendon called Dye about offering to purchase all the TCI office equipment and computers securing the Wells Fargo TCI credit line. Tr., pp. 941-42. Dye emailed Brendon on August 12, 2004, about his offer to purchase the TCI computers and office equipment from Samson. Ex. CC; Tr., pp. 943. Brendon testified that he was not able to reach an agreement with Samson about acquiring TCI's computers and office equipment, and those items remain in storage. Tr., pp. 942-43.

Samson requested information from Brendon about a vehicle deposit, Ex. MM, by email to Brendon dated May 26, 2004, and Brendon responded with Ex. NN the next day advising that Brendon made a $500 deposit on 8/23/03 on a 1989 Mercedes 560SL. Tr., p. 916.

Samson advised Brendon and Dye that he wanted bank records from Brendon's individual accounts, joint accounts, TCI accounts, tax returns for 2001 and 2002. Ex. 2, pp. 88-92. Samson testified that he received bank statements about 90 days after the first § 341 meeting in June 2004, and the Wells Fargo statement was missing page 2. Tr., pp. 27, 28, 29-30. Brendon testified that he was focusing on getting copies of what Samson wanted, and thought he was keeping up with what Samson wanted. Tr., p. 776. Brendon emailed Dye on June 22, 2004, asking about a date for the second § 341 meeting and asking: "Can I safely assume that if Samson does not ask for anything else that we are OK *besides the updated schedules*?" Ex. S (emphasis added); Tr., p. 917. Dye testified that he is sure he responded to Brendon's question

but could not recall what his response was, but Dye did not tell Brendon that he did not have to update the Schedules.  Tr., p, 1107-08.  On cross examination Brendon admitted that as of June 22, 2004, he still knew he needed to update the Schedules, but he testified he thought he was okay and the updated schedules would come at the end when everything was complete.  Tr., pp. 1023, 1125.

Brendon testified that he did not come up with draft amended Schedules or SFA in the eleven months from the first meeting of creditors to the date the adversary proceeding was filed because "Until we had everything done, it didn't seem like it could use[47] the time."  Tr., p. 778. Brendon testified that after March of 2004 he elected to spend time with his father and respond to Samson's requests for documents.  Tr., p. 779.

Samson received Ex. 38, and Ex. 67, statements of Brendon's Glacier Bank account with the account number x'd out[48], in June or July 2004 from Brendon.  Tr., p. 72.  Ex. 42, 43, and Ex. 44 are Brendon's Glacier Bank statements for October-December 2003, and include the account number.  Tr., pp. 139-40.  Samson testified that he did not know whether he has copies of the bank account statements with account numbers or not, and that he believes he received Ex. 42, 43 and 44 from Abbey's counsel.  Tr., pp. 147-49.  Brendon testified that Ex. 38 must have been printed online because the account number line reflects all "x".  Tr., pp. 597-98.  Brendon testified that he gave Samson bank statements without account numbers if he was not able to locate the originals and had to go online to get them for Samson.  Tr., pp. 599-600.

---

[47]Perhaps the transcript should read "good use of".

[48]Samson agreed that the x's and o's in place of account numbers on the statements were how Brendon received them online.  Tr., pp. 122-23.

Ex. 107 and Ex. 114 are Bank of America credit card statements.  Tr., p. 74.  Ex. 107 is

Brendon's personal Bank of America statement for November and December 2003, and shows at

page 2 cash withdrawals on the card by Brendon at Glacier Bank on December 10, 2003, in the

amount of $10,000, another $10,000 withdrawal on December 11, 2003, and a $15,000 cash

withdrawal on December 15, 2003.  Brendon was not sure what he did with that money, but

testified he probably used it to fund TCI payroll, including catching up past due payroll before

the end of the year.  Tr., pp. 711-12.  Although the Ex. 107 Bank of America charges were on his

personal card, Brendon testified that the charges for TCI payroll were not his personal

obligations.

Ex. M is comprised of several bank account statements, with a notation on the first page

"Sent to Richard Samson 6/8/04", which Brendon testified he[49] sent Samson, which were

discussed at the § 341 meeting.  Tr., pp. 912-13, 1015.  The fourth page of Ex. M is one of three

pages of a Wells Fargo statement for account no. 543-7229171 for February 6 through March 4,

2004.  Brendon admitted that pages from his bank statements were missing twice, but attributed

it to online error.  Tr., p. 1016.  Later Brendon testified that he thinks the Wells Fargo statements

were printed on both sides, and he failed to double-side copy so the statements he mailed to

Samson in Ex. M lacked the back side.  Tr., pp. 1021-22.  Dye testified that Brendon gave

Samson the missing second page at Brendon's continued § 341 meeting in July 2004.  Tr., p.

1087.

Samson wrote Dye requesting additional bank statements and other information,

---

[49]Dye could not tell whether Brendon sent Ex. M to Samson through Dye's office, or
whether Brendon sent it directly.  Tr., pp. 1093-94.

including about North Forty Resort Corp., by letter dated July 6, 2004, requesting page 2 for the

Wells Fargo statement for account no. 543-7229171 for February 6 through March 4, 2004, and

deposit slips.  Tr., pp. 28, 59, 106, 1016-17, 1091; Ex. 4[50].  Brendon responded to Ex. 4 more

than three months later with Ex. 5, a letter to Samson dated October 27, 2004, which Samson

described as only "partly responsive" to his request after he had granted Brendon several

extensions to respond.  Tr., pp. 58, 107-08, 911; Ex. PP.

Ex. 5 did not provide the missing page 2 Samson requested for the Wells Fargo February

2004 statement, or the deposit slips.  Brendon testified that he provided the missing pages more

informally, but could not say for sure whether he had produced the deposit slips.  Tr., pp. 1018-

19.  Brendon agreed that no reason existed not to give Samson the missing page 2 of the Wells

Fargo February 2004 statement showing his payments to Dye and on his mortgage, when Samson

asked for them.  Tr., pp. 1024-25.  Ex. 5 also includes Brendon's statement on the fourth page:

"I will work diligently on completing any unfinished items", but complained on the third page

that "[t]he request for documents is very broad" with respect to North Forty Resort Corp.  Tr., pp.

590-91.  Brendon testified that he was intending to respond to Samson's questions as fully as he

could.  Tr., p. 910.  At trial Black asked:  "Mr. Retz, what did you do in diligence to complete the

unfinished items after October 27th of 2004?"  Tr., p. 591.  Brendon responded:  "I didn't do very

much."  Tr., p. 592.  Later Brendon testified that he "made quite a bit of effort in a lot of those

areas", and may have sent the Trustee some TCI documents and information on the North Forty

transaction.  Tr., pp. 592, 911, 1019.

Ex. 66 is the portion of TCI's general ledger, dated 7/27/04, generated from Master

---

[50]Also Defendant's Ex. E.

Builder which date stamps it and provides TCI's activity of distributions and contributions. Tr., pp. 431-32. Ryan testified that his handwriting is on Ex. 66, page 1, fourth entry from the top marked "legal fees" next to a $6,478.69 entry, dated 9/22/04, and described as "owners dist", which Ryan described as owner's distribution contributions. Tr., pp. 431-32. Ex. 66 shows a negative $332,000 balance as of 7/27/04. Tr., p. 433.

On August 12, 2004, Samson sent Dye Ex. T, an email regarding a 2003 Harley Davidson motorcycle with a lien against it subject to avoidance, and the latter portion regarding documents:

> I know that I've told Brendon I would prefer to receive documents from him in one "pile" as opposed to piecemeal over time. I've also not been pushing on him very hard to get me all of the information. However, based on this particular matter, I think it's time to move ahead. There is an abundance of information that needs to come to me from him. I feel that there are other issues that need to be addressed with regard to his existing schedules – but I will leave that to your end to handle.

Samson requested all additional information from Brendon be delivered by the end of August. Ex. T. Samson testified that as of the date of Ex. T he was still talking with Dye about amending the Schedules. Tr., p. 125. Brendon testified that he took that as meaning that as long as he was providing Samson with what he wanted, that amending the Schedules "wasn't that big a deal". Tr., p. 777. Dye testified that he interpreted Ex. T as meaning that Brendon would do "a cure to the amendment once all the documentation was provided to Mr. Samson", but Dye admitted that no amendment had been done as of the date of trial. Tr., p. 1087.

Samson testified that he did not, after the second § 341 meeting, discover any other bank accounts or assets in which Brendon had an interest. Tr., pp. 95, 147.

### 5. North Forty Resort Corp. Asset Sale.

Samson testified that he wanted information from Brendon about North Forty, and asked

for it in writing and verbally, but that he believes Brendon did not provide that information.  Tr., p. 5.  Brendon testified that he did not have any discussions himself with Samson because Samson told him he was represented by counsel, but that Dye said that they needed to inform Samson and it may be a good time to offer to buy the North Forty Resort Corp. shares from the estate.  Tr., pp. 722, 723, 736.  Dye's billing records, Ex. 6, Bates # 00026, show a phone call between Brendon and Dye on August 5, 2004, a conference on the following day and another phone call with Brendon and another with Samson regarding the North Forty restructure and the TCI computers.  Tr., p. 942.  Brendon does not recall what they discussed.  Tr., p. 726.  Brendon testified that he could not recall giving Dye a copy of the North Forty Resort Corp. appraisal.  Tr., p. 728.  Ex. 25 and 26 are a North Forty Resort Corp. income statement and balance sheet, respectively, for a period ending August 31, 2004.  Brendon testified that he had never seen Ex. 25 or 26 before he found it in his father's office after his death and produced it.  Tr., p. 733-34.

Brendon testified that he did not consider North Forty Resort Corp. to be an insider because he did not own a controlling interest, but he admitted that he had the ability to control its bank account and make withdrawals to his personal bank accounts.  Tr., pp. 639, 640.

At the time of the North Forty transfer Robert Retz was dying of cancer.  Tr., pp. 151, 410.  Brendon testified that his mother phoned him one Saturday night and he learned that his father was in distress and wanted a will done, and Brendon tried to find Tornow and later met with Schultz.  Tr., p. 726.  Schultz testified that Brendon called him to work on the consultation agreement involving the North Forty Resort Corp., and Brendon was Schultz's main contact during the consultation.  Tr., pp. 287-88, 302.

Eric testified that his dad, Robert, had a lot of capital loss carryovers which would be lost

84

upon his death, that he had discussions involving his dad, mom, both brothers, Ryan and Brendon, and their accountant, Schultz, about how to use up some of the capital loss carryovers before his dad's death.  Tr., pp. 215-16, 217.  Ryan testified that Robert hired attorney Tom Tornow and Schultz to take advantage of the tax losses Robert had incurred in the stock market. Tr., p. 410.  Schultz confirmed that the tax losses would have expired upon Robert's death if he died before the transaction occurred.  Tr., p. 320.  Tornow provided legal advice regarding the plan to preserve Robert's tax loss carryovers.  Tr., pp. 227-28, 302.

Schultz testified that he consulted on the tax consequences of the sale of the resort and and tax return preparation work for North Forty Resort Corporation and North Forty Resort, LLC.  Tr., pp. 284, 289.  He testified that everyone in the Retz family was concerned about Robert's spouse JoEllens' financial condition because of Robert's terminal illness, but that Robert was the driving force behind the transaction.  Tr., pp. 293, 302.

Eric testified:  "Just my dad and Brendon were the ones that were doing this transaction, basically."  Tr., p. 216.  Schultz testified that he worked mainly with Robert, Brendon, and Tornow, and JoEllen was involved in a couple of meetings.  Tr., p. 289.  Schultz testified that there were "probably" no conversations he had with Robert where Brendon was not involved. Tr., p. 290.  Shultz regarded Robert and North Forty Resort Corp. as his client.  Tr., pp. 307, 319.

Schultz testified that he asked Tornow to make sure that all legal formalities were taken "to protect the minority shareholders and treat them legally and fairly."  Tr., p. 317.  Schultz testified that he discussed with Dye in late summer or September 2004, the minority shares held by Brendon's bankruptcy estate, and the potential tax consequences of the sale.  Tr., p. 286. Brendon also had contact with Dye on 9/7/2004 regarding the tax effects of a sale, and a week

later Dye left a voice message to Schultz regarding a North Forty letter and correspondence to Samson on the same subject.  Ex. 6, Bates # 00028; Tr., p. 727.

Brendon testified that the framework for the North Forty transaction had been presented by September 7, 2004, but he could not remember if his father had decided to go through with it. Tr., pp. 727-28.  Brendon described his input in the transaction "that I was doing what my dad wanted me to do to try and achieve his goals."  Tr., p. 930.  Brendon testified that he advised Dye about the possible transaction, so that he could let Samson know.  Tr., p. 929.  Samson testified that Dye approached him outside of the courtroom asking whether Samson would be willing to sell the estate's 6% interest in North Forty Resort Corp., but Samson responded that he needed more information about Brendon's and Ryan's combined 12% interest in North Forty Resort Corp.  Tr., p. 60.  Brendon acknowledged that Samson held his shares for the estate, but testified that they could not wait for negotiations with Samson because his father was dying.  Tr., pp. 723, 927.  Brendon testified that he asserted that the transaction needed to be done fairly to pass the obvious scrutiny they were under from Samson.  Tr., p. 932.

Ex. 23 is a "discussion memo" which Schultz testified was a "road map" of the ideas he discussed with Robert and Brendon, and the goals, which was authored by Schultz before the special meeting on September 17, 2004.  Tr., pp. 292-293, 308, 310.  Schultz testified that Brendon was involved in the discussions regarding Ex. 23, and the discussions about the financial and tax goals for the Retz family.  Tr., pp. 293-94, 299.  Brendon admitted attending a family meeting with Schultz about his father's tax losses.  Tr., p. 720.  But Brendon testified that he did not see Schultz's discussion memo through 2004.  Tr., p. 929.  Ex. 23 has a blacked-out portion in the second paragraph of the first page which Schultz read into the record: "Bob and

his wife, Joellen, have long-term capital losses available in excess of 1.5 million", which Schultz testified was the primary fact driving the transaction.  Tr., pp. 301-02.

Schultz testified that another one of the goals of the Retz family included in Ex. 23 was to minimize liquidation or fair market value of the minority shareholders of North Resort Corp.  Tr., pp. 294, 298-99; Ex. 23.  Schultz explained that goal was regarding the condominiumization of the property and maximizing its economic value.  Schultz admitted that he was not aware at the time of the concept of dissenter's rights, which he described as minority shareholders' right to object to a sale of substantially all of the assets.  Tr., p. 296.  Ex. JJJ includes Schultz's understanding that he will develop a plan with Tornow, Brendon and Robert to protect the majority shareholder of North Forth Resort Corp.:  "[A]s well as taking into account the rights of any minority shareholders.  We will rely on your legal opinion as to minority shareholder rights." Tr., p. 309.

The final goal listed by Schultz on Ex. 23 is:  "Minimize exposure to possible creditors of Brendon that survive the bankruptcy."  Schultz testified that he is sure that Brendon was involved in expressing that goal.  Tr., p. 300.  Brendon testified that Schultz said that if Brendon's mother was going to be the owner of the new enterprise, Schultz wanted to make sure that the new enterprise could not "be sucked into my whole mess".  Tr., p. 721.

Schultz testified that the decision was made to sell all or substantially all of the assets of North Forty Resort Corp.  Tr., pp. 295-96.  Brendon testified that Tornow was responsible for preparing legal notices required in conjunction with the transaction, but that Brendon received no notices.  Tr., p. 932.

The minutes of the special meeting of North Forth Resort Corp.'s directors and

shareholders were admitted as Ex. 29, which Eric testified that he signed.  Ex. 29 is dated

September 17, 2004, and it reflects the results of the special meeting including removal of

Brendon as director and vice president, and entering into the sale and purchase agreement with

North Forty Resort, LLC.  Brendon testified that he attended meetings where the transfer of

North Forty Resort Corp. assets to North Forty Resort, LLC, was discussed, but he denied being

involved in any discussions with his father or Eric about changing directors.  Tr., p. 719.

Brendon testified that he was not given any notice of the corporate meetings at which he was

removed as officer or director, or where the transfer of assets to North Forty, LLC, was to be

discussed or voted upon, and that he did not attend the meeting to effect the transfer.  Tr., pp.

927-28, 932-33.  He testified that he had forgotten by the Fall of 2004 that he was a director of

North Forty Resort Corp., and that he ceased being a director right about the time of his father's

death.  Tr., pp. 719, 927.

Eric testified that he is sure he discussed the transaction with Brendon, but he did not

remember any details.  Tr., p. 221.  Eric could describe the transaction only as:  "It was basically

a note that was – the North Forty, LLC, was going to owe North 40 Corp."  Tr., p. 218.  The

agreement for sale and purchase between North Forty Resort Corp., and North Forty Resort,

LLC, was admitted as Ex. 24, dated September 17, 2004, for a purchase price of real and

personal assets for a promissory note in the amount of $850,000 payable in 30 years at 6 percent

(6%).  Tr., pp. 284-85.  Eric testified that the price was based on an appraisal done on the

property.  Tr., p. 224.

Brendon testified that Dye drew up some promissory notes needed to close the North

Forty transaction, but he did not remember if they used them.  Tr., pp. 728-29.  Ex. 6, Dye's

billing records at Bates # 00028, includes an entry of .6 hours and $105.00 dated 9/28/2004 described as: "Prepare North Fourty[sic] and Retz Holdings notes". Tr., p. 156. Dye testified that he prepared the documents after the transaction had already closed, which he was not aware of at the time, basically as a favor to Brendon because he was upset over his father's illness. Tr., pp. 1082-83. Eric testified that a payment of interest on the note was made in 2005. Tr., pp. 220-21.

Ex. JJJ is Schultz's letter to attorney Tornow, dated September 23, 2004, after the sale took place[51], setting forth his understanding of Schultz's firm's engagement, "[w]orking closely with you and Brendon Retz and Robert Retz". Tr., p. 319. Ex. 27 is a notarized warranty deed dated September 24, 2004, signed by Robert Retz as president of North Forty Resort Corp., conveying the real property to North Forth Resort, LLC. Schultz testified that a form K-1 was issued and a gain was passed out from the sale. Tr., p. 315. Robert died on or about September 30, 2004. Tr., pp. 320, 723.

Samson testified that he did not receive Ex. 28, and he first learned of Brendon's transfer of interest in the North Forty Resort Corp. on or about September 20, 2004, when he received Ex. FF from Dye and an attached letter from Schultz. Tr., pp. 117, 112-13. Dye testified that he spoke with Samson prior to the date of Ex. FF regarding the transfer of assets by North Forty Resort Corp. to a new LLC. Tr., pp. 1080-81. Ex. 6, Dye's billing records, at Bates # 00026, shows a conference he had with Samson "regarding North 40 stock" on August 6, 2004. Dye explained that he discussed with Samson Brendon buying the estate's share of North Forty Resort

---

[51]Schultz described the reason he did not sign and send the engagement letter until the latter part of September as an oversight on his part. Tr., p. 322.

Corp. stock to preserve Roberts tax loss attributes, but Samson was reluctant to sell the stock without Abbey's approval. Tr., pp. 1081-82. Samson testified that he did not call Schultz or Dye about the transaction, because he believed they had an obligation to contact him. Tr., pp. 115-16. Schultz testified that he knew Dye would send Samson Ex. FF, the purpose of which was to notify the Trustee that North Forty Resort Corp. was going to elect out of installment gain tax treatment. Tr., pp. 312, 314-15, 322. Schultz admitted that Ex. FF does not identify the potential buyer, which was known when Schultz drafted Ex. FF. Tr., p. 312.

Brendon testified that he responded to Samson's July letter asking for anything related to the North Forty, and Brendon asked for clarification and then sent Samson some specific documents. Tr., p. 918. Brendon's letter to Samson dated after the sale on October 27, 2004, Ex. 5, in response to Samson's request for information about North Forty and after the sale, states on page 3: "The request for documents pertaining to the North Forty Resort is very broad especially considering that to [sic] company has been in business since 1992. Please be more specific about what you need if my testimony at the last creditor meeting was insufficient." Tr., pp. 137-38.

Samson wrote Dye a letter, Ex. 11 dated November 30, 2004, requesting clarification and documents regarding the sale of North Forty Resort Corp. assets. Brendon testified that Ex. 10 dated December 6, 2004, is his response to Ex. 11. Tr., p. 933. Samson testified that he received the documents relating the North Forty transaction on December 7, 2004. Tr., pp. 136-37, 153-54. Ex. 10 discloses for the first time that the third party purchaser of North Forty Resort Corp. Was North Forty Resort, LLC, owned 100% by Brendon's and Ryan's mother Jo Ellen. Tr., pp. 61, 122. Samson testified that he did not receive any notice pursuant to a dissenter's rights

clause[52].  Tr., pp. 62-63.  Samson testified that he has not received any other information from Brendon after Ex. 10, but admitted that he did not send Dye or Brendon a follow up letter to Ex. 10.  Tr., pp. 70, 108-09.  Brendon testified that he was still working on his response to Question 3B of the SFA with respect to the North Forty Resort transfer.  Tr., p. 639.

### 6.  Other Developments During Administration.

Samson took possession and stored TCLLC's records in a Whitefish storage unit in July and August 2004.  He took them to his office in Missoula at the end of October 2004 where they stayed until July or August of 2005, when he gave them to Abbey who purchased the estate's TCI stock.  Tr., pp. 144-45.  Although Samson intended to try to sit down with Brendon and go through the documents, he did not.  Tr., p. 146.  Samson testified that within 30 days before trial he discovered at least one check Brendon wrote to his father on an account which may be a payment to an insider.  Tr., p. 104.

On November 11, 2004, Samson wrote Brendon requesting additional information about TCI.  Ex. 9; Tr., p. 56.  Samson wrote Dye Ex. 11 on November 30, 2004, complaining that Brendon had not responded to Samson's request for TCI documents and requesting clarification of the sale of assets owned by North Forty Resort Corp. to a then-unidentified third party.  Tr., pp. 59-60.  Samson testified that during the bankruptcy the books and records from the Timberland entities were transferred from Cossitt to Abbey, who had acquired the TCLLC interests of the estate.  Tr., p. 79.

Ex. II is a compilation prepared by Brendon, in 2005 or 2006 after the adversaries were

---

[52]Ultimately Samson entered into a settlement agreement with Jo Ellen Retz and Brendon which was approved by this Court, and Samson received payment for the estate's 6% interest in North Forty Resort Corp. in the spring of 2006.  Tr., pp. 62, 120.

filed, regarding North Forty Resort Corp. transactions in preparation for a meeting between

Taleff and Samson about a preference claim[53] against North Forty based upon the American

Express charges which also form the basis for some of Abbey's claims.  Tr., pp. 990-91, 1034.

Brendon testified that Ex. II was work done for Taleff, who was representing his mother and not

Brendon at the time, on behalf of his mother to straighten out Samson's concerns, and did not

involve Brendon's Schedules.  Tr., p. 1034.

Abbey filed a complaint initiating the instant adversary proceeding on March 8, 2005, and

Samson filed a separate adversary complaint objecting to Brendon's discharge[54] on the same

date.  Tr., p. 31.  Samson testified that Brendon's Chapter 7 case had become contentious, and

Dye told him that Samson and Abbey had had ample time to investigate and "that if we thought

we had grounds to bring a complaint, to bring it on."  Tr., p. 126.  Samson filed the complaint

because Dye told him he would object to any further requests for extensions.  Tr., p. 127.

Brendon testified that after the adversary proceeding was filed he asked Dye whether he

should "formally amend" his schedules, but Dye said not to, that they had to defend it.  Tr., p.

908.  Dye testified that he advised Brendon after the adversaries were filed "that the die was

cast[55], that I saw that it would not help and it would possibly hurt to – after the adversary

---

[53]According to Brendon and Dye, Taleff's meeting with Samson satisfied Samson that
there was no preference issue regarding the North Forty credit card transactions.  Tr., pp. 992,
1078-79.  Brendon testified that he miscounted and doubled up on transfers, and TCI ended up
with $38,000 to $40,000 of North Forty Resort's money.  Tr., pp. 992-93.

[54]Samson's adversary proceeding is No. 05-00016.  Samson's complaint seeks denial of
Brendon's discharge for, among other claims, under § 727(a)(4)(A) for false oaths on Schedule B
(Count I) and the SFA (Count II).

[55]The original phrase "the die is cast", in Latin is attributed to Julius Caesar in 49 B.C. as
he crossed the Rubicon river with his legions, an act regarded as an irrevocable act of war against

proceeding was filed, to file an amendment." Tr., p. 1089. Brendon testified that he was

working on providing information to Samson such as the transfers on Ex. 38, but that after the

adversary proceedings were filed Dye advised Brendon not to provide any more information. Tr.,

pp. 599, 638, 654. Even after the adversaries were filed, Brendon testified, he and Misty tried to

meet with Samson to show him that "we're not trying to pull anything here", but he felt they

were never given the chance. Tr., pp. 908-09. Brendon wrote Dye an email dated March 8,

2005, Ex. BB, commenting on the allegations in Samson's the adversary complaint. Tr., pp. 993,

1055. Dye testified that he met with Brendon and Misty in his office[56], and that was when Dye

first realized that information from Brendon's worksheet, Ex. K, had not made it onto his

Schedules and SFA. Tr., p. 1055.

**7. The Lost Worksheet – Ex K.**

 Brendon testified that he did not compare his worksheet, Ex. K, with his Schedules and

SFA until after the adversaries were filed because he had told Samson of things that were

missing at his § 341 meeting and believed that that constituted informal amendment of the

Schedules and SFA. Tr., p. 868. Dye testified that when he reviewed Ex. K after the adversaries

were filed, he clearly realized that Brendon had given him the worksheet and that information

from it had not gotten into the Schedules and SFA. Tr., p. 1055.

Brendon testified that Ex. K became misplaced, Dye could not find it in his files and it

---

Rome. Mirriam Webster's "Dictionary of Allusions", p. 150, citing Plutarch's *Lives*; *see also*
William Shakespeare *Richard III*, Act 4, Scene 4 ("I have set my life upon the cast/And I will
stand the hazard of the die.") (1592).

[56]Ex. 6, Bates # 00041, shows a 3 hour meeting between Dye, Brendon and Misty
regarding Samson's adversary proceeding, the first such meeting after the filing of the complaint.

remained missing until Misty brought Brendon a box of his bankruptcy papers in Missoula, where Brendon found his worksheet Ex. K in that box and concluded that, after their meeting with Dye, Brendon had scooped it up with his papers and took Ex. K back to Whitefish.  Tr., pp. 772-73, 870, 871, 1032.  When they compared the worksheet with the Schedules Brendon testified that, after the adversary proceeding was filed, he contacted Dye and asked about the worksheet and Dye found Ex. K in his file, and "there was a bunch of stuff on there that didn't make it on our schedules."  Tr., pp. 771, 863, 868, 869.  Brendon admitted that if everything on his "lost" worksheet had been on the Schedules, they still would not have been complete.  Tr., p. 773.

Brendon testified that when he recovered his worksheet from Misty and compared it with his Schedules, he learned that the questions on his worksheet were different than the questions on the Schedules, and that Dye told him that his answers to worksheet questions were not right because the questions were not right.  Tr., pp. 773-74.  Dye testified that he was not aware of the difference between the language of the questions on the worksheet and the Schedules and SFA until he experienced some of the same issues in another case.  Tr., pp. 1048-49.

Brendon testified that he made notations on the first and third pages of Ex. K regarding Riverside Properties and claims arising from breach of contract, and he discussed those with Dye for purposes of disclosure on his Schedules, and he did not think those interests ever made it onto the filed Schedules and SFA.  Tr., p. 876.  Also on the third page of Ex. K is a line entry: "Deposits of Money (indicate source)", to which Brendon entered and highlighted "1".  Brendon testified that he did not believe he was required to list actual bank accounts, but rather "money that I had that was positive in account – in bank accounts."  Tr., p. 894.  Brendon remembers

94

answering the question and got the balance from his account at the last minute, but overlooked the Whitefish Credit Union account because they both had approximately $68 in them.  Tr., p. 894.

The fourth page of Ex. K includes Brendon's notations next to Whitefish Credit Union and Dye's name.  Brendon testified that he was indicating to Dye to disclose the mortgage payment to Whitefish Credit Union and payment to Dye that were made right before the date of filing his petition.  Tr., p. 877.  The payment to Dye made it onto Brendon's SFA (at Question 9), but the mortgage payments to Whitefish Credit Union did not.  Ex. 1; Tr., pp. 877, 878, 1025. Brendon made notations on other pages of Ex. K to bring other payments and his intention to Dye's attention, after they had discussed them.  Tr., pp. 878-79.

Ex. K includes questions corresponding to the questions on the SFA beginning on the ninth page, and Brendon made notations next to questions involving wages, income from employment or operation of business.  Brendon made notations regarding whether he should include Misty's income, and marked other entries next to question 3a on the tenth and eleventh pages of Ex. K:  "Not Done".  Tr., pp. 880-81.  His answer to Question 3b of Ex. K, eleventh page, calling for payments to insider creditors, lists TCLLC with a highlighted question:  "List all loan paybacks."  Tr., p. 882.  Brendon was not sure whether his short term loans back and forth to TCLLC were considered payments to insider creditors, and was indicating that the question was not done and needed to be discussed or amended.  Tr., p. 882.  Question 3b on Brendon's SFA is marked "None".  Ex. 1.

Three lawsuits are listed at question 4a of Ex. K, but not on the SFA.  Tr., 882; Ex. 1. Question 6b of Ex K includes value from a house and stock in Cossitt's possession, but those

interests are not listed on Question 6a of the SFA.  Tr., pp. 883, 884; Ex. 1. Question 8 of Ex K

includes Brendon's entries for gambling, a broken watch and automobile, but only the gambling

loss was entered on the SFA at Question 8.  Tr., p. 883.  Brendon testified that he did not

specifically list the watch as jewelry because he was told it has no value.  Tr., p. 883.

Question 10 of Ex. K lists 650 Woodside transferred to Ryan for 160000, but no other

transfers.  Tr., p. 884.  The SFA response to Question 10, as discussed above, listed no specific

transfers but referred to the addendum, which listed no specific transfers and only generally

referred to contributions to and distributions from TCI in the ordinary course of business.  Ex. 1.

Brendon testified that he answered question 10 of Ex. K differently than Question 10 of the SFA

because the questions are different, and he was answering the question on Ex. K.  Question 10 of

Ex. K reads:

> List all property, other than property transferred in the ordinary course of business
> or financial affairs of the debtor, transferred absolutely or as security during the
> past year to a creditor or a family member.

Question 10a of the SFA, "Other transfers", on Ex. 1 reads:

> List all other property, other than property transferred in the ordinary course of the
> business or financial affairs of the debtor, transferred either absolutely or as
> security within one year immediately preceding the commencement of the case.
> (Married debtors filing under chapter 12 or chapter 13 must include transfers by
> either or both spouses whether or not a joint petition is filed, unless the spouses
> are separated and a joint petition is not filed.)

Brendon testified that, because question 9 of Ex. K says to list all payments made or other

property transferred, he believed that question 10 which said "List all property" excluded

payments.  Tr., p. 885.  Question 9 of Ex. K and the SFA both refer to all payments made or

property transferred, "to any persons", including attorneys, for consultation concerning debt

consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within

96

the past year preceding commencement of the case[57].  Brendon believes he answered question 10

on Ex. K correctly, and that Question 10 of the SFA "was a completely different question".  Tr.,

p. 886.

Question 15 of Ex. K, premises occupied and vacated during the last two years, lists

Brendon's occupancy of 650 Woodside.  Tr., p. 891.  Question 15 of the SFA is marked "None".

Ex. 1.  Brendon's response to question 17b on Ex. K likewise did not make it onto Question 17

of the SFA.  Tr., p. 891; Ex. 1.  At question 18 of Ex. K Brendon wrote "Relist?", and testified

that he was asking Dye whether he needed to relist entities which he listed on the first page[58] of

Ex. K, at question 18.  Tr., pp. 892, 923, 924.  The SFA response to Question 18 is checked

"None".  Ex. 1.

Ex. K ends with question 18, while the SFA ends with Question 24.  Tr., p. 887.  Brendon

did not notice that discrepancy until he recovered Ex. K from Misty and compared it with his

SFA.  Tr, p. 887.  Brendon remembered being asked at the § 341 meeting why he did not list his

accountants on the SFA Question 19, and that in both adversary proceedings against him there

were issues about his marking "None" on the SFA Questions 21 and 22.  Tr., p. 888.  He testified

that he disclosed to Dye his involvement in TCI, TCLLC, Riverside Properties and North Forty

Corp., and that there were other shareholders, officers and directors.  Tr., p. 888.

Dye testified that when he received Ex. K, "that information, somehow through some sort

---

[57]There are minor differences in punctuation and language between questions 9 in Ex. K
and the SFA, but those do not change the fact that question 9 on both Ex. K and the SFA call for
payments relating to debt consolidation or bankruptcy.  That limitation makes the information
called for in question 9 markedly different from the information called for in question 10.

[58]Next to "Other Tax ID#'s" on Ex. K, first page.

of wire-crossing, didn't get entered into our computer program. And that's the reason it didn't get put, it didn't get put down." Tr., p. 1063-64[59]. On cross examination Brendon admitted that Ex. K is not close to being complete, even for what it states. Tr., p. 1024.

Brendon testified that he has not intentionally withheld from the Trustee or refused to provide the Trustee with information he requested, has not concealed or destroyed his financial records or asked anyone else to. Tr., p. 904. At trial Brendon testified that he was going to meet with Samson a week after trial and would "give him whatever he needs; and if he wants a formal amendment, we'll prepare a formal amendment." Tr., pp. 704-05. Brendon believes that Samson has asked for answers to Questions 3 and 10 of the SFA. Tr., p. 705. Dye testified that Brendon is an intelligent person and could get the information to Dye to amend his Schedules and SFA, and that Brendon gave a substantial part of the information to Samson and is in the process of compiling more[60]. Tr., p. 1095. Dye testified that as far has he knows Brendon's tax returns, as well as those for TCI and TCLLC, have still not been done and in order to get Brendon's taxes done would require TCLLC's returns being done. Tr., p. 1080.

## DISCUSSION

Pursuant to Order entered on March 9, 2007 (Docket No. 92) the trial of this adversary proceeding was bifurcated and limited to Abbey's claims for relief objecting to Brendon's discharge under 11 U.S.C. § 727. The Pretrial Order (Docket No. 109) approved on April 4, 2007, specified Abbey's Counts Nine (alleging Brendon knowingly and fraudulently making

---

[59]Dye described his normal practice at Tr. p. 64, but stated that this case is different from normal practice in just about every aspect.

[60]Brendon filed amended Schedules and SFA on August 7, 2007, which are not part of the record in this adversary proceeding.

false oaths or accounts on Schedules by failing to disclose income, assets, and transfers under §
727(a)(4)(A)); Ten (alleging Brendon transferred interests in property with intent to hinder, delay
or defraud creditors under § 727(a)(2)(A)); Eleven (alleging Brendon failed to explain
satisfactorily loss or deficiency of assets under § 727(a)(5)); Twelve (Alleging Brendon caused
borrowing from Wells Fargo Bank on a line of credit secured by his brother Ryan house at 650
Woodside, which Brendon caused to be fraudulently transferred by TCLLC to Ryan under §
727(a)(2)(B)); Thirteen (alleging Brendon transferred assets of TCLLC to himself or entities
which he controlled, with intent to hinder, delay or defraud, constituting concealment,
destruction or mutilation of property of the Debtor with intent to hinder, delay or defraud a
creditor under § 727(a)(2)(A)); and Fourteen (alleging Brendon participated in a plan which
transferred, removed, destroyed, mutilated or concealed the value of Debtor's interest in North
Forth Resort Corp., by transferring all its assets to North Forty Resort, LLC, with intent to hinder,
delay and defraud a creditor under § 727(a)(2)(A)).

Certain principles or factors are common and apply to each of Abbey's claims for denial
of discharge under § 727(a). First, "[a] claim for denial of discharge under § 727 is construed
liberally and in favor of the discharge and strictly against a person objecting to the discharge."
*Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly
Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986). The principal purpose of the
Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor".  *Marrama v.
Citizens Bank of Mass.*, __ U.S. __, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007).  The "fresh
start" is explained by the Ninth Circuit Bankruptcy Appellate Panel in *In re Albarran*, 347 B.R.
369, 379 (9th Cir. BAP 2006):

The general policy of bankruptcy law favors allowing an honest debtor to discharge debts and to make a fresh start free from the burden of past indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but honest, there is a presumption that all debts are dischargeable unless a party who contends otherwise proves, with competent evidence, an exception to discharge. *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p. 870 (2006 ed.).

The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan v. Garner*, in further explaining the "fresh start" policy of the Bankruptcy Code, states that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)." 498 U.S. 279, 286, 111 S.Ct. 654, 659 112 L.Ed.2d 755 (1991). The party seeking to deny the debtor's discharge bears the burden of proof, which under § 727 is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 289; *In re Searles*, 317 B.R. 368, 376 (9th Cir. BAP 2004), *aff'd.*, 212 Fed.Appx. 589 (9th Cir. 2006).

Second, the Court notes and deems it significant that the Trustee in Debtors' Chapter 7 case, Richard J. Samson, appeared and testified at trial in support of Abbey's claims for denial of Brendon's discharge, and the Trustee filed a separate adversary proceeding to deny his discharge. Finally, the Court concludes and finds, after observing Brendon's demeanor while testifying under oath and cross examination, and examination of the transcripts of the state court hearing, Ex. FFF, and other evidence discussed below, that Brendon is not a credible witness. *Allen v.*

100

*Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002); *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518  (1985); *In re Taylor*, 514 F.2d 1370, 1373-74 (9th Cir. 1975).

### Count Nine – § 727(a)(4)(A) – False Oaths.

### Contentions of the Parties.

Under § 727(a)(4)(A), Abbey cites *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999) and *In re Wright*, 364 B.R. 51, 7 (Bankr. D. Mont. 2007), that only a single false oath involving a material false statement or omission in a debtor's schedules is required if it detrimentally affects administration of the estate, and intent exists where there has been a pattern of falsity or reckless indifference or disregard to the truth.  Abbey cites *Searles*, 317 B.R. at 377, for the proposition that a debtor has a continuing duty to formally amend incorrect Schedules and SFA, and that reliance on counsel must be in good faith, citing *Adeeb*, 787 F.2d at 1343.  Abbey argues that Brendon did not fully disclose all relevant information to his counsel Dye and therefore good faith reliance on his attorney has not been shown.

Abbey argues that Brendon freely admitted that his Schedules and SFA were incomplete and inaccurate, that he knew so at the first § 341 meeting and was told at least twice by the Trustee to amend, but had not amended his Schedules and SFA by the time of trial more than 3 years later even though he continued to insist he will answer SFA Questions 3 and 10.  Abbey cites the Trustee's testimony that Brendon's lack of disclosure hindered administration of the estate.  Tr., at pp. 63:17-69:5.  Abbey contends that Brendon was not forthcoming at the § 341 meeting, was not truthful and made false oaths even as he disclosed ownership of the Cadillac,

101

airplane hangar and helicopter, because he never informed the Trustee that he was making payments to Glacier Bank for the helicopter, which he solely owned, while it was titled in Chacon's name, and did not disclose these payments on the SFA.  Abbey contends that Brendon's failure to provide account numbers for the Glacier Bank statements show a pattern of failure to disclose, because Brendon had statements with account numbers but did not include them on the Schedules and SFA, spent little time reviewing the bank statements and did not disclose them to the Trustee for years until just before trial.

Abbey contends that question 3A of the SFA remains incomplete and required amendment, but Brendon did not amend by the time of trial to list payments to several creditors, and he admitted that his worksheets given to Dye were incomplete.  Abbey notes that Brendon failed to list the insider transaction to his father in March of 2003 on his worksheets or SFA Question 3.  Abbey argues that Brendon understated his assets by listing $68.42 in one bank account on Schedule B while his Wells Fargo account had $17,372.26 on February 12, 2004, and that Brendon failed to list the $9,665.88 check to Whitefish Credit Union to prepay his mortgage from the sale of the helicopter or hangar at Question 3 of his SFA, which Abbey contends was a postpetition transfer.

Brendon contends that Abbey failed to show that Brendon had the requisite intent to conceal, hinder, delay or defraud the Trustee and creditors under each of Abbey's § 727(a) claims for denial of discharge.  Brendon argues that Brendon, Misty, and his other witnesses all testified that the transactions were legitimate and were disclosed to and approved by his attorneys, and that Abbey did not refute that testimony.  Brendon argues that if the Court believes that the testimony of Brendon's witnesses was truthful and credible, then he should not be denied a

discharge.

Brendon argues that he provided and continues to provide information to the Trustee and was motivated to protect his creditors, but was denied access to his records by Abbey, an extremely aggressive creditor.  Brendon contends that, in determining his intent, his attorney Dye's admitted failure to include information from Brendon's worksheets in the SFA and the inconsistency of Dye's worksheets with the official forms, are critical aspects, as well as Brendon's "ongoing supplementation of the SFA based upon communications with the Trustee and disclosure of information at two separate Section 431 [sic] meetings."  Brendon argues that his gambling losses are listed on his SFA and worksheet; his lawsuits were listed on the worksheet and discussed with Dye but not included on the SFA because of Dye's inadvertent omission, and the Trustee and Abbey were aware of the lawsuits.  Brendon argues he listed his household goods and wedding ring on his Schedules, and listed his broken watch on the worksheet.  He contends that the watch was damaged twice and had no value, and he had no intent to conceal the watch.  Brendon argues the golf membership was included in his valuation of his real estate lot, and was discussed at the § 341 meeting.  He argues his business interests are listed on his SFA and worksheet, were discussed at the § 341 meeting and the failure to include them in multiple places was Dye's inadvertent failure.  Brendon cites *Wright*, 364 B.R. at 75-76, that a discharge should not be denied for willfully false omissions when items are omitted by mistake or upon honest advice of counsel to whom the debtor has disclosed all the relevant facts, and argues that there is no evidence that Brendon did not disclose to his attorneys the relevant facts of the transactions at issue.

Brendon contends that the SFA was filed under exigent circumstances and he advised the

103

Trustee that it was incomplete and would require amendment, but that his documents were voluminous and not in his possession.  Brendon asserts that debtors routinely file schedules which are not fully accurate and complete despite the certification and supplement them throughout the case, which do not generate dischargeability complaints as a matter of "professional understandings and courtesies" between debtors and trustees, who ask for and receive additional information at § 341 meetings and throughout a case.

Brendon cites his father's illness, his deteriorating marriage and chemical dependency issues.  He argues that his omissions stemming from his attorney's failure to include information in the SFA and his inability to access voluminous information should not result in the most severe punishment of denial of discharge.

Brendon argues that the sale of the helicopter and hanger and payment of proceeds to his mortgage and attorney were discussed with and approved by his attorney, and do not establish improper intent but rather at the worst he failed to appreciate the situation, which he disclosed at the first § 341 meeting.  Brendon argues that he did not intentionally fail to disclose his 2003 and 2004 income, but could not because he has not received a form K-1 from TCLLC, and he agreed to produce it after he receives the information to prepare his tax returns.

Regarding amendment of his Schedules and SFA, Brendon argues that he intended to eventually amend and provided information to the Trustee, and admits that he was advised by Dye and the Trustee that they needed to be and would be amended.  Brendon argues that the Trustee did not want several periodic amendments, and that after the adversary complaint was filed Dye advised him not to amend.  Brendon argues that the information necessary to compile a thorough response and amendment to the SFA was voluminous and scattered and not made

available to Brendon or the Trustee by the receiver, and that one payment to his father was believed to be outside the preference period which Brendon argues was a legitimate, reasonable mistake and not a basis to deny him a discharge based on fraudulent intent.  Brendon describes Abbey's contentions regarding lack of bank account numbers as "laughable", and contends that Brendon obtained the bank records online with the numbers redacted.

Brendon contends, without citation to authority in his reply brief:  "Good faith reliance on the advice of counsel is a valid defense to a Sec. 727 claim."  Brendon argues that he relied on the advice of his attorneys, and cites *in re Halperyn*, 346 B.R. 65 (W.D. N.Y. 2006) and *In re Ellingson*, 63 B.R. 271 (Bankr. N.D. Iowa 1986), as authority that debtors' discharge should not be denied for omissions from Schedules caused by an honest mistake or upon honest advice of counsel, where debtors made every effort to see that their Schedules were properly prepared and the attorney assured them they had been.  Brendon cites *In re Cornelius*, 333 B.R. 850 (Bankr. N.D. Fla. 2005) that a debtor's reliance on a professional can be a defense to an attempt to deny discharge for false oaths, and he asserts he relied on Dye's advice after disclosure.  Lastly, Brendon argues that a false oath must be made intentionally with regard to a matter material to the case, and a discharge may not be denied where the untruth was the result of mistake or inadvertence.  *In re Cutignola*, 87 B.R. 702, 706 (Bankr. M.D. Fla. 1988).  Brendon concludes that he is entitled to discharge because the omissions and errors were the result of his attorney's mistake, honest misunderstandings and voluminous records, not actions which were intentionally designed to conceal assets and hinder creditors.

### § 727(a)(4)(A).

This Court construed § 727(a)(4)(A) in *Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R.

149, 150-51, 17 Mont. B.R. 43, 44-46 (Bankr. Mont. 1999):

> The Bankruptcy Code provides that a debtor under Chapter 7 shall be granted a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case--(A) made a false oath or account...."  11 U.S.C. S 727(a)(4).  Thus, to succeed on a § 727(a)(4)(A) claim, the objecting party must demonstrate that:  (1) a false oath or statement was made by the debtor; (2) knowingly and fraudulently; (3) which was material to the course of the bankruptcy proceedings.  *First Nat'l Bank of Crosby v. Syrtveit (In re Syrtveit)*, 105 B.R. 596 (Bankr. Mont. 1989).  A false oath or statement is made when it occurs (1) in the debtor's schedules or (2) at an examination during the course of the proceedings.  *Scimeca v. Umanoff*, 169 B.R. 536, 542 (D.N.J.1993); *aff'd*, 30 F.3d 1488 (3d Cir.1994).  The Court in *Scimeca* noted that while the initial burden lies on the objector to prove that the debtor made a false statement in connection with the proceedings, once it "reasonably appears the oath is false, the burden falls on the bankrupt" to disprove the allegation.  *Scimeca*, 169 B.R. at 542; *Kramer v. Poland (In re Poland)*, 222 B.R. 374 (Bankr. M.D.Fla 1998) ("it is well established that once the Plaintiff has met the initial burden by producing evidence which establishes a basis for the objection, the Defendant has the ultimate burden of persuasion.  *See, Chalik v. Morrefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).").

* * * *

> With regard to materiality, the Eighth Circuit Court of Appeals adopted the following standard of materiality as espoused by the Eleventh Circuit Court of Appeals in *Chalik*, 916 F.2d at 484:

>> The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.

> *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992). . . .  This case highlights an obvious and fundamental maxim in bankruptcy–that providing false information under oath in a bankruptcy proceeding is not a matter to be taken lightly.  *See e.g., Tully*, 818 F.2d 106, 112 (1st. Cir. 1987) (stressing that sworn statements in bankruptcy schedules "must be regarded as serious business" because "the system will collapse if debtors are not forthcoming");  *In re Nazarian*, 18 B.R. 143, 146 (Bankr. D.Md.1982) (noting that a creditor need not actually rely on the false statement).  As previously noted by this Court,

>> The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so they can rely upon it without the need for the

106

Trustee or other interested parties to dig out the true facts through examinations or investigations.

*Bastrom*, 106 B.R. at 227.

*See also Mabank Bank v. Grisham (In re Grisham)*, 245 B.R. 65, 76 (Bankr. N.D. Tex. 2000).

This Court discussed a debtor's responsibility in completing schedules and statements of financial affairs in *Torgenrud v. Wolcott (In re Wolcott)*, 194 B.R. 477, 486 (Bankr. D. Mont. 1996):

> As to the false declarations in Wolcott's Schedules and Statement of Affairs, the preparation and filing of such documents for the Bankruptcy Court "is no idle task." *Torgenrud v. Smith* (*In re Smith* ), 14 Mont.B.R. 228, 232 (Bankr. D. Mont.1995). Courts take a very dim view of the " 'intentional and fraudulent omission of property from sworn schedules [which] amounts to an offense punishable by the Criminal Code.' " *In re Woodson*, 839 F.2d 610, 614 (9th Cir.1988). "Numerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately." *In re Mohring*, 142 B.R. 389, 394 (Bankr.E.D.Cal.1992), *aff'd mem.*, 153 B.R. 601 (9th Cir. BAP 1993), *aff'd mem.*, 24 F.3d 247 (9th Cir.1994). Moreover, a debtor must correct such documents filed with a court upon learning of their inaccuracy or incompleteness. *Id.* The debtor has "no discretion in this regard." *Smith*, 14 Mont.B.R. at 233. Furthermore, a debtor has an affirmative duty to "cooperate with the trustee in preparing a 'complete inventory of the property of the debtor.' " *Mohring*, 142 B.R. at 394. Failure to follow these precepts results in denial of a debtor's general discharge for harboring an intent to conceal property. 11 U.S.C. § 727(a)(2); *Devers*, 759 F.2d at 753-754.
>
> In the case *sub judice*, Wolcott's actions fly in the face of the foregoing dictates. The Court identified at least six flat falsehoods contained in Wolcott's Schedules and Statements of Affairs. Furthermore, in written arguments filed with the Court, Wolcott boldly admitted to concealing from the Trustee a $45,000 asset. These flagrant violations of Wolcott's clear duty of honesty and forthrightness in the conduct of Wolcott's bankruptcy clearly demonstrate a calculated intent to conceal property. Thus, once again, even construing the evidence against Wolcott in the most lenient light, the Court finds 11 U.S.C. § 727(a)(2) altogether satisfied.

The above-quoted language demonstrates the overlap between the subsections of § 727, and was included in this Court's decision in *Wright*, 364 B.R. at 71-73.

All that is required for a denial of discharge under the plain language of § 727(a)(4)(A) is

a single false oath or account.  *Wright*, 364 B.R. at 73; *Smith v. Grondin (In re Grondin)*, 232

B.R. 274, 277 (1st Cir. BAP 1999) (*citing Schmitz*).  "A false oath may involve a false statement

or omission in the debtor's schedules." *Wills*, 243 B.R. at 62; *Searles*, 317 B.R. at 377, citing

*Wills*; *Wright*, 364 B.R. at 73.

      Materiality may be established if a false statement "bears a relationship to the bankrupt's

business transactions or estate, or concerns the discovery of assets, business dealings, or the

existence and disposition of the debtor's property". *In re Retz*, 364 B.R. 742, 758-59 (Bankr. D.

Mont. 2007) (denying summary judgment), quoting *Wills*, 243 B.R. at 62.  The above analysis in

*Schmitz* remains good law consistent with the BAP's analysis of §727(a)(4) in *Searles* and *Wills*,

243 B.R. at 62-63, in which the BAP sets forth a comprehensive analysis of intent and materiality

thus:

> Materiality is broadly defined.   A false statement is material if it bears a
> relationship to the debtor's business transactions or estate, or concerns the
> discovery of assets, business dealings, or the existence and disposition of the
> debtor's property.  *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984).   See also *In
> re Weiner*, 208 B.R. 69, 72 (9th Cir. BAP 1997), rev'd on other grounds, 161 F.3d
> 1216 (9th Cir.1998) (citing *Chalik* and holding that a false statement is material if
> it "bears a relationship to the debtor's estate, and concerns the discovery of assets,
> or the existence and disposition of his property").
>
> A false statement or omission may be material even if it does not cause direct
> financial prejudice to creditors.   See *Weiner*, 208 B.R. at 72; *Chalik*, 748 F.2d at
> 618.   *See also In re Hoblitzell*, 223 B.R. 211, 215-16 (Bankr.E.D.Cal.1998)
> (omission of asset may be material even if it did not financially prejudice the
> estate or creditors "if it aids in understanding the debtor's financial affairs and
> transactions"); [*In re Ford*, 159 B.R. 590, 593 (Bankr. D. Or. 1993)] (omission or
> false statement may be material if it is relevant to the discovery of past
> transactions--value of omitted assets does not have to be significant to be material
> and no detriment to creditors need be shown); *In re Haverland*, 150 B.R. 768, 771
> (Bankr.S.D.Cal.1993) (applying standard set forth in *Chalik* and noting that
> materiality of false oath does not depend on whether the falsehood is detrimental
> to creditors).

The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations.  [*In re Aubrey*, 111 B.R. 268, 274 (9th Cir. BAP 1990)].  "[T]he opportunity to obtain a fresh start is . . . conditioned upon truthful disclosure."  *Id.*  "The entire thrust of an objection to discharge because of a false oath or account is to prevent knowing fraud or perjury in the bankruptcy case.  As a result, the objection should not apply to minor errors or deviations in testimony under oath."  William L. Norton, Jr., NORTON BANKRUPTCY LAW AND PRACTICE 2D § 74.11 (1997).   A false statement or omission that has no impact on a bankruptcy case is not grounds for denial of a discharge under § 727(a)(4)(A).   6 Lawrence P. King *et al.*, COLLIER ON BANKRUPTCY ¶ 727.04[1][b] (15th ed. Rev. 1998)(citing *In re Fischer*, 4 B.R. 517 (Bankr.S.D.Fla.1980)).  As a result, omissions or misstatements relating to assets having little or no value may be considered immaterial.  *See, e.g., In re Waddle*, 29 B.R. 100 (Bankr. W.D. Ky. 1983). Likewise, omissions or misstatements concerning property that would not be property of the estate may not meet the materiality requirement of § 727(a)(4)(A).  *See, e.g., In re Swanson*, 36 B.R. 99 (9th Cir. BAP 1984). However, an omission or misstatement relating to an asset that is of little value or that would not be property of the estate is material if the omission or misstatement detrimentally affects administration of the estate.

> In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors. Even if the debtor can show that the assets were of little value or that a full and truthful answer would not have directly increased the estate assets, a discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition. Similarly, if the omission interferes with the possibility of a preference or fraudulent conveyance action the omission may be considered material.

6 King, COLLIER ON BANKRUPTCY ¶ 727.04[1][b].

In this case, the bankruptcy court determined that the false statements and omissions in Debtors' petition were not material solely because Fogal did not show that the assets had sufficient value to increase the amount paid to creditors. Based on the above authorities, we conclude that a statement or omission relating to an asset that is of little value or that would not be property of the estate can be material if it detrimentally affects the administration of the estate.   The bankruptcy court applied an incorrect interpretation of the materiality requirement of § 727(a)(4)(A).   We therefore remand so that the court can apply the correct legal standard.

b. Intent

> To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show that
> the debtor knowingly and fraudulently made a false oath. *Aubrey*, 111 B.R. at 274.
> Intent must be actual, not constructive. *In re Devers*, 759 F.2d 751, 753 (9th
> Cir.1985).

*See Wright*, 364 B.R. at 73-74.

As noted above debtors must knowingly and fraudulently make a false oath.  First, the
Court considers the term "fraudulently."  The requisite fraudulent intent "must be actual, not
constructive".  *Wills* 243 B.R. at 64 (citing *Devers*, 759 F.2d at 753).  Abbey may prove such
intent through "circumstantial evidence or by inferences drawn from Brendon's course of
conduct."  *Id*. (citing *Devers*, 759 F.2d at 753-54).  Surrounding circumstances and certain
badges of fraud may establish the necessary intent.  *Wills*, 243 B.R. at 64, citing *See In re
Woodfield,* 978 F.2d 516, 518-19 (9th Cir.1992).  Although *Woodfield* involves 11 U.S.C. §
727(a)(2), the analysis of intent applicable to such section applies also to 11 U.S.C. § 727(a)(4).
6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.).  "A court may find the requisite intent
where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard
of the truth."  *Wills*, 243 B.R. at 64 (citing *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564
(Bankr. S.D.Cal. 1996)).

The second term "knowingly" requires Wrights to act deliberately and consciously.

*Roberts*, 331 B.R. at 883.  The following analysis from *Roberts*, is instructive:

> The bankruptcy court did not make a finding that Roberts acted deliberately and
> consciously in failing to make these disclosures until he amended his Statement.
> Instead, the court found that Roberts exhibited, "a careless and reckless approach
> to the important duty of disclosure in sworn bankruptcy filings." "Careless and
> reckless" is a lower standard than "knowing."
>
> An action is careless if it is "engaged in without reasonable care." *Id.* at

110

225. This is a negligence standard, not a knowing misconduct standard. A false statement resulting from ignorance or carelessness does not rise to the level of "knowing and fraudulent." *See, e.g., Mondore v. Mondore (In re Mondore),* 326 B.R. 214, 217 (Bankr.W.D.N.Y.2005) ("a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent").

  Similarly, recklessness does not measure up to the statutory requirement of "knowing" misconduct. An action is reckless if it creates, "a substantial and unjustifiable risk of harm to others [through] a conscious (and sometimes deliberate) disregard for or indifference to that risk ...." BLACK'S LAW DICTIONARY at 1298. Since the bankruptcy court did not find that Roberts made his nondisclosures "knowingly" in the required sense, we cannot sustain the denial of his discharge.

*Roberts*, 331 B.R. at 884. The Court notes however that "[a] reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge." *Wright*, 364 B.R. at 76, quoting 6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.). The elements of "knowingly" and "fraudulently" may not be conflated. They each must be proven. *See Roberts,* 331 B.R. at 885.

A debtor's bankruptcy schedules must be verified or contain an unsworn declaration under penalty of perjury. 28 U.S.C. § 1746; F.R.B.P. Rule 1008; *Searles*, 317 B.R. at 377. Accordingly, a false statement or omission in a debtor's schedules or statement of financial affairs qualifies as a false oath under § 727(a)(4)(A). *In re Leija*, 270 B.R. 497, 502-03 (Bankr. E.D. Cal. 2001). A number of false statements and omissions exist in Brendon's Schedule B and SFA, which will be discussed in greater detail below. However, Brendon testified at trial that he signed the declarations under penalty of perjury, and that he read his Schedules and SFA, Ex. A and B, when in fact he had not read the Schedules and SFA before signing Ex. A and B or before they were filed. Tr., pp. 576-578, 872, 874, 1126, 1127. The declarations filed with the

111

Schedules and SFA Affairs in Ex. 1, A and B state "that I have read the" foregoing schedules and answers in the SFA, "and that they are true and correct". Those are knowing and fraudulent false oaths sufficient for denial of Brendon's discharge by themselves under § 727(a)(4)(A).

*Leija* involved a debtor who signed blank schedules representing that he had read the information in the documents and that they were true and correct to the best of his information and belief. 270 B.R. at 502-03. The bankruptcy court concluded that the verifications were materially false oaths because, since they were blank when the debtor signed them, he could not have read them and could not have formed a reasonable belief regarding their truthfulness and accuracy, and further that "the execution of those documents in blank was intended to perpetrate a fraud on the court – to give the appearance that the documents were truthful and accurate when in fact they were not." *Leija*, 470 B.R. at 503.

Although the schedules in *Leija* were blank, its reasoning is equally applicable in the instant case because Brendon signed the declarations, Ex. A and B, without reading the Schedules or SFA at all before he signed them:

> The courts have generally recognized that failure to read the schedules is not a defense to an action under Bankruptcy Code section 727(a)(4)(A). *Equibank v. Ward (In re Ward)*, 92 B.R. 644, 647 (Bankr.W.D.Pa.1988). Nor is the "advice of counsel" a defense when the erroneous information should have been evident to the debtor. [*Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987)], (citing *In re Mascolo* 505 F.2d 274, 277 n. 4 (1st Cir.1974)).

> "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Id.*

Brendon testified that his Schedules and SFA were still being completed when he signed his declarations Ex. A and B without reading them, and thus content was added later by his attorney Dye. As it turned out no dispute exists in the record that the answers in the SFA Dye

112

completed were incomplete and omitted numerous transfers and income in Questions 1, 2, 3, and 10.  The court in *Leija* noted that the truthfulness and accuracy of the information added later by the attorney, and the reason for any errors, "are irrelevant to the 'false oath' issue when the debtor verifies the documents in blank."  270 B.R. at 503.

F.R.B.P. 7015 applies Fed. R. Civ. P. 15(b) in adversary proceedings.  Rule 15(b) provides for amendments to conform to the evidence and states in pertinent part:  "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."  Brendon's ready admission at trial that he signed his declarations stating that he read his Schedules and SFA and that they were true and correct, when he had not read them, as explanation for all the errors and omissions in his Schedules and SFA, persuades this Court that amendment to conform to the evidence is necessary and appropriate pursuant to Rule 15(b) to enforce the requirements of accurate reporting.  Debtor offers his failure to read the Schedules and SFA before filing them as a defense, and why he should not be held accountable for the numerous errors and omissions in his Schedules and SFA, but on the contrary his perjured declarations by themselves justify denial of his discharge for false oaths under § 727(a)(4)(A).  As the Ninth Circuit Bankruptcy Appellate Panel wrote:  "The efficacy of the bankruptcy system depends in important aspects on accurate self-reporting by debtors.  Debtors and bankruptcy professionals who do not fulfill their obligations deserve to be chastised severely."  *In re An-Tze Cheng*, 308 B.R. 448, 458 (9th Cir. 2004), *aff'd.*, 160 Fed.Appx. 644 (9th Cir. 2005).

This Court finds the following language from *Leija* consistent with the above-quoted case law from *Schmitz* and *Wolcott*, and applicable in the instant case:

Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming. The record in this case shows, at the very least, cavalier indifference and a pattern of disdain for the truth. Meaningful disclosure was accorded too low a priority. [*Tully*, 818 F.2d at 112].

    If Mr. Leija read the verifications before signing them, the error would have been obvious. If Mr. Leija did not read the verifications before signing them, then his actions were at best, recklessly indifferent. Either way, the shoddy practice of verifying *blank* pleadings to be filed in a judicial proceeding cannot be condoned by this court.

*Leija*, 270 B.R. at 503-04.

Likewise, Brendon's signing declarations under penalty of perjury that he read his Schedules and SFA, when he had not, and declaring under penalty of perjury that they were true and correct when he knew that whatever was going to be filed was not complete, shows cavalier indifference and a pattern of disdain for the truth, as well as shoddy practice, and will not be condoned by this Court. *See Leija*, 270 B.R. at 504. No amount of professional courtesy, understandings, courtesies, collegiality or reliance on counsel can excuse perjury.

Brendon's false declarations on Ex. A and B may not be explained away by reliance on mistaken advice by his attorney. The record shows that Dye sent Brendon draft Schedules and SFA by fax, and while the testimony shows that Brendon told Dye he had not read them and Dye told Brendon they had absolutely had to file the Schedules and SFA by the end of the day[61], no evidence exists in the record that Dye told Brendon to sign the declarations Ex. A and B under

_____

    [61]The rush was self-imposed because Dye had requested only a one day extension to file the Schedules and SFA when he could have requested 15 days or moved for another extension, which Dye admitted is routinely granted. Dye's reason for not seeking additional time was because the § 341 meeting was imminent. The Trustee, however, continued the § 341 meeting because of the omissions from the Schedules and SFA, so Dye's rush to file the Schedules and SFA proved futile.

penalty of perjury without reading them.  Advice of counsel is not a defense when the

information should have been evident to the debtor.  *Leija*, 270 B.R. at 503 (other citations

omitted).

Ⅰ  The evidence shows that Misty expressed her concern to Brendon that they had not seen

the schedules and statements.  Tr., pp. pp. 822-23, 872.  Brendon testified that he himself was "a

little bit more nervous" about listing something under penalty of perjury than he would be

estimating income for borrowing purposes.  Tr., p. 921.  But notwithstanding Brendon pressured

Misty to sign her declarations despite her concerns and he signed his declarations Ex. A and B

regarding his Schedules and SFA without reading them, and knowing that they were not

complete, true and correct but stating they were, which this Court concludes constitutes

knowingly and fraudulently making materially false oaths under penalty of perjury, warranting

denial of discharge under § 727(a)(4)(A).  *Leija*, 270 B.R. at 503.

Ⅰ  The record shows numerous additional false statements and omissions in Brendon's

Schedules and SFA.  The single bank account listed on Schedule B omits Brendon's other

accounts, and Schedule B does not list the 1984 Cadillac.  Brendon's Omega watch is not

specifically listed, and while Brendon testified that he learned the Omega watch was worthless

from a pawnbroker because it was broken, Brendon's insurance records at Ex. 80 and 81 show

that he owns, or at least presently is insuring, more than 1 valuable watch, and the Omega watch

is insured at a value of $2,026 on Ex. 81 after what looks like a $233 repair claim paid on Ex. 81.

Ⅰ  Questions 1 and 2 of the SFA failed to list Brendon's income from 2003 and 2004 to the

petition date.  Question 3a and 3b failed to list payments to several banks, including advance

payments on his mortgage on or about the petition date, and to his father and North Forty Resort,

LLC, which Brendon admitted at trial.  The response to Question 10 of the SFA is indisputably wholly inadequate, as he admitted, and failed to list short term loans and repayments, transfers to his father, a deposit on a Mercedes, and transfer of his helicopter and hangar.  At his first § 341 meeting held on March 14, 2004, Brendon falsely testified under oath that he owned half of the helicopter with Chacon, when Ex. 116, dated January 28, 2004, shows that he purchased Chacon's half interest in 2003.  Ex. 2, pp. 83-84.  The responses marked "None" at Questions 6a, 15, 17b, 18, 19, 21 and 22 were incorrect.  The answer to Question 8 was incomplete.

A  common instance of 'false oath' is when a debtor declares that the schedule of property is true and correct and it appears that the debtor has knowingly and fraudulently omitted assets from it.  But if items were omitted by mistake or upon honest advice of counsel, to whom the debtor had disclosed all the relevant facts, the declaration will not be deemed willfully false, and the discharge should not be denied because of it."  *Wright*, 364 B.R. at 76; 6 COLLIER ON BANKRUPTCY, ¶ 727.04[2] (15th ed. rev.) (citing *In re Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974) ("explanation by a bankrupt that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud").  While the foregoing "generally" rebuts an inference of fraud, it cannot in the instant case because of the magnitude and number of errors and omissions, which the Trustee Samson testified interfered with his ability to administer the case.  *Adeeb* noted that a debtor's reliance on attorney advice must be in good faith.  787 F.2d at 1343.  Brendon's admitted perjury in his declarations Ex. A and B, and false § 341(a) testimony under oath regarding his ownership in the helicopter, persuade the Court that Brendon did not rely on his attorney's advice in good faith.

In the Ninth Circuit a person who has consulted with an attorney "can be charged with

constructive knowledge of the law's requirements." *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1050 (9th Cir.1987).  The Debtor voluntarily selected Dye as his attorney of record, and he cannot now avoid the consequences of the acts or omissions of his freely-selected attorney.  *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 396-97, 113 S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993); *Link v. Wabash Co.*, 370 U.S. 626, 633-34 (1962); *In re Casey*, 193 B.R. 942, 949 (Bankr. S.D. Cal. 1996).  Because of this mandatory authority, Brendon may not excuse his false oaths and omissions from his Schedules and SFA based upon of the inconsistency between the worksheet supplied by Dye and the official forms, or Dye's other acts, omissions and bad advice.  First, the worksheet questions do not appear to the Court as dissimilar as Brendon contends.  Second, it does not matter if they were dissimilar because he was charged with knowledge of the law's requirements and Dye's acts or omissions under *Stallcop* and *Pioneer Investment*.  Dye's billing records Ex. 6 show a substantial number of billed hours in communication and conferences with Brendon regarding the Schedules and SFA.  Third, Brendon admitted at trial that the Schedules and SFA would still be incomplete even if everything on his worksheet, Ex. K, had made it onto his Schedules and SFA.

Brendon cites no authority, and this Court is aware of none, which supports his contention that his statements to the Trustee at the § 341(a) meeting and correspondence constitute informal amendments to his Schedules and SFA, which could be followed at the very end of the case by a corrective amendment.  To the contrary, in the Ninth Circuit the fact of *prompt* correction of an inaccuracy or omission may be evidence probative of lack of fraudulent intent.  *Searles*, 317 B.R. at 377 (emphasis added), citing *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 733 (9th Cir. BAP 1999), *aff'd.*, 5 Fed.Appx 743 (9th Cir. 2001).  The

117

05-00018-RBK   Doc#: 166   Filed: 09/06/07   Entered: 09/06/07 09:04:27   Page 118 of 135

BAP in *Beauchamp* surveyed cases including *Adeeb* and *Baker v. Mereshian*, 200 B.R. 342, 346

(9th Cir. BAP 1996). *Id.,* 236 B.R. at 733. The BAP first noted that "*Mereshian* does not stand

for the proposition that § 341 meeting confessions absolve fraud", and then observed that "None

of them holds that disclosure of secreted assets at or before the § 341 meeting precludes finding

intent to hinder, delay or defraud, and we will not extend *Adeeb*[62] so far." *Beauchamp*, 236 B.R.

at 733, 734. Brendon's testimony at the § 341(a) meeting merely scratched the surface of the

errors and omissions on his Schedules and especially his SFA, and he did not amend promptly to

show evidence probative of lack of fraudulent intent as explained in *Searles* and *Beauchamp*.

317 B.R. at 377.

　　　Neither case law, professional understandings, courtesies or collegiality among counsel

can excuse or explain Brendon's numerous errors and omissions in his Schedules and SFA, and

his failure to promptly amend. Brendon cites *Wright* in support of his right to amend, but *Wright*

is distinguishable in several critical respects, including the fact that the Wrights promptly

amended their Schedules to include missing assets, while Brendon waited more than three years

after his § 341 meeting, and after the trial of this adversary proceeding was concluded, to amend

his Schedules and SFA. *See Wright*, 364 B.R. at 76. If Dye advised Brendon to wait until the

end of the case to amend his Schedules and SFA, that was bad advice and does not compare

---

[62]*Adeeb* involved a § 727(a)(2)(A) claim in which the Ninth Circuit concluded "that a debtor who transfers property within one year of bankruptcy with the intent penalized by section 727(a)(2)(A) may not be denied discharge of his debts if he reveals the transfers to his creditors, recovers substantially all of the property before he files his bankruptcy, and is otherwise qualified for a discharge." 787 F.2d at 1345. The Ninth Circuit specified that a concealment may be undone simply by disclosing the existence of the property, but disclosure does not undo a transfer – a transfer may be undone by recovering the property. *Id.* The record in the instant case reflects little if any recovery of property by Brendon.

favorably to the Wrights.  Amendment of schedules is liberally allowed pursuant to F.R.B.P.

1009(a), and may be denied only upon a showing of a debtor's bad faith or of prejudice to

creditors.  *In re Michael*, 17 Mont. B.R. 192, 198, 163 F.3d 526, 529 (9th Cir. 1998), quoting *In*

*re Doan*, 672 F.2d 831, 833 (11th Cir. 1982) (per curiam); *Wright*, 364 B.R. at 76.  By not

amending the Schedules and SFA, Brendon failed to avail himself of the policy of liberal

amendment for purposes of this adversary proceeding.

    As bad as that advice was, Dye's advice to Brendon not to amend the Schedules and SFA

after the adversary proceedings were commenced because "the die is cast", and telling the

Trustee to "bring it on," is astonishing.  By advising his client not to amend his Schedules and

SFA before trial of this adversary proceeding, Dye effectively precluded any analysis by the

Court of the debtor's bad faith or prejudice to creditors, or whether the amendments cured the

allegations of Abbey's second amended complaint since no amendments exist in the record

before the Court to consider.

    In summation of Count Nine, the Court finds that Abbey satisfied his burden of proof by

a preponderance of the evidence of numerous knowing and fraudulent false oaths and omissions

in Brendon's Schedules and SFA, and Brendon failed to satisfy his burden to disprove the

allegations or correct his documents.  *See Wright*, 364 B.R. at 72-73, quoting *Schmitz*, 224 B.R.

at 150-51 and *Wolcott*, 194 B.R. at 486 (citing cases).  Brendon's fraudulent intent was shown by

a pattern of falsity, his reckless indifference to and disregard of the truth, and demonstrated by

his course of conduct.  *Wills*, 243 B.R. at 64; *Devers*, 759 F.2d at 753-54; *Wright*, 364 B.R. at 75.

### § 727(a)(2).

    Abbey's Counts Ten, Twelve, Thirteen and Fourteen all are based upon subsections of §

727(a)(2) which provides that the court shall grant the debtor a discharge unless –

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

>> (A) property of the debtor, within one year before the date of the filing of the petition; or

>> (B) property of the estate, after the date of the filing of the petition.

*Hansen v. Moore (In re Hansen)*, 368 B.R. 868, 876 (9th Cir. BAP 2007).

 *Hansen* quotes *Beauchamp* that the party seeking denial of discharge under § 727(a)(2) must prove by a preponderance of the evidence: "1) a disposition of property, such as transfer or concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property." 368 B.R. at 876, quoting *Beauchamp*, 236 B.R. at 732.

 Discharge may be denied under § 727(a)(2)(A) only upon a finding of actual intent to hinder, delay, or defraud a creditors. *Adeeb*, 787 F.2d at 1342-43; *Devers*, 759 F.2d at 753. Constructive fraudulent intent can not be the basis for denial of discharge. *Adeeb*, 787 F.2d at 1343. However, it is sufficient under the plain language of § 727(a)(2)(A) to deny discharge upon a showing of intent to hinder <u>or</u> delay <u>or</u> defraud creditors. *Searles*, 317 B.R. at 379. In other words, intent to defraud need not be shown because mere proof intent to hinder or to delay is sufficient. In *Wolkowitz v. Beverly (In re Beverly)*, __ B.R. __, 2007 WL 2200590 at * 14 (9th Cir. BAP), citing *Searles*. The BAP wrote in *Beverly* that under § 727(a)(2), "[m]ere <u>intent</u> to hinder, delay, or defraud a creditor is all that is needed to deny a discharge under §

727(a)(2)(A)[63]." *Beverly,* __ B.R. at __, 2007 WL 2200590 at * 15.  As above, intent may be inferred from surrounding circumstances including "badges of fraud" that constitute circumstantial evidence of intent, or a course of conduct.  *Id.*, citing *Woodfield*, 978 F.2d at 518, *Adeeb*, 727 F.2d at 1343, *Devers*, 759 F.2d at 753-54, and *Searles*, 317 B.R. at 380.

### Count Ten – 727(a)(2)(A) – Transfers to North Forth Resort Corp.

Count Ten alleges that Brendon transferred his property to various entities including North Forty Resort Corp. which is controlled by his family.  The Pretrial Order prepared by the parties describes the issue regarding Count Ten at page 7 as whether Brendon's responses to questions on the SFA were intended to delay or defraud creditors by transferring or concealing his property within one year before the petition date.  Abbey contends that question 3 of the SFA remains incomplete and required amendment, but that Brendon has not amended to list payments to several creditors, and admitted that his worksheets given to Dye were incomplete and failed to list the insider transaction to his father in March of 2003 on his worksheets or SFA Question 3.  Abbey does not separately or specifically address Count Ten in his brief.  The insider transfer to Robert is time barred, according to the Trustee.

Brendon contends that the claimed transfer of his property to North Forty Resort Corp. never happened, that Brendon recovered and repaid the credit card advances from American Express he incurred trying to settle with Abbey.

Abbey's Count Ten fails under the language of *Hansen* quoted above requiring proof of a

---

[63]There is no reason why the same should not apply to intent under § 727(a)(2)(B).  The BAP in *Beverly* was distinguishing between the intent requirement under § 727(a)(2) and avoidable fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and state law, and noted that in practice the Ninth Circuit has used "intent" and "actual intent" interchangeably.  2007 WL 2200590 at *15.

disposition of property either by transfer or concealment.  Brendon's responses to Question 3 of

the SFA are encompassed in Count Nine above, and the Court will not construe disposition of

property under § 727(a)(2) to encompass responses or lack of responses to the SFA.

Next, Brendon acquired funds from his American Express account in an effort to effect a

settlement with Abbey.  On advice of counsel Brendon repaid those charges.  The evidence in the

record from Brendon's testimony is that he miscounted and doubled up on transfers, and TCI

ended up with $38,000 to $40,000 of North Forty Resort's money.  Tr., pp. 992-93.

The only transfers by Brendon of property to family entities shown by the record is his

testimony that he stored TCI's computers, servers, office equipment and furniture at the North

Forty Resort.  The only evidence in the record regarding those items of property is that the

Trustee did not recover the TCI computers, office furniture and equipment, and those items

remain in storage at the "Parkhill property" or North Forty Resort.  Tr., pp. 89, 941, 942-43.

Abbey now owns TCI, and is free to recover its assets.

The Court concludes that Abbey failed to satisfy his burden of proof under § 727(a)(2)(A)

under Count Ten by a preponderance of the evidence.

**Count Thirteen – 727(a)(2)(A) – Transfers of TCLLC assets.**

Count Thirteen alleges that Brendon transferred, removed, destroyed, mutilated or

concealed property of the debtor within one year before the petition date with intent to hinder,

delay or defraud a creditor or trustee, by a pattern of conduct calculated to reduce and destroy the

value of TCLLC by transferring its assets to himself and other entities including TCI.  Abbey

contends that the transfer of 650 Woodside to his brother Ryan was made with intent to hinder or

delay him because the purchase and sale agreement was backdated, Brendon did not request or

obtain Abbey's written consent to transfer TCLLC property as required under their Operating

Agreement, Abbey did not authorize a compensation package to Ryan which included a price

break on a TCLLC house and the sale was at least $60,000 less than fair market value.  Abbey

cites Brendon's testimony that he never thought the Operating Agreement was enforceable and

he felt free to disregard its requirements.  Tr., at 487:23-488:11.  Brendon contends that neither

the receiver nor the state court agreed with Abbey's objection to his sale of 650 Woodside, and it

was approved by his attorneys.

This Court does not decide herein the merits of parties' respective claims against each

other under the TCLLC Operating Agreement, Ex. 12, and nothing herein should be considered

as having preclusive effect with respect to any such state law claims.  For purposes of § 727(a)(2)

and the Bankruptcy Code, the term "creditor" means an entity that has a claim against the debtor

that arose at the time of or before the order for relief.  11 U.S.C. § 101(10)(A).  "Claim" means

right to payment, including an unliquidated, contingent and disputed claim such as Brendon

listed Abbey in his Schedule F.  11 U.S.C. § 101(5)(A).  Thus for purposes of the above-

captioned Chapter 7 case and this adversary proceeding, Abbey is a "creditor" with a "claim" by

virtue of the proofs of claim he has filed in Brendon's Chapter 7 case, to which no objection has

been filed.  11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of

this title, is deemed allowed, unless a party in interest . . . objects").

The record above sets forth a number of transactions Brendon undertook while in control

of TCLLC's finances, including temporary loans from himself to TCLLC to pay expenses and

payroll and repayments thereof, acquisition and disposition of property such as the 650/665

Woodside Lane exchange at cost, Brendon's living at 650 Woodside rent free, his transfer of 665

Woodside Lane to himself at cost, distributions he made from TCLLC to TCI passed through to himself, and Brendon's subsequent sale of 650 Woodside to Ryan at below market, all without Abbey's written approval.  Brendon's position, and his testimony at trial and the state court hearing shown in Ex. 2, is that the Operating Agreement was only for the file and that he and Abbey operated pursuant to verbal agreements.

The evidence set forth above recites the lengthy negotiation process the parties went through, with each employing professionals and undertaking numerous drafts over a long period of time before they signed Ex. 12 and Abbey made his remaining $200,000 contribution, which he would not have made without a written Operating Agreement similar to those he used in his other businesses.  In light of that substantial  investment of time, money and effort to arrive at a signed written Operating Agreement, Ex. 12, Brendon's contention that Abbey told him that the Operating Agreement was "only for the file" and not binding, Tr., p. 488, 489, 496, stretches credulity beyond the breaking point.  Abbey testified that he did not ever tell Brendon that the operating agreement was only for the file and that Brendon did not have to abide by it.  Tr., p. 334:19-23.  The Court finds that Abbey's testimony is credible, and that Brendon's testimony is not.

The Court further finds that Abbey did not tell Brendon that he had his consent to transfer 650 Woodside out of TCLLC, and that he did not tell Brendon that it was okay to live in 650 Woodside without paying TCLLC rent other than putting a quarter in a cup at the back door for Uncle Don now and then.  Tr., p. 960.  This testimony by Brendon regarding Abbey's nonchalance about his business affairs is fantastic, and wholly inconsistent with the evidence of Abbey's business practices in dozens of companies.  Furthermore, under their written Operating

124

Agreement, Ex. 12, which Brendon signed personally and for TCI, Ex. 12 is the binding and complete agreement and supersedes and replaces all prior written *and oral agreements* between the members, paragraphs 14.2 and 14.3; and Paragraph 14.14 on page 47 of Ex. 12 requires that any amendments to the operating agreement must be in writing and signed by all members. Tr., p. 334. Abbey testified that no written amendments were made to Ex. 12 and that he never gave up any of his rights under Ex. 12. Tr., pp. 334, 342. Neither did Abbey consent in writing to Brendon's transfer of 650 Woodside to himself. Thus, Brendon's transfer of 650 Woodside to himself from TCLLC came subject to Abbey's and TCLLC's rights and interests to the property under the Operating Agreement.

Abbey opposed and objected to Brendon's sale of 650 Woodside to Ryan, which took place within a year of Brendon's petition. Brendon argues that the state court allowed the sale over Abbey's objection, but the transcript of the September 3, 2003, hearing demonstrates Brendon's lack of candor to the court. Brendon opposed the court's suggestion that it order him to transfer 650 Woodside to TCLLC under the operating agreement for the sole reason that he had entered into a buy/sell on 650 Woodside. Ex. FFF, pp. 104-107. Based upon Brendon's testimony the court allowed the sale of 650 Woodside to go through, without doubt inferring from Brendon's reference to a "signed buy-sell" that it was an arm's length buy-sell agreement for fair market value. Only it was not. Rather it was a sale by Brendon to his brother for up to $60,000 below market price[64], in an increasing real estate market.

Brendon further testified in the state court that he had bought 650 Woodside himself and

---

[64]At trial Brendon's counsel objected to Abbey's contention regarding the below market sale, claiming failure to plead, but the Court finds Abbey's Count Thirteen encompasses the sale of 650 Woodside.

transferred value of the property as agreed with Abbey, under their verbal agreements.  Ex. FFF,

p. 107.  In fact Brendon had exchanged 650 Woodside for 665 Woodside at cost, without paying

any profit to TCLLC for the exchange and without Abbey's written consent.  This lack of candor

to the state court is troubling, but consistent with Brendon's course of conduct and pattern.  The

state court attempted to protect Abbey's rights by ordering that the proceeds from the sale of 650

Woodside, after paying the underlying debt and costs, be turned over to the receiver, Ex. QQ, p.

5; Tr., pp. 848-49, but the state court was unaware that Brendon's sale to his brother was well

below market value because of Brendon's lack of candor.

The Court concludes that Abbey satisfied his burden of proof under § 727(a)(2)(A) and

*Hansen* by showing a disposition of property by transfer of 650 Woodside with intent to hinder

or delay Abbey through the act of disposing of the property.  368 B.R. at 876; *Beauchamp*, 236

B.R. at 732.  The transfer was within one year prepetition.  *Wills*, 243 B.R. at 65.  Lack of injury

to creditors is irrelevant, but nonetheless present in the loss to Abbey and TCLLC of almost

$60,000 in fair market value.  *Id.*  The Court finds that Brendon's fraudulent intent is established

by several "badges of fraud" listed in *Wills*, 243 B.R. at 64, including:  (1) a close relationship to

the transferee, his brother; (2) the transfer was during a pending suit; (3) the Debtor was in poor

financial condition at the time of the transfer; and (4) that the Debtor received inadequate

consideration by selling for $60,000 less than appraised value[65].  *See In re Woodfield*, 978 F.2d

516, 518-19 (9th Cir. 1992); *In re Robertson*, 19 Mont. B.R. 546, 548 (9th Cir. 2002), citing *Wills*.

Brendon's sale of 650 Woodside, by itself, easily satisfies Abbey's burden under Count

---

[65]*Wills* lists additional "badges of fraud", which were not necessary to include.  243 B.R.
at 64.

126

Thirteen.  The other unauthorized withdrawals from TCLLC and unauthorized transactions by

Brendon involving TCLLC's assets made without Abbey's written consent, add further weight to

the conclusion to deny Brendon's discharge under Count Thirteen based upon § 727(a)(2)(A).

**Count Twelve – § 727(a)(2)(B).**

Count Twelve of Abbey's complaint alleges a transfer of property of the estate by the

Debtor with intent to hinder, delay or defraud a creditor of the Trustee, after the date of filing

based upon Brendon's borrowing of $50,000 on his line of credit at Wells Fargo Bank on

February 13, 2004, the day after the petition date, shown at page 2 of Ex. MMM.  Abbey

contends that the borrowing was secured by 650 Woodside even though Brendon no longer

owned 650 Woodside, and "devalued the property of an insider and continued his pattern of

hindering, delaying and defrauding his creditors."

Abbey's Count Twelve, frankly, is difficult to follow.  Abbey cited no case law stating

that borrowing funds postpetition on a line of credit can constitute a disposition of property of the

estate under § 727(a)(2)(B).  By the time Brendon borrowed the $50,000 on the Wells Fargo line

of credit the sale of 650 Woodside to Ryan had closed.  Ryan is not a party to this adversary

proceeding and thus Count Twelve's averment that 650 Woodside Lane is held by Ryan in a

constructive trust is not properly before the Court.  While Wells Fargo may have cause to

complain about Brendon's $50,000 borrowing against a secured line of credit, the Court finds

and concludes that Abbey failed to satisfy his burden of proof under Count Twelve based upon §

727(a)(2)(B).

**Count Fourteen – § 727(a)(2)(B) – North Forty Resort Corp. Asset Sale.**

With respect to the transfer of North Forty Resort Corp. assets to North Forty Resort,

LLC, Abbey argues that Brendon was involved in the transfer as a director and officer with some control of the corporation, but was not forthcoming with information and the assets, which were sold without notice to the Trustee with the goal to minimize exposure to Brendon's creditors, and deprived the Trustee the opportunity to assert dissenter's rights and recover value for the estate. Abbey argues that Brendon represented to two banks and the receiver that his North Forty Resort Corp. stock was worth between $90,000 to $100,000, and that his manipulations affecting the value of his stock is a fraudulent transfer and grounds to deny his discharge, citing *In re Dreiling*, 233 B.R. 848, 875-77 (Bankr. Colo. 1999).

Brendon went ahead with the sale in the face of a state court contempt order prohibiting transfers, and postpetition borrowed $50,000 from Wells Fargo which was secured by 650 Woodside and devalued the property of an insider, all of which Abbey argues evidences part of a pattern of nondisclosure and intent to hinder or delay.

Brendon contends that Abbey failed to show that Brendon had the requisite intent to conceal, hinder, delay or defraud the Trustee and creditors, and that the sale of North Forty Resort Corp. assets was done to prevent the loss of Robert's $1.8 million tax loss benefit upon his death, upon the advice of professional. Brendon contends he had been removed as an officer and director of the North Forty Corp. before the transfer and was not a part of the transaction and informed his attorney as soon as he learned of it, who informed the Trustee. Brendon argues that no one was harmed by the transfer and the Trustee retained the 6% interest in the corporation and reached a settlement with the corporation.

No dispute remains that the sale of North Forty Resort Corp. assets included a legitimate purpose, i.e., to preserve Robert's tax loss benefits. Nevertheless, Brendon's 6% stock interest in

North Forth Resort Corp. unquestionably was property of the estate, and the sale unquestionably was a disposition of property under *Hansen*, 368 B.R. at 876.

The second element under § 727(a)(2)(B) and *Hansen* – subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property, is a closer call. Brendon paid lip service to his obligation to the Trustee by notifying him and offering to purchase the state's North Forty Resort Corp. shares. Schultz's testimony establishes that Brendon called him, and that Brendon was involved in most if not all of the conversations leading up to the sale. Eric also testified to Brendon's involvement.

Brendon contends that he had forgotten that he was an officer and director, and was acting only on behalf of his father in organizing the asset sale. But Robert had other sons, and had hired the expertise of both an accountant, Schultz, and an attorney, Tornow. Schultz testified that Brendon was involved in the discussions leading up to Schultz's discussion memo, Ex. 23. The final goal listed in Ex. 23 is: "Minimize exposure to possible creditors of Brendon that survive the bankruptcy." This Court finds that this goal of the transfer satisfies the second *Hansen* requirement of subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property." 368 B.R. at 876. Preserving Robert's tax losses is a legitimate goal, but the final goal of the sale is evidence of fraudulent intent.

Brendon had a duty to cooperate with the Trustee, but Samson testified that he did not receive Ex. 28, and he first learned of Brendon's transfer of interest in the North Forty Resort Corp., on or about September 20, 2004, when he received Ex. FF, and Brendon did not respond to Samson's July letter asking for anything related to the North Forty until October 27, 2004, Ex. 5, where in response to Samson's request for information about North Forty *and after the sale,*

Brendon complained that Samson's request for documents pertaining to the North Forty Resort "is very broad" and asked him: "Please be more specific about what you need if my testimony at the last creditor meeting was insufficient."   Tr., pp. 137-38.

Based on the final goal stated in Ex. 28 and Brendon's delay and evasiveness to the Trustee after the sale, the Court finds that the second *Hansen* factor of fraudulent intent is satisfied with respect to the sale of North Forty Resort Corp. assets.  Certain "badges of fraud" listed in *Wills*, 243 B.R. at 64, are also present including:  (1) Brendon's close relationship to the transferee, an entity owned and controlled by his mother; (2) the transfer was during the pending bankruptcy; and (3) the Debtor was bankrupt at the time of the transfer.  *See In re Woodfield*, 978 F.2d 516, 518-19.

The Court finds and concludes that Abbey satisfied his burden of proof by a preponderance of the evidence under Count Fourteen based upon § 727(a)(2)(B).

**Count Eleven – § 727(a)(5) – Failure to Explain.**

Under § 727(a)(5) an objecting party bears the initial burden of proof and must demonstrate:  (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets.  *Ballew v. Ballew (In re Ballew)*, 18 Mont. B.R. 404, 417-18 (Bankr. D. Mont. 2000); *Wright*, 364 B.R. at 79; *Huntington Center Partners, Ltd., v. Dupree (In the Matter of Dupree)*, 197 B.R. 928, 938 (Bankr. N.D. Ala. 1996); *Farmers Nat'l Bank v. Yokley (In re Yokley)*, 61 B.R. 198, 200 (Bankr. W.D. Ky. 1986).  Once the objecting party has met the initial burden of proof, the burden then shifts to the debtors to

provide a satisfactory explanation for the disposition of the assets. *Ballew*, 18 Mont. B.R. at 418; *Wright*, 364 B.R. at 79; *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984). In *Ballew* the Court found that the debtor's amendments to schedules and amended statement of financial affairs provided the requisite information to satisfy debtor's burden under § 727(a)(5) and denied the creditor's request for denial of discharge, "especially in light of the fact that objections to discharge are to be construed liberally in favor of the debtor and strictly against those objecting to discharge". *Ballew*, 18 Mont. B.R. at 418**.**

More recently in *In re Lacounte*, 342 B.R. 809, 815 (Bankr. D. Mont. 2005) this Court quoted the Ninth Circuit decision affirming this Court in *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985): "A debtor's failure to offer a satisfactory explanation when called on by the court is a sufficient ground for denial of discharge under section 727(a)(5)." Applying these principles to Abbey's claim for denial of discharge under § 727(a)(5), the Court finds that Abbey has satisfied his burden of proof by a preponderance of the evidence.

The inadequacy of Brendon's Schedules and SFA are discussed in detail above. The record reflects no amendments to his Schedules and SFA to the date of trial of this adversary proceeding, despite being told by his attorney and the Trustee at the first § 341 meeting and later to amend. The Court deems significant the Trustee's testimony that Brendon's lack of disclosure hindered administration of the estate and that he has not received complete and accurate information. Tr., at 63:17-69:5.

Brendon contends that he has produced tens of thousands of pages of documents, which may be true but his Schedules and SFA still do not reflect an adequate explanation for the

disposition of his assets.  *Ballew*, 18 Mont. B.R. 404; *Wright*, 364 B.R. at 79.  It is also true that

his records were transferred into the possession of the receiver, and then Abbey.  However,

Brendon had the right under F.R.B.P. 2004(c) to compel production of documents, and does not

appear to have used it to recover enough material to prepare his tax returns[66].

      What can be ascertained from the record is that Brendon took several unauthorized

withdrawals of money and property from TCLLC and its lending facilities and borrowers, and his

own credit, and went on a spending spree for himself and TCI purchasing computers, office

furniture, servers, luxury cars, a Harley Davidson motorcycle, jewelry, a helicopter and hangar,

and gambling trips where he lost thousands of dollars which may have belonged to TCLLC.  As

much documentation as has been produced, the Court finds and concludes that Brendon has

failed to explain satisfactorily the loss or deficiency of assets.  The Court finds that Abbey

satisfied his burden of proof by a preponderance of the evidence under Count Eleven, based on §

727(a)(5).

### Judgment – Fed. R. Civ. P. Rule 54(b).

      A judgment as to fewer than all the claims for fewer than all the parties is not a "final

judgment" unless the Court makes an "express determination that there is no just reason for

delay" and "an express direction for entry of judgment."  Fed. R. Civ. P. 54(b) (applicable in

adversary proceedings under F.R.B.P. Rule 7054); *In re Beverly*, __ B.R. at __, 2007 WL

2200590 at *4.

---

[66]It has long been this Court's policy that it is not in the public interest to allow debtors, who fail to undertake their burdens under the Internal Revenue Code by not filing tax returns, to enjoy the benefits of the United States Bankruptcy Code.  Brendon may not use Abbey to escape his responsibility to file his own tax returns.

Having determined that Brendon's discharge must be denied under Counts Nine, Eleven, Thirteen, and Fourteen under provisions of § 727(a), this Court pursuant to Rule 54(b) hereby makes an express determination that no just reason exists for delay and makes an express direction for entry of judgment against Brendon denying his discharge.  Having made the required express determination and express direction required by Rule 54(b), it is not necessary for the Court to take up Abbey's claims for exception from discharge under 11 U.S.C. § 523.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2.  This is a core proceeding involving Abbey's objections to discharge under 28 U.S.C. § 157(b)(2)(J) and 11 U.S.C. §§ 727(a)(2)(A) and (B), 727(a)(4)(A) and 727(a)(5) which are construed liberally and in favor of the discharge and strictly against the party objecting to discharge.  *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005); *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).            .

3.  The Plaintiff satisfied his burden of proof by a preponderance of the evidence with respect to his claim for denial of Defendant's discharge under Count Nine (§ 727(a)(4)(A)) for false oaths in Defendant's Schedules and Statement of Financial Affairs by failing to list assets, income, and transfers of property.

4.  The Plaintiff failed to satisfy his burden of proof under his claim for denial of Defendant's discharge under Count Ten (§ 727(a)(2)(A)) for transferring Debtor's interests to North Forty Resort Corp. with intent to hinder, delay, or defraud creditors, within one year before the date of the filing of the petition.

133

5.  The Plaintiff satisfied his burden of proof under its claims for denial of Defendant's discharge under Count Eleven (§ 727(a)(5)) for failure to explain satisfactorily loss or deficiency of assets to meet his liabilities.

6.  The Plaintiff failed to satisfy his burden of proof under his claim for denial of Defendant's discharge under Count Twelve (§ 727(a)(2)(B)) for concealment, destruction or mutilation of property of the estate with intent to hinder, delay or defraud a creditor or trustee, after the date of the filing of the petition, for borrowing funds on a line of credit secured by Ryan's house at 650 Woodside Lane.

7.  The Plaintiff satisfied his burden of proof under his claim for denial of Defendant's discharge under Count Thirteen (§ 727(a)(2)(A)) for concealment, destruction or mutilation of property of the debtor with intent to hinder, delay or defraud a creditor or trustee, within one year before the date of the filing of the petition, by engaging in a pattern of conduct calculated to reduce or destroy the value of TCLLC by transferring assets of TCLLC to himself or to other entities controlled by him, including TCI.

8.  The Plaintiff satisfied his burden of proof under his claim for denial of Defendant's discharge under Count Fourteen (§ 727(a)(2)(B)) for concealment, destruction or mutilation of property of the estate with intent to hinder, delay or defraud a creditor or trustee, after the date of the filing of the petition, by devising or assisting in devising a plan to minimize the value of Defendant's 6% interest in North Forty Resort Corp. by transferring all assets of North Forty Resort Corp. To North Forty Resort, LLC.

**IT IS ORDERED** a separate Judgment shall be entered against the Defendant/Debtor Brendon Keith Retz, and in favor of Plaintiff Donald G. Abbey, denying Defendant/Debtor

Brendon Keith Retz a discharge of debts under 11 U.S.C. §§ 727(a)(4)(A) (Count Nine), §11

U.S.C. § 727(a)(2)(A) (Count Thirteen), 11 U.S.C. § 727(a)(2)(B) (Count Fourteen), 11 U.S.C. §

727(a)(4)(A) (Count Nine); 11 U.S.C. § 727(a)(5) (Count Eleven), and dismissing Counts Ten

and Twelve of the Second Amended Complaint.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana